WR-83,585-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/15/2015 4:12:09 PM
Accepted 7/16/2015 8:26:00 AM
ABEL ACOSTA
CLERK

No.        -          -___

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS

RECEIVED
COURT OF CRIMINAL APPEALS
7/16/2015
ABEL ACOSTA, CLERK

IN RE JANA DUTY,
RELATOR

IN HER OFFICIAL CAPACITY AS DISTRICT ATTORNEY
FOR THE STATE OF TEXAS, WILLIAMSON COUNTY

**RELATOR'S PETITION FOR WRIT OF MANDAMUS**
ORAL ARGUMENT NOT REQUESTED

TRIAL COURT CAUSE NUMBER 13-0826-K277
IN THE 368TH DISTRICT COURT
OF WILLIAMSON COUNTY, TEXAS
HON. RICK J. KENNON

**J. Woodfin Jones**
State Bar No. 10911700
ALEXANDER DUBOSE
JEFFERSON & TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303
wjones@adjtlaw.com

Brent Webster
State Bar No. 24053545
Assistant District Attorney
405 MLK Street, #1
Georgetown, Texas 78626
Telephone: (512) 943-1234
Facsimile: (512) 943-1255
bwebster@wilco.org

## IDENTITY OF PARTIES AND COUNSEL

**Relator** – Jana Duty, District Attorney, 405 M.L.K. Street, #1, Georgetown, Texas 78626.

**Counsel for Relator** – Brent Webster, Assistant District Attorney, Eric Gutierrez, Special Prosecutor, 405 M.L.K Street, #1, Georgetown, Texas 78626.

J. Woodfin Jones, Alexander, Dubose, Jefferson & Townsend, LLP, 515 Congress Ave., Suite 2350, Austin, TX 78701.

**Respondent** – Hon. Rick J. Kennon, Judge, 368th District Court, 405 M.L.K. Street, Georgetown, Texas 78626.

**Real Party in Interest** – Crispin James Harmel, represented in the underlying criminal prosecution by attorneys Kristen Jernigan, 207 S. Austin Ave., Georgetown, Texas 78626, Ryan Deck, 107 N. Lampasas, Round Rock, Texas 78664, and R. Scott Magee, 107 N. Lampasas, Round Rock, Texas 78664.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..........................................................i

TABLE OF CONTENTS.................................................................................ii

INDEX OF AUTHORITIES...........................................................................iv

STATEMENT OF THE CASE......................................................................... 1

STATEMENT OF JURISDICTION................................................................ 2

ISSUE PRESENTED........................................................................................ 2

STATEMENT OF FACTS ............................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................. 10

THE COURT SHOULD GRANT RELIEF THROUGH A
WRIT OF MANDAMUS ............................................................................... 11

ARGUMENT AND AUTHORITIES............................................................. 17

  I.  No Adequate Remedy at Law ................................................................. 17

  II.  Clear Entitlement to Relief ................................................................. 18

    A.  The gag order is an unconstitutional prior restraint ................................... 18

    B.  A court abuses its discretion when it places prior restraints on a party
      without following the two-pronged *Davenport* analysis............................ 20

      1.  The gag order contains no specific findings that an imminent and
        irreparable harm will deprive litigants of a just resolution of
        their dispute ................................................................................... 25

      2. The gag order is not the least restrictive means to prevent the harm ....... 27

C.  The State did not request or agree to the gag order signed by Respondent Court.............................................................................................29

D.  The gag order signed by the Respondent Court is void and therefore can be attacked by the State irrespective of any prior request or agreement ........32

E.  Relator and the public are harmed by the unconstitutional gag order ........36

PRAYER.........................................................................................................38

CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4 ........................40

CERTIFICATE PURSUANT TO TEX. R. APP. P. 52.3(j)...................................41

CERTIFICATE OF SERVICE ............................................................................42

iii

**FEDERAL CASES**

*Alexander v. U.S.,*
      509 U.S. 544 (1993)..................................................................................19

*Ex parte Siebold,*
      100 U.S. 371 (1879)..................................................................................33

*Gentile v. State Bar of Nevada,*
      501 U.S. 1030 (1991)..............................................................15, 16, 23, 37

*U.S. v. Brown,*
      218 F.3d 415 (5th Cir. 2000).............................................................23, 24, 25

**STATE CASES**

*Conlin v. Darrell Haun & Solarcraft, Inc.,*
      419 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2013)..............................34

*Davenport v. Garcia,*
      834 S.W.2d 4 (Tex. 1992)...................................12, 13, 18, 19, 21, 25, 27, 35

*Ex parte Foster,*
      71 S.W. 593 (Tex. Crim. App. 1903).......................................................12, 33

*Ex parte McCormick,*
      88 S.W.2d 104 (Tex. Crim. App. 1935) (orig. proceeding)..........................12

*Ex parte Tucci,*
      859 S.W.2d 1 (Tex. 1993)........................................................................21

*Grigsby v. Coker,*
      904 S.W.2d 619 (Tex. 1995)................................................................13, 31

*Henke v. Peoples State Bank of Hallettsville,*
      6 S.W.3d 717 (Tex. App.—Corpus Christi 1999, pet. dism'd w.o.j.)...........35

*In re Benton,*
      238 S.W.3d 587 (Tex. App.—Houston [14th Dist.] 2007, no pet.)..13, 23, 24

*In re Garza*,
  126 S.W.3d 268 (Tex. App.—San Antonio 2003, no pet.)...............33, 34, 35

*In re Graves*,
  217 S.W.3d 744 (Tex. App.—Waco 2007, no pet.)................................13, 22

*In re Jana Duty*,
  No. 03-15-00320-CV, 2015 Tex. App. LEXIS 5421
  (Tex. App.—Austin May 28, 2015, orig. proceeding) (mem. op.).................8

*In re Jana Duty*,
  No. 03-15-00360-CV, 2015 Tex. App. LEXIS 6082
  (Tex. App.—Austin June 17, 2015, orig. proceeding) (mem. op.)...............10

*In re Perritt*,
  992 S.W.2d 444 (Tex. 1999)....................................................................17

*Kennedy v. Eden*,
  837 S.W.2d 98 (Tex. 1992).....................................................................18

*Low v. King*,
  867 S.W.2d 141 (Tex. App.—Beaumont 1993, no writ)............................13

*Marketshare Telecom, L.L.C. v. Ericsson, Inc.*,
  198 S.W.3d 908 (Tex. App.—Dallas 2006, no pet.)...................................19

*Neveu v. Culver*,
  105 S.W.3d 641 (Tex. Crim. App. 2003), *subsequent mandamus
  proceeding sub nom. In re Neveu*, 14-07-00589-CV, 2007 WL 2198825
  (Tex. App.—Houston [14th Dist.] Aug. 2, 2007).........................................13

*Operation Rescue-Nat'l v. Planned Parenthood*,
  975 S.W.2d 546 (Tex. 1998)..........................................................20, 33, 34

*San Antonio Express-News v. Roman*,
  861 S.W.2d 265 (Tex. App.—San Antonio 1993, no writ)...............13, 19, 22

*State v. Patrick*,
  86 S.W.3d 592 (Tex. Crim. App. 2002)....................................................14

v

*State ex rel. Hill v. Court of Appeals for Fifth Dist.*,
 34 S.W.3d 924 (Tex. Crim. App. 2001).......................................................14

*State ex rel. Rosenthal v. Poe*,
 98 S.W.3d 194 (Tex. Crim. App. 2003).......................................................13

*State of Texas v. Wachtendorf*,
 No. 03-14-00633-CR, 2015 WL 894731 (Tex. App.—Austin
 Feb. 26, 2015) (*pet. granted* April 29, 2015, PD-0280-15)…......................30

*Walker v. Packer*,
 827 S.W.2d 833 (Tex. 1992).......................................................................14

## STATUTES

Tex. Crim. Proc. Code Ann. § art. 4.04 (Vernon 2015)...……………………………….2

Tex. Crim. Proc. Code Ann. § art. 44.01 (Vernon 2015)...………………………18

Tex. R. App. P. 72.......................................................................................2

## CONSTITUTIONS

Tex. Const. art. I, § 8.........................................................................11, 18, 19

Tex. Const. art. V, § 5 (amended 2001)…………………………………………….2

U.S. Const. amend. I...................................................................................18

## STATEMENT OF THE CASE

This mandamus proceeding arises out of the criminal prosecution of Crispin James Harmel, the Real Party in Interest, for the offense of Capital Murder. The Defendant's case is set for trial in November of 2015.

On April 9, 2015, the Respondent Court signed a gag order that broadly prohibits the parties, attorneys, and the attorneys' staff, from any communication with the media/press or publicly commenting about the case. The order excluded terms the State had previously requested, did not include any findings justifying its entry, and was not narrowly tailored, thereby violating the constitutional rights of Relator and more than 40 persons affected by the order. Also, the Respondent Court did not give notice to Relator that he had signed and entered a written gag order.

Subsequently, Relator, unaware that a written gag order had been signed, spoke to a member of the press solely for the purposes of defending herself against Defense Counsel's accusations of unethical conduct. Respondent Court then threatened to hold Relator in contempt of court. These threats continue, with a contempt hearing scheduled for July 23, 2015. At the time of filing this petition, there has been discussions to reschedule the hearing to a future date.

The State filed written motions asking the Respondent Court to withdraw the gag order and later petitioned the Third Court of Appeals to issue a writ of

1

mandamus vacating the order. The relief requested has been denied, both by Respondent Court and the Third Court of Appeals.

## STATEMENT OF JURISDICTION

Jurisdiction of this Honorable Court is invoked pursuant to Tex. Const. art. V, § 5 (amended 2001); Tex. Crim. Proc. Code Ann. § art. 4.04 (Vernon 2015); and Tex. R. App. P. 72.

## ISSUE PRESENTED

Whether Respondent was without authority or discretion to violate the free speech rights of Relator by failing, before entering a gag order, to hear evidence and make specific findings that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm.

## STATEMENT OF FACTS

On March 18, 2015, approximately two weeks preceding the anticipated start of the Defendant's jury trial, Defense Counsel filed a Pre-Trial Motion for Writ of Habeas Corpus, alleging that Relator, Williamson County District Attorney Jana Duty, representing the State, had committed prosecutorial misconduct by withholding timestamps from a surveillance video and by not disclosing the

2

timestamps to Defense Counsel until after the commencement of the first trial. *See* Appendix 1. Relator and the State have denied the misconduct accusations, asserting that the timestamps were included in the video provided to Defense Counsel and could have been viewed if played on a proper video player. *See* Appendix 18 at 229-230. The Respondent Court had granted the Defense's motion for mistrial without prejudice on May 7, 2014, ending Defendant's first trial in the manner Defense Counsel requested. *Id*. When granting the mistrial, the Respondent Court expressly stated on the record that there was no prosecutorial misconduct. *Id*.

After filing its Motion for Writ of Habeas Corpus, Defense Counsel granted several interviews with various local news organizations. *See* Appendix 14 at 24. Following the interviews, stories were published regarding the accusations with titles that included language such as "Prosecutor lied about evidence." *Id*. at 25. As a result of these interviews and considering the proximity of the stories being published to the anticipated trial date, the State made a general request at a hearing on March 20, 2015, that a gag order be issued in the case. *Id*. at 24. At the time of the March 20, 2015 hearing, the case was set for jury trial on March 31, 2015. *See* Appendix 1.

At that hearing, the parties preliminarily discussed with each other and the Respondent Court the issuance of a gag order. *See* Appendix 14. The State

3

contended that the Defense Counsel's media interviews put the State in a predicament: either not respond and have false allegations and misinformation continue to circulate unrebutted, or respond and run the risk of over-responding, which could lead to larger complications. *Id*. at 24-25. Mark Brunner, First Assistant District Attorney who is sitting second chair in the Real Party in Interest's case, made it clear to the Respondent Court that the attorneys representing the State would defend themselves from personal attacks and accusations derived from misinformation, just as the Defense Counsel would if any attacks or accusations were aimed at them by the State. *Id*. at 26-27.

The Respondent Court determined that the gag order issue would be taken up at the next pretrial hearing, and then scheduled the hearing for March 31, 2015. *Id*. at 28. The Respondent Court stated that any communications with the media until the March 31, 2015 hearing were prohibited. *Id*. The Respondent Court made clear a willingness to discuss at that hearing the scope of any limitations and restrictions that should be included in the gag order. *Id*.

At the end of the pretrial hearing on March 31, 2015, the Respondent Court again discussed the issuance of a gag order with the parties. *See* Appendix 15 at 74. Neither party opposed the issuance of a gag order. *Id*. The Respondent Court explained that the gag order would restrict all parties from discussing the case with the media or posting on any social media websites. *Id*. Additionally, the

4

Respondent Court agreed with the State that the gag order should also restrict Defense Counsel from discussing the case on the Williamson County Defense Lawyers Association listserv. *Id*. at 74-75. The Respondent Court then said the gag order "applies to [Defense Counsel]'s employees, anyone else you have hired, it applies to the DA's Office and anybody that's hired or with the DA's Office." *Id*. at 75. The Respondent Court directed Defense Counsel Jernigan to draft the gag order. *Id*. at 76. Ms. Jernigan responded that she would "take care of [it]." *Id*. at 76.

At the next pretrial hearing held on April 8, 2015, the Respondent Court noted that he had not received a draft of a written gag order from Defense Counsel. *See* Appendix 16 at 89. The following day, April 9, 2015, Defense Counsel drafted and e-mailed a proposed gag order to the Respondent Court and Mr. Brunner. *See* Appendix 4. Mr. Brunner did not discover the proposed gag order that had been e-mailed on April 9, 2015, and was unaware that it was signed by the Respondent Court later that same day. *See* Appendix 18 at 73. Relator, District Attorney Jana Duty, the first chair prosecutor on the Real Party in Interest's case, was not included on the email sent by Defense Counsel to Mark Brunner. *See* Appendix 4.

The gag order consists of a single sentence: "The parties, attorneys, and employees of the attorneys in this case are prohibited from communicating with

5

the press/media regarding this case or publicly commenting on this case during the pendency of the proceedings." *See* Appendix 2. The Respondent Court signed the proposed order on the same day that Defense Counsel Jernigan sent the email, April 9, 2015, and filed the order with the District Clerk on April 10, 2015. *See* Appendix 2. No hearing was held on April 9, 2015.

On May 6, 2015, Relator Jana Duty, still unaware that a written gag order had been signed, sent an e-mail to the Respondent Court notifying the court that Relator planned to contact a reporter at the Austin American Statesman because the reporter had recently published an online article about the Real Party in Interest's case referencing and including details from the Defense Counsel's latest pleading. *See* Appendix 8.2. In the e-mail, Relator stated that she would not discuss the facts of the case, but would only defend herself against the Defense Counsel's accusations against her. *Id.* The Respondent Court did not respond to this email. On May 6, 2015, the Austin American Statesman published an article containing quotes from Relator. *See* Appendix 8.3.

On May 7, 2015, at 5:22 p.m., the Respondent Court sent an e-mail to the parties on the case, stating that he wanted to meet with the parties sometime on May 8, 2015. *See* Appendix 8.4. Relator responded at 5:51 p.m. that she would be willing to rearrange her schedule to attend the meeting, but would like notice as to the topic of the meeting. *Id.* Without providing such notice, the Respondent Court

6

responded at 5:54 p.m. with a command to meet in the courtroom at 10:30 a.m. the following day. *Id*.

On May 8, 2015, the Respondent Court called the Real Party in Interest's case, saying he did not have another case number under which to call the proceeding at the time. *See* Appendix 17 at 4. The Respondent Court asked for Relator. *Id*. Mr. Brunner, who had appeared for the State at many previous hearings as the second chair prosecutor in the Defendant's case, told the Respondent Court that the State was present. *Id*. The Respondent Court declared that the State had two options at this point: either get ahold of Relator for her to appear before the court or the court would issue a capias for Relator's arrest to get her to the hearing. *Id*. Mr. Brunner again asked to know the subject matter of the hearing, to which the Respondent Court responded: "You'll know when she shows up." *Id*. at 5.

After a short recess, the hearing continued without Relator's presence. *Id*. at 5-6. The Respondent Court summarized events that had transpired in the past few months. *Id*. at 7-10. The Respondent Court then concluded that Relator's quotes in the article directly violated the gag order and that Relator's conduct constituted contempt of court. *Id*. at 11-12.

On May 12, 2015, the State filed a Motion to Rescind Unconstitutional Gag Order. *See* Appendix 3. In its motion, the State (1) argued that the gag order is

7

unconstitutional on its face under both the State and Federal Constitutions, (2) requested the Respondent Court to rescind and declare void the existing gag order, and (3) requested the Respondent Court to enter a valid gag order. *Id*. On May 14, 2015, the State filed a Motion to Enter a Constitutional Gag Order, re-urging the Respondent Court to rescind and declare void the existing gag order. *See* Appendix 5. The State attached a proposed, constitutionally valid gag order to its motion. *Id*.

On May 14, 2015, the Respondent Court filed a motion and affidavit laying out its intent to hold Relator in contempt for violating the gag order. See Appendix 8. On May 15, 2015, Relator was served with an Amended Order to Show Cause as to why she should not be held in contempt of court for violating the gag order. See Appendix 10. These documents include notice of a hearing on the show cause order set for July 6, 2015. See Appendix 7.

On May 27, 2015, Relator District Attorney Jana Duty filed her Petition for Writ of Mandamus with the Third Court of Appeals, requesting the Court to void the unconstitutional order and cease all contempt proceedings against Relator. *See* Appendix 12. On May 28, 2015, the Petition was denied. *In re Jana Duty*, No. 03-15-00320-CV, 2015 Tex. App. LEXIS 5421 (Tex. App.—Austin May 28, 2015, orig. proceeding) (mem. op.).

On May 29, 2015, the Respondent Court held a pre-trial hearing regarding the disqualification of the District Attorney's office and the Real Party in Interest's Writ of Habeas Corpus. *See* Appendix 18. At the hearing, Relator took the stand as a witness. Relator testified under oath that at the time she reached out to the reporter, she was unaware that a written gag order had been signed and entered in the case, as the proposed order was never sent to her and had been signed by the Respondent Court on the same day Defense Counsel sent it to the court. *Id*. at 31. Relator was not notified by Respondent Court that a written gag order had been signed and entered by the court. Relator testified that when she reached out to the reporter, she did not discuss the facts of the case, only the accusations that were made against her of withholding evidence. *Id*. at 35-36. On cross-examination, Relator further stated that she only contacted the reporter with respect to the accusations of withholding evidence, *not* the facts of the case. *Id*. at 74.

The State orally requested the Respondent Court to rule on its previously filed motions regarding the gag order. *Id*. at 95. The Respondent Court summarily denied the State's motions, basing its decision on the doctrine of estoppel. *Id*. at 96-97. The Respondent Court did not address the unconstitutionality of the existing gag order in denying the State's motion. *Id*. at 97. The Respondent Court went on to state that if the State wanted to enter a subsequent gag order, the State would have to present evidence at a hearing to justify the specific findings that

9

would be included in the order. *Id*. at 97. On May 29, 2015, the Respondent Court issued an Order denying the State's motions with respect to the gag order. *See* Appendix 6. It is this May 29, 2015 order denying the State's motion that forms the procedural basis for this mandamus petition.

On June 9, 2015, Relator filed a second Petition for Writ of Mandamus with the Third Court of Appeals, requesting the Court to void the unconstitutional gag order and cease all contempt proceedings against Relator. *See* Appendix 13. On June 17, 2015, the court of appeals denied the Petition. *In re Jana Duty*, No. 03-15-00360-CV, 2015 Tex. App. LEXIS 6082 (Tex. App.—Austin June 17, 2015, orig. proceeding) (mem. op.).

## SUMMARY OF THE ARGUMENT

Respondent Court is without authority or discretion to violate Relator's free speech rights by entering a gag order without first hearing evidence and making appropriate specific findings based on that evidence, pursuant to the Texas Supreme Court's holding in *Davenport* and this Court's holdings in *Ex Parte Foster* and *Ex Parte McCormick*. Although the State had made a general request for a gag order, the State did not request the Respondent Court to enter the unconstitutional gag order prepared by Defense Counsel here. Respondent Court signed and entered Defense Counsel's gag order shortly after receiving it. The gag

10

order, which consisted of a one-sentence blanket prohibition that constitutes a broad prior restraint on the speech of the Relator and multiple others, lacks any of the specific findings required by law, is not narrowly tailored, and does not use the least restrictive means to achieve the goals of the order. This renders the gag order unconstitutional and void. Because the Respondent Court is without authority or discretion to bypass the process of hearing evidence and making specific findings supported by that evidence, this Court should grant the requested mandamus relief.

———————◆———————

## THE COURT SHOULD GRANT RELIEF THROUGH A WRIT OF MANDAMUS

Relator is petitioning this Court to mandamus the Respondent Court for entering an unconstitutional and void gag order that infringes on the constitutional rights of Relator, a trial participant. This Court should grant Relator leave, hear this Petition for Writ of Mandamus, and reaffirm the oft-repeated standard for the protection of free speech rights granted to all Texas citizens by the Texas Constitution. Tex. Const. art. I, § 8. The Respondent Court refused to withdraw its gag order even in the face of well-settled Texas law regarding orders that restrict a person's free speech rights under the Texas Constitution. That well-settled law has been articulated by the Texas Supreme Court citing holdings made by this Court as precedent for its conclusion that injunctions that place prior

11

restraints on speech are presumed unconstitutional unless the trial court hears evidence and makes specific findings that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *See Davenport v. Garcia*, 834 S.W.2d 4, 9-12 (Tex. 1992) (citing *Ex parte McCormick,* 88 S.W.2d 104 (Tex. Crim. App. 1935); *Ex parte Foster*, 71 S.W. 593 (Tex. Crim. App. 1903)). In the present case, the Respondent Court made no findings whatsoever pertaining to the gag order at issue.

Although this Court has not ruled on whether mandamus relief should be granted when a court places prior restraints on free speech of trial participants, which was the issue in *Davenport,* this Court has addressed the issue of prior restraints on free speech in criminal cases. *See Ex parte McCormick*, 88 S.W.2d 104 (Tex. Crim. App. 1935) (orig. proceeding); *Ex parte Foster*, 71 S.W. 593 (Tex. Crim. App. 1903). In both cases, this Court found prior restraints unconstitutional under Section 8 of the Texas Constitution and declared the trial court orders void. *McCormick,* 88 S.W.2d at 107; *Foster,* 71 S.W. at 596. Furthermore, in many cases, the Texas Supreme Court and several Texas courts of appeals have granted mandamus relief in both civil and criminal cases in determining that the injunction at issue was an unconstitutional prior restraint and declared the gag order void. *See, e.g., Davenport,* 834 S.W.2d 4, 8-10 (Tex. 1992); *San Antonio Express-News*

12

*v. Roman*, 861 S.W.2d 265, 266 (Tex. App.—San Antonio 1993, no writ); *In re Benton*, 238 S.W.3d 587, 592 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *In re Graves*, 217 S.W.3d 744, 747-748 (Tex. App.—Waco 2007, no pet.); *Grigsby v. Coker*, 904 S.W.2d 619 (Tex. 1995); *Low v. King*, 867 S.W.2d 141 (Tex. App.—Beaumont 1993, no writ). Relator is unaware of a Texas case, with facts similar to this case, where a gag order restricting the speech of trial participants has been held to be constitutional when contested by a trial participant.

Every court that has addressed this issue on mandamus has determined that a trial court abuses its discretion if it does not make specific findings supported by evidence before entering a gag order that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *See Davenport*, 834 S.W.2d at 10.

Mandamus relief may be granted if the relator can demonstrate that: (1) the act that relator seeks to compel is purely ministerial, and (2) relator has no other adequate legal remedy. *Neveu v. Culver*, 105 S.W.3d 641, 642 (Tex. Crim. App. 2003), *subsequent mandamus proceeding sub nom. In re Neveu*, 14-07-00589-CV, 2007 WL 2198825 (Tex. App.—Houston [14th Dist.] Aug. 2, 2007) (citing *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 198 (Tex. Crim. App. 2003)). This Court has alternatively stated that, in order to be entitled to a writ of mandamus, the

13

relator must demonstrate that: (1) there is no other adequate legal remedy, and (2) there is a clear and indisputable right to the relief sought. *State v. Patrick*, 86 S.W.3d 592, 594 (Tex. Crim. App. 2002) (citing *State ex rel. Hill v. Court of Appeals for Fifth Dist.*, 34 S.W.3d 924, 927 (Tex. Crim. App. 2001)).

The ministerial-act requirement has been described as a requirement that the relator has "a clear right to the relief sought," meaning the relief sought must be "clear and indisputable" such that its merits are "beyond dispute" with "nothing left to the exercise of discretion or judgment." *State ex rel. Hill*, 34 S.W.3d at 927-928. A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992).

When a trial court enters a gag order, that court does not have the authority or discretion to summarily skip the requirement to hear evidence and make specific findings. The Relator here is not asking this Court to review findings that involved discretion by the Respondent Court; indeed, such a review would be impossible, since there was no effort by Respondent Court to make any findings at all. Relator is instead asking this Court to grant mandamus relief on the basis that no evidence was heard, no findings were made, and the gag order is not the least restrictive means to prevent any anticipated harm.

Finally, this Court should grant the petition in this case because the public is harmed by allowing an unconstitutional gag order to continue in effect. In *Gentile*, Justice Kennedy articulated that prior restraints on speech of trial participants affect the public's ability to have an informed opinion about criminal proceedings. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035 (1991). The *Gentile* Court articulated why the public's right to information is important in a criminal proceeding:

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations. *See, e.g.*, *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838-839 (1978). "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). Public vigilance serves us well, for "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.... Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver*, 333 U.S. 257, 270-271 (1948) . . .
>
> . . . .
>
> In *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966), we reminded that "[t]he press ... guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."
>
> . . . *see Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 606 (1976) (Brennan, J., concurring in judgment) ("[C]ommentary on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern"), or where, as is also the present circumstance, the criticism questions the judgment of an elected public prosecutor. Our system grants prosecutors vast discretion at all stages of the criminal process, *see*

*Morrison v. Olson*, 487 U.S. 654, 727-728 (1988) (SCALIA, J., dissenting). The public has an interest in its responsible exercise.

*Gentile*, 501 U.S. at 1035-36.

The public in Williamson County has a right to accurate information regarding criminal cases, including the actions of Relator, the public's elected District Attorney. If this Court allows the present void gag order to stay in place, the public will be hampered in having complete and accurate knowledge.[1] For example, if a newspaper, television station, or blog decides to present a story about this case and reports inaccurate or false information, the current gag order prevents all parties from issuing any type of press release, press conference, or other measure to correct the false information. In this case, false allegations of unethical conduct were made by Defense Counsel against Relator, the elected District Attorney. The public is harmed when it does not have both sides of the story as it relates to allegations of wrongdoing against the elected prosecutor and her staff. This is exactly the type of harm Justice Kennedy was concerned about in *Gentile*.

———————◆———————

---

[1]Ironically, while the Respondent Court summarily restricted the free speech of the parties, the court e-mailed a member of the press on June 27, 2015, to correct what the court believed to be an inaccurate story about actions the court had or had not taken in the underlying case. The Respondent Court instructed the newspaper to "take the article down." *See* Appendix 11.

16

## ARGUMENT AND AUTHORITIES

### I. No Adequate Remedy at Law

The Respondent Court has issued a gag order preventing all parties, including Relator, from talking to the press or the public about Cause Number 13-0826-K277. The State has an obligation to approach the trial court and ask that court to address the State's objection to the order before petitioning for a writ of mandamus. *In re Perritt*, 992 S.W.2d 444, 446 (Tex. 1999). The State has attempted to fulfill this obligation by submitting two separate motions to the Respondent Court before petitioning for a writ of mandamus. The first written motion objected to the May 12, 2015 gag order and asked the Respondent Court to rescind that order because it is unconstitutional and void. *See* Appendix 3. The second motion re-urged the Respondent Court to withdraw the April 9, 2015 gag order and apply the *Davenport* analysis to enter a constitutional gag order. *See* Appendix 5. At a hearing on May 29, 2015, the State requested the Respondent Court to rule on its two motions to void the existing gag order. *See* Appendix 18 at 95. The Respondent Court orally denied the motion.[2] *Id*. at 95-96. That same day,

_____

[2] During the hearing where the State objected to the gag order on May 29, 2015, the Respondent Court demonstrated that he understood that the ruling in *Davenport* should apply to gag orders but refused to apply it to the one that was entered. After denying state's motion to vacate or void the earlier gag order, the court stated, "If you want to enter a different gag order, then you need to put on evidence that meets all the criteria that you wanted in the proposed gag order that you filed in your other motion. But you would have to present evidence that would justify those findings in order to enter that particular order." *See* Appendix 18 at 97. The Respondent Court's

17

the Respondent Court signed a written order denying the State's Motion to Void Gag Order. *See* Appendix 6.

The State can only pursue relief by way of an extraordinary writ before this Court. The State has no right to appeal the Respondent Court's ruling. *See* Tex. Crim. Proc. Code Ann. § art. 44.01 (Vernon 2015). The harm suffered from an order restraining the speech of the Relator could not be repaired on appeal. *Kennedy v. Eden*, 837 S.W.2d 98, 99 (Tex. 1992). The State cannot challenge the Respondent Court's ruling by way of an application for a writ of habeas corpus, and the Texas Legislature has set up no administrative remedy whereby the State can challenge the Respondent Court's ruling.

## II.  Clear Entitlement to Relief

### A.  The gag order is an unconstitutional prior restraint

The protection of a person's free speech rights is firmly rooted in the United States and Texas Constitutions, with Texas providing even greater rights of free expression than its federal analogue. *See Davenport v. Garcia*, 834 S.W.2d 4, 8-10 (Tex. 1992); *see* U.S. Const. amend. I. The Texas Constitution provides, "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege, and no law shall ever be passed

---

refusal to apply *Davenport* to his first gag order but insistence that it apply to future gag orders demonstrates an even greater need for mandamus relief.

curtailing the liberty of speech or of the press." Tex. Const. art. I, § 8.

An order of a court that forbids communications before they occur constitutes a prior restraint on speech. *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 917 (Tex. App.—Dallas 2006, no pet.); *see also Alexander v. U.S.*, 509 U.S. 544, 550 (1993) (A prior restraint on speech is an "administrative and judicial order forbidding certain communications when issued in advance of the time that such communications are to occur."). Prior restraints on speech are presumptively unconstitutional. *Davenport*, 834 S.W.2d at 10; *San Antonio Express-News*, 861 S.W.2d at 267.

The Texas Supreme Court has described gag orders as injunctions. *See Davenport*, 834 S.W.2d at 6. ("The trial court correctly characterized as a 'gag order' its oral injunction…").[3] This is important because the constitutionality of

---

[3] Black's Law Dictionary defines injunctions in a way that is reflected in the *Davenport* ruling:

"A court order commanding or preventing an action. To get an injunction, the complainant must show that there is no plain, adequate, and complete remedy at law and that an irreparable injury will result unless the relief is granted.
. . . .
'In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing. An injunction has also been defined as a writ framed according to the circumstances of the case, commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience; as a remedial writ which courts issue for the purpose of enforcing their equity jurisdiction; and as a writ issuing by the order and under the seal of a court of equity." 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2–3 (1909).'" *Black's Law Dictionary* 855 (9th ed. 2011).

injunctions are to be judged even more strictly than the review of legislative action. *Operation Rescue-Nat'l v. Planned Parenthood*, 975 S.W.2d 546, 559-560 (Tex. 1998). It appears that most of the case law regarding injunctions was developed through civil cases, as this is a common remedy in civil law; most criminal cases do not have the need or place for injunctions.

The Respondent Court's gag order signed on April 9, 2015, constitutes a prior restraint on the future speech of all persons in this case, including the "parties, attorneys, the employees of the attorneys in this case." *See* Appendix 2. This order broadly places prior restraints on more than 40 persons,[4] all of whom are deserving of the protections found in the Texas and United States Constitutions. More specifically, the order restricts Relator District Attorney Jana Duty's free speech rights and causes her actual and affirmative harm. *See* discussion *infra* Part II.E. An unconstitutionally broad order such as the one signed by the Respondent Court does not give the parties who are subject to the order adequate notice as to how or why their rights are being restricted.

**B. A court abuses its discretion when it places prior restraints on a party without following the two-pronged *Davenport* analysis**

The Respondent Court did not have the authority or discretion to ignore the

---

[4] Including the defense attorneys, their employees, the defendant, the elected District Attorney, all of the employees of the District Attorney's office, and the special prosecutors currently employed at the District Attorney's office, there are more than 40 individuals affected by this order.

20

*Davenport* test when issuing the gag order. The failure to hear evidence and make findings supported by that evidence is sufficient grounds alone to grant mandamus relief.

*Davenport* involved an oral injunction, later put in writing, in a protective order which constituted a gag order that was ultimately declared void as unconstitutional. *Davenport*, 834 S.W.2d at 6, 10. There, the supreme court held that a trial court abuses its discretion if it does not make specific findings supported by evidence before entering a gag order that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *Id*. at 10; *see also Ex parte Tucci*, 859 S.W.2d 1, 5-6 (Tex. 1993). *Davenport* fully recognized that a prior restraint can withstand scrutiny under the court's two-part test only "under the most extraordinary circumstances." *Davenport*, 834 S.W.2d at 10. The court reasoned that this result is consistent with the mandate of the Texas Constitution recognizing the broad right to freedom of expression in Texas. *Id*. Without taking the steps necessary to make specific findings and without actually making any specific findings, a gag order is unconstitutional and void for violating the parties' rights to free speech. *Id*. at 11.

The Fourth Court of Appeals has applied the *Davenport* test with respect to the constitutionality of gag orders in criminal cases. *See San Antonio Express-*

*News*, 861 S.W.2d at 268 (mandamus conditionally granted requiring trial court to rescind unconstitutional order prohibiting relator, newspaper that claimed its state constitutional rights had been violated, from publishing names of two witnesses). The Tenth Court of Appeals gave the following reason for applying the *Davenport* test in a criminal case,

> The Court of Criminal Appeals often relies on the decisions of the Supreme Court of Texas when addressing matters of state constitutional law. *See, e.g., Luquis v. State*, 72 S.W.3d 355, 364-65 (Tex. Crim. App. 2002); *Ex parte Mitchell*, 977 S.W.2d 575, 580 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 131 (Tex. Crim. App. 1996). The Supreme Court reciprocates. *See Davenport*, 834 S.W.2d at 14 ("We give thoughtful consideration to that court's analysis in part to avoid conflicting methods of constitutional interpretation in our unusual system of bifurcated highest courts of appeal."); *see also Yanes v. Sowards*, 996 S.W.2d 849, 852 (Tex. 1999) (per curiam). Therefore, we shall apply *Davenport* in this case.

*Graves*, 217 S.W.3d at 749.

Here, the Respondent Court did not have the authority or discretion to completely skip hearing evidence and making findings supported by that evidence, as *Davenport* requires. In fact, the Respondent Court applied no test, heard no evidence, and made no findings at all. The court merely enacted a blanket restriction on all communication, no matter how tenuous it might be in relation to the case. This act unconstitutionally violates Relator's free speech rights and that of 40 other individuals.

Not only is the Respondent Court without authority or discretion to take

22

such action, but the court's action affirmatively creates harm. Without the protections that are embodied in the procedure laid out in *Davenport*, the harm that can be done by a gag order spreads far and wide and subjects many individuals to violations of a broad injunction without any notice. The findings are necessary to put the 40 individuals, who were not all in court, on notice as to the specifics of what they are barred from doing and justifies the bar. Without those findings, those individuals are left without direction. *See* discussion *infra* Part II.E.

The gag order entered by the Respondent Court also fails the federal test regarding prior restraints, similar to the *Benton* gag order. In *In re Benton*, the trial court issued a gag order prohibiting a juvenile, her trial attorneys, and the attorneys' agents and employees from discussing the juvenile's criminal case. *See Benton*, 238 S.W.3d at 598. The Fourteenth Court of Appeals noted that "Texas courts have consistently applied a higher standard when reviewing prior restraints of speech." *Id*. at 597. The *Benton* Court compared the more stringent *Davenport* test and the federal test applied to prior restraints under the U.S. Constitution and found that the gag order at issue there failed even the lower federal standards articulated in *U.S. v. Brown* and *Gentile v. State Bar of Nevada*. *See Benton*, 238 S.W.3d at 597 (citing *U.S. v. Brown*, 218 F.3d 415 (5th Cir. 2000) and *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991)). The *Benton* court concluded that it did not need to do an analysis under the *Davenport* test because the gag order did

not meet the federal constitutional minimum requiring the order to be "narrowly-tailored to avert a substantial likelihood of material prejudice." *Benton*, 238 S.W.3d at 597.

Under the federal test applied in *Benton*, preclusion against all communication as ordered by Respondent Court would certainly not be consistent with a "narrowly tailored" order. *Id*. Here, the Respondent Court made no effort to determine that *all* communications "regarding this case," which the gag order here prohibits, had the substantial likelihood to cause material prejudice to the case.

The Respondent Court's gag order is distinguishable from the gag order examined in *U.S. v. Brown* that was ultimately upheld under federal law. *Brown*, 218 F.3d at 432. Unlike the Respondent Court's "no comment" gag order on an elected official, the sua sponte *Brown* gag order left various avenues of expression accessible to the elected official, who was under indictment at the time. *Id*. at 418. The various avenues of expression included assertions of innocence, general statements about the nature of an allegation or defense, and statements of matters of public record. *Id*. at 429-430. Additionally, the district court imposing the order made special allowances for Brown's re-election campaign by lifting most of the order for the duration of the campaign. *Id*. at 430. The *Brown* court ultimately found that the order provided sufficient guidance regarding the nature of the

24

prohibited comments to survive a constitutional challenge. *Id*.

In contrast, the Respondent Court in this case has failed to apply any test, failed to conduct any analysis to narrowly tailor its order, failed to hear any evidence before entering the order prepared by the defense, and failed to make any findings justifying the gag order. The decision not to make any findings or conduct any analysis to support a prior restraint on the free speech rights of an elected official and more than 40 persons is either outside the Respondent Court's authority or is a clear abuse of discretion.

## 1. The gag order contains no specific findings that an imminent and irreparable harm will deprive litigants of a just resolution of their dispute

Under the first prong of *Davenport*, the trial court must make "specific findings supported by evidence" that an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute. *Davenport*, 834 S.W.2d at 10. This first prong is based on the state constitutional preference for post-speech remedies. *Id*. In *Davenport*, the Supreme Court identified several shortcomings with the trial court's order:

> The orders fail to identify any miscommunication that the trial court may have perceived, does not indicate any specific, imminent harm to the litigation, and offers no explanation of why such harm could not be sufficiently cured by remedial action. For instance, had any miscommunication stemmed from improper statements by Relator, as implied by the court, the proper response may have been to sanction her conduct.

25

*Id*. at 11. Similar to the respondent in *Davenport,* the Respondent Court here failed to make *any* "specific findings" detailing the nature or extent of the pretrial publicity in the Real Party in Interest's case or how the pretrial publicity would adversely impact the right to a fair and impartial jury.

The Respondent Court did not have the authority or discretion to bypass an examination of the relevant evidence and a determination of whether or not public statements would cause imminent and irreparable harm to the litigants. Had the gag order addressed the harm that might occur to the jury trial scheduled two weeks after the State originally made its request, the Respondent Court would at least have attempted to comply with the first prong of *Davenport*. Instead, the gag order prepared by Defense Counsel and signed by the Respondent Court did not even attempt to give the illusion that an analysis and finding had been made under any test designed to protect free speech rights. If the Respondent Court fails to determine what the harm will be under the first prong of the test, it is logically impossible to determine the least restrictive means to prevent that harm, because the harm to the judicial process is undefined. The Respondent Court acted outside his authority or committed a clear abuse of discretion by issuing a gag order without making specific findings to support a prior restraint on the parties' rights to free expression.

**2. The gag order is not the least restrictive means to prevent the harm**

Similar to the respondent in *Davenport*, the Respondent Court failed to make *any* findings about how and why the gag order is the least restrictive means to prevent any anticipated harm. Without those findings, the existing gag order is not narrowly tailored and is comparable to the unconstitutional gag order in *Davenport*. The written *Davenport* gag order summarily stated, in part: "Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing." *Davenport*, 834 S.W.2d at 6. The *Davenport* court found, "By stopping not only the purported miscommunications but *any* communications, the broadly worded injunction certainly fails the second part of our test." *Id*. at 11. Here, the Respondent Court's gag order is a blanket prohibition against communication with the press or making public comments "regarding this case," which is essentially identical to the "any communications" prohibition found in *Davenport*. *Id*. There is no substantive difference between the gag order in *Davenport* and the gag order issued by the Respondent Court in the present case. The Respondent Court's gag order should be set aside because a blanket prohibition of all communication necessarily fails the second part of the *Davenport* test. *Id*.

The Respondent Court's gag order is the opposite of "least restrictive" in the breadth of prior restraint that it places on more than 40 persons. As worded, the

27

gag order would preclude any communication that can be connected to the case in any way, no matter how tenuous. For example, if opposing counsel made unfounded allegations in subsequent pleadings in the Real Party in Interest's cause number against Relator or any other employee in the District Attorney's office, the broad unconstitutional gag order would prevent any public response to said allegation, no matter how tenuous or far removed such allegations might be from the facts or law of the underlying case. Thus, the Respondent Court's gag order would allow the damage caused by the unfounded but publicized allegations to stand, causing harm to the elected District Attorney and potentially any other party who is precluded from publicly responding to the false allegations. In addition, the existing gag order is so broadly written that it could be construed as applying to any communication about the contempt proceeding initiated against Relator. Thus, any attempts by Relator to defend herself publicly or to the press regarding that proceeding could subject Relator to further contempt proceedings by the Respondent Court.

It is important to note that while ordering such an expansive gag order, the Respondent Court failed to include restrictions it had orally mentioned during the March 31, 2015 hearing, which would have placed specific restrictions on Defense Counsel's ability to communicate about their case through the Williamson County Defense Attorney Association's list-serve. *See* Exhibit 15 at 74. The State

requested such a restriction due to concerns about communications to the Defense Association as a "backdoor" around the gag order. *Id*. at 74-75.

**C. The State did not request or agree to the gag order signed by Respondent Court**

There has been no request or agreement by the State in this case regarding the existing gag order. It is uncontroverted that earlier in the process the State made a general request that a gag order be entered; however, there was no agreement regarding the necessary findings to be made, the appropriate language to be used, or the specific gag order that was to be signed by the Respondent Court. See Appendix 18 at 71-72. The State was not given a reasonable opportunity to be heard once the gag order was drafted by Defense Counsel. Asking generally for a gag order and agreeing to the specific terms of such an order are two different things, because the specific terms of the order, including necessary findings, are the heart and substance of the order. *See* discussion *infra* Part II.C.

Defense Counsel e-mailed the proposed gag order on April 9, 2015, to the Respondent Court and First Assistant Mark Brunner, and the court signed the order that same day. *See* Appendix 2. There was no hearing held on that day. It would be an absurd result if "agreement" to the terms of a proposed order could be established by emailing a party a proposed order and then immediately obtaining a

29

judge's signature on that order without giving the other side a reasonable opportunity to review the order.

Furthermore, Relator, Jana Duty, stated under oath that the proposed order was never sent to her and that she was unaware of its existence. See Appendix 18 at 73. Not only was it not sent to her, but the Respondent Court did not send the State any notice that the court had signed a written gag order.[5] Relator further testified that she believed that a valid gag order, even if it prohibited her from discussing the facts of the case, would still allow her to respond to accusations that she violated ethical rules and intentionally withheld evidence. Id. at 35-36. Relator's testimony demonstrates the fundamental lack of any agreement between the parties with respect to the language of the gag order.

Equally telling, the absence of restrictions prohibiting Defense Counsel from discussing the case with the local defense bar association's listserv demonstrates the lack of any agreement regarding the final written gag order. *See* Appendix 15 at 74-75. Nor does the existing gag order include the State's proposed restriction that the parties not discuss the case on social media. *Id*. at 74. Given this lack of

---

[5] The Respondent Court has a history of *not* notifying the State of orders the Court has signed. In *State of Texas v. Wachtendorf,* No. 03-14-00633-CR, 2015 WL 894731 (Tex. App.—Austin Feb. 26, 2015) (*pet. granted* April 29, 2015, PD-0280-15), recently in the Third Court of Appeals and currently pending before this Court, the Respondent Court signed an order, dated it on the same day it was signed, and then waited to file it with the District Clerk until the time for appeal for the State had passed. Under binding case law at the time of this filing, the State is prevented from an appeal in this instance.

30

agreement as to numerous details, the present gag order should be treated as an ex parte order or a sua sponte order and not as an agreed order to which both parties have signed off on the terms.

This case is procedurally similar to *Grigsby v. Coker*, where one party requested a gag order (authorized under the family code), but the court did not enter a written gag order until seven weeks later. *Grigsby*, 904 S.W.2d at 621. There, the Texas Supreme Court discussed the abuse of discretion procedurally: "The faults in this gag order are likely a function of the procedure, or lack of procedure, used in adopting it: no formal motion, no prior notice, and no formal hearing or evidence. There is no indication that exigent circumstances warranted an abbreviation in procedures authorized by section 11.11, when seven weeks passed between the date the trial court stated it would issue a gag order and the date the order was signed." *Id*. at 621. In the present case, the Respondent Court did not follow any procedure in entering the gag order, and, as discussed above, was without authority or discretion to discard the procedure.

Thus, the State did not invite error because it did not request or agree to the gag order that was signed by the Respondent Court. The fact that the State earlier requested a *different* gag order does not constitute a request for this one. To hold otherwise would be like holding that a general suggestion by the State of the need for a definition of a term in a jury charge constitutes a request or agreement for *a*

*specific, incorrect* definition. That cannot be the law. Accordingly, the State has not waived its right to challenge this gag order by inviting error.

Accordingly, the only way this Court could conclude that the State requested or agreed to the specific gag order signed by the Respondent Court would be to find that when 1st Assistant District Attorney Mark Brunner failed to respond within a few hours to Defense Counsel's e-mail, the State had thereby "agreed" to the Order included in that e-mail. Such a conclusion would not only be unfair, it would be inconsistent with the fact that the gag order drafted by Defense Counsel and signed by the Respondent Court did not include the restrictions and terms the State had requested in the preliminary hearings leading up to the order. And finally, the failure of one of Relator's employees to respond immediately to an e-mail simply cannot waive the constitutional rights of Relator or the 40 individuals affected by this gag order.

**D. The gag order signed by the Respondent Court is void and therefore can be attacked by the State irrespective of any prior request or agreement**

As explained above, there was never an agreement as to the specific terms or scope of a gag order, and at no time did Relator, Jana Duty, invite error by requesting or agreeing to the gag order that the Respondent Court signed and entered. Even if there had been such a request or agreement, however, the State would not be precluded from challenging the gag order here.

32

A court, like a public official, should not be permitted to take action contrary to the constitution. In *Ex parte Siebold*, the Supreme Court articulated this principle: "[I]f the laws are unconstitutional and void, the Circuit Court acquired no jurisdiction of the causes. Its authority to indict and try the petitioners arose solely upon these laws." *Ex parte Siebold*, 100 U.S. 371, 377 (1879). This Court has applied a similar principle to prior-restraint injunctions, holding: "[W]e accordingly hold that the court *had no power* to prohibit the publication of the testimony of the witnesses in the case, and that his act in punishing the relator for contempt for violating that order was without jurisdiction, and was consequently void." *Ex parte Foster*, 71 S.W. at 596 (emphasis added). If a court does not have the power to unconstitutionally enjoin someone, and is thus without jurisdiction to enforce a gag order, then it must be that the court is without discretion to take either action.

The Respondent Court had no authority to enter the gag order under the facts in this case. Not only are unconstitutional injunctions void, they are subject to even stricter scrutiny than when a court is examining the constitutionality of statutes. The Texas Supreme Court, in examining whether an injunction violated free speech rights, summarized, "We are therefore persuaded, as the Supreme Court has been, that injunctive restrictions must be judged more strictly than legislative restrictions." *Operation Rescue-Nat'l*, 975 S.W.2d at 559. This result

33

is only logical in that an injunction functions as a law would on the persons who are enjoined. Any action an enjoined person takes in contravention of that injunction would subject that person to consequences similar to the way that any action taken in contravention of a statute would subject a person to consequences. However, unlike a law that has gone through a democratic process to be put in effect, an injunction is put in effect by one person. Therefore, when a single government actor puts an injunction in place, and that injunction infringes or violates the enjoined person's constitutional rights, a court reviewing that injunction should judge it more strictly than a legal restriction that was democratically enacted. *Id*. at 559. Since Respondent Court had no power to enter an unconstitutional order, that court should be prohibited from persisting in the enforcement of an unconstitutional order.

The gag order is therefore void. Thus, even if there had been a specific request or agreement by the State (which there was not), the gag order entered by Respondent Court is still void, with no force or effect. If a gag order is unconstitutional and void, then any agreement to enter that order is likewise void. *See In re Garza*, 126 S.W.3d 268, 271 (Tex. App.—San Antonio 2003, no pet.) ("A void order has no force or effect and confers no rights; it is a mere nullity . . . . Thus, a party who agrees to a void order has agreed to nothing.").

Because a gag order is a type of injunction, *In re Garza* is persuasive. *See Conlin v. Haun*, 419 S.W.3d 682, 687 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Our sister court, the Fourteenth Court of Appeals, has followed *In re Garza* …. We likewise find *In re Garza* persuasive and follow it and *In re Corcoran* here. Accordingly, the Conlins are not estopped from complaining about the 'Agreed Temporary Injunction' order's failure to comply with the mandatory requirements of Rule 683."). *In re Garza* held that a trial court abuses its discretion in holding a litigant in contempt for violating a void injunction even though the litigant had agreed to the specific terms of the injunction entered. *Garza*, 126 S.W.3d at 273. That case involved a family business dispute between Trevino and his cousin Garza. *Id*. at 269. The trial court entered a temporary injunction preventing Garza from depleting his assets during litigation. *Id.* The trial court ultimately signed a "Judgment of Contempt" after an evidentiary hearing in which evidence showed Garza borrowed $112,000 against a homestead protected by the injunction to pay for her legal fees. *Id*. at 270. The judgment ordered Garza to effectuate a release of lien and pay Trevino's attorney's fees and costs of the proceedings. *Id*.

When Garza challenged the validity of the injunction, Trevino argued that Garza was barred from complaining that the injunction was erroneous because he had agreed to its precise terms. *Id*. at 270-271. Trevino argued the general rule

35

that a party may not appeal from or attack a judgment to which he has agreed, absent proof of fraud, collusion, or misrepresentation. *Garza*, 126 S.W.3d at 270-271 (citing *Henke v. Peoples State Bank of Hallettsville*, 6 S.W.3d 717, 720 (Tex. App.—Corpus Christi 1999, pet. dism'd w.o.j.)). The *Garza* court determined that *Henke* was distinguishable in that the underlying order in *Henke* was not void, whereas the *Garza* injunction was found to be void. *Id*. at 271.

Stating that "a party who agrees to a void order has agreed to nothing," the *Garza* court held that Garza had not waived her right to attack the void order. *Id*. In the present case, the Respondent Court's void gag order should be treated the same as the void injunction order in *Garza*. *See Davenport*, 834 S.W.2d at 11 (judicially imposed gag orders that are found to be unconstitutional are *void*). On this additional basis, Relator has not waived her right to attack the gag order here.

## E. Relator and the public are harmed by the unconstitutional gag order

Relator's constitutional rights are harmed daily, as the gag order silences the elected District Attorney from responding to allegations against her, regardless of how false or tenuous they may be. Relator is not just an attorney in private practice who is mostly outside the realm of public scrutiny. Relator is a democratically elected official and holds a position in which all of her actions are judged by the public and have an impact on community safety in Williamson County. The Respondent Court has not just placed a prior restraint on an

36

individual; he has placed a prior restraint on the free speech rights of an elected official, within a year of the coming primary election for the position of Williamson County District Attorney.

Beyond the harm of not being able to defend herself against false accusations, Relator suffers affirmative harm to her reputation from the void gag order when the gag order is improperly used to attack her through the vehicle of contempt. Furthermore, Relator is caught in a "catch-22" in that if she attempts to respond to allegations against her regarding the void gag order, or responding to any other allegation of wrongdoing whatsoever, she subjects herself to the Respondent Court pursuing additional contempt proceedings for violating the void order.

The Respondent Court made clear his intent to hold Relator in contempt for violating the gag order on May 8, 2015. *See* Appendix 17 at 10-11. The Respondent Court now insists on having another hearing on July 23, 2015, in an attempt to repeat what occurred on May 8, 2015. *See* Appendix 10. The mere allegation of contempt causes damage to an attorney's reputation. Allegations of wrongdoing and misconduct against elected officials also cause damage, regardless of the false nature of the allegations. The fact that the very gag order being used to find Relator in contempt prevents Relator from responding to false allegations or correcting misunderstandings in the press further compounds this injury. There is

no benefit to allowing the Respondent Court to continue to hold a void gag order over Respondent's head by attempting to hold her in contempt for alleged violations of that order.

Finally, as Relator addressed at the beginning of this petition, the citizens of Williamson County are harmed when they do not have both sides of the story as it relates to allegations of wrongdoing against their elected District Attorney and her staff. Our democracy is contingent upon an informed electorate, and when one of our elected officials is summarily silenced by an unconstitutional gag order, democracy suffers. *Gentile*, 501 U.S. at 1035-36.

## PRAYER

The blanket gag order entered by the Respondent Court is unconstitutional on its face, overly broad, and does not comply with the requirements, recognized in *Davenport*, for specific findings and supporting evidence. The existence of such findings and evidence are essential for the protection of the parties' free speech rights under the Federal and Texas Constitutions. For these reasons, Relator asks this Court to declare the Respondent Court's April 9, 2015 gag order unconstitutional and void and order it withdrawn.

Respectfully submitted,

*/s/ J. Woodfin Jones*
J. Woodfin Jones
State Bar No. 10911700
ALEXANDER DUBOSE
JEFFERSON & TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303
wjones@adjtlaw.com

*/s/ Brent Webster*
Brent Webster
State Bar No. 24053545
Assistant District Attorney
Williamson County, Texas
405 MLK Street, #1
Georgetown, Texas 78626
Telephone: (512) 943-1234
Facsimile: (512) 943-1255
bwebster@wilco.org

*/s/ Eric Gutierrez*
Eric Gutierrez
State Bar No. 24089267
Special Prosecutor
Williamson County, Texas
405 MLK Street,  #1
Georgetown, Texas 78626

39

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 9, 313 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

*/s/ Brent Webster*_____
Brent Webster
State Bar No. 24053545
Assistant District Attorney
Williamson County, Texas
405 MLK Street, #1
Georgetown, Texas 78626
Telephone: (512) 943-1234
Facsimile: (512) 943-1255
bwebster@wilco.org

## CERTIFICATE PURSUANT TO TEX. R. APP. P. 52.3(j)

I have reviewed the foregoing petition and state that the factual statements therein are supported by competent evidence included in the appendix and/or filed with the petition.

*/s/ Brent Webster*_____
Brent Webster
State Bar No. 24053545
Assistant District Attorney
Williamson County, Texas
405 MLK Street, #1
Georgetown, Texas 78626
Telephone: (512) 943-1234
Facsimile: (512) 943-1255
bwebster@wilco.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2015, I electronically filed the foregoing document with the clerk of the court for the Court of Criminal Appeals, using the efile.txcourts.gov system. Via that system, a "Notice of Electronic Filing" was sent to the Respondent Court, Hon. Rick J. Kennon, 368th District Court, 405 M.L.K. Street, Georgetown, Texas 78626 at rkennon@wilco.org and to the Real Party in Interest's attorneys of record, Kristen Jernigan, 207 S. Austin Ave., Georgetown, Texas 78626 at kristen@txcrimapp.com, Ryan Deck, 107 N. Lampasas, Round Rock, Texas 78664 at ryandecklaw@gmail.com, and R. Scott Magee, 107 N. Lampasas, Round Rock, Texas 78664 at scott@mageefirm.net.

*/s/ Brent Webster*_____
Brent Webster
State Bar No. 24053545
Assistant District Attorney
Williamson County, Texas
405 MLK Street, #1
Georgetown, Texas 78626
Telephone: (512) 943-1234
Facsimile: (512) 943-1255
bwebster@wilco.org

42

No.      -        -___

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS

---

IN RE JANA DUTY,
RELATOR

IN HER OFFICIAL CAPACITY AS DISTRICT ATTORNEY
FOR THE STATE OF TEXAS, WILLIAMSON COUNTY

---

**APPENDIX AND MANDAMUS RECORD**

---

TRIAL COURT CAUSE NUMBER 13-0826-K277
IN THE 368TH DISTRICT COURT
OF WILLIAMSON COUNTY, TEXAS
HON. RICK J. KENNON

---

J. Woodfin Jones
State Bar No. 10911700
ALEXANDER DUBOSE
JEFFERSON & TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303
wjones@adjtlaw.com

Brent Webster
State Bar No. 24053545
Assistant District Attorney
405 MLK Street, #1
Georgetown, Texas 78626
Telephone: (512) 943-1234
Facsimile: (512) 943-1255
bwebster@wilco.org

# APPENDIX AND MANDAMUS RECORD

Applicant's Pre-Trial Motion for Writ of Habeas Corpus and Request for Hearing..................................................................................................Tab 1

Gag Order..................................................................................................Tab 2

State's Motion to Rescind Unconstitutional Gag Order.....................................Tab 3

Response/Clarification to State's Motion to Rescind Gag Order.......................Tab 4

State's Motion to Enter a Constitutional Gag Order..........................................Tab 5

Order Denying State's Motion to Void Gag Order.............................................Tab 6

Notice of Hearing to Show Cause......................................................................Tab 7

Motion to Hold Jana Duty in Contempt.............................................................Tab 8

     Affidavit of Judge Rick J. Kennon.......................................................Tab 8.1

     Jana Duty E-mail, "On-line AAS Story," May 6, 2015........................Tab 8.2

     Austin American Statesman Article, dated May 6, 2015......................Tab 8.3

     E-mail Thread, "Re: Harmel," May 7-8, 2015......................................Tab 8.4

Order to Show Cause.........................................................................................Tab 9

Amended Order to Show Cause.......................................................................Tab 10

Kennon E-mail to Parties, June 27, 2015.........................................................Tab 11

1st Memorandum Opinion, In re Jana Duty, 3rd Court of Appeals....................Tab 12

2nd Memorandum Opinion, In re Jana Duty, 3rd Court of Appeals..................Tab 13

Reporter's Records
Reporter's Record, Status Hearing, March 20, 2015.......................................Tab 14

Reporter's Record, Motion to Disqualify, March 31, 2015............................Tab 15

Reporter's Record, Motion to Disqualify DA, April 8, 2015.........................Tab 16

Reporter's Record, Contempt of Court, May 8, 2015....................................Tab 17

Reporter's Record, Writ Hearing, May 29, 2015..........................................Tab 18

State Statutes
Tex. Crim. Proc. Code art. 4.04……….........................................................Tab 19

Tex. Crim. Proc. Code art. 44.01.................................................................Tab 20

Tex. R. App. P. Rule 72................................................................................Tab 21

Constitutions

Tex. Const. art. I, § 8..................................................................................Tab 22

Tex. Const. art. V, § 5.................................................................................Tab 23

U.S. Const. amend. I....................................................................................Tab 24

**No. _____**

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS

**IN RE JANA DUTY,**

**Relator.**

Original Proceeding from the
TRIAL COURT CAUSE NUMBER 13-0826-K277
IN THE 368TH DISTRICT COURT
OF WILLIAMSON COUNTY, TEXAS
HON. RICK J. KENNON

**AFFIDAVIT OF BRENT WEBSTER**

STATE OF TEXAS           §
                         §
COUNTY OF WILLIAMSON §

**BEFORE ME,** the undersigned authority, on this day personally appeared Brent Webster, who is personally known to me and, who, after being duly sworn according to the law, deposed and said:

"My name is Brent Webster. I am of sound mind, over the age of twenty-one (21) years old, capable of making this affidavit, have never been

convicted of a felony, and have personal knowledge of the facts stated herein and affirm that the following is true and correct.

"I am an attorney of record for the State of Texas in State vs. Crispin James Harmel, Cause No. 13-0826-K277, in the 368th District Court, Williamson County, Texas (the "underlying suit"). I have reviewed the pertinent pleadings, orders, exhibits, reporter's records, and other documents in and related to the underlying suit.

"I have reviewed each and every document contained in the Appendix and Mandamus Record. Each document is a true and correct copy of the original or of a copy received by Relator from Real Parties in Interest, the Respondent, or the court reporter."

FURTHER, AFFIANT SAYETH NOT.

_____
Brent Webster

SUBSCRIBED AND SWORN TO BEFORE ME on this __15__ day of July, 2015, to certify which witness my hand and seal of office.

Notary Public
State of Texas
Ronnie James Simek
My Commission Expires
March 19, 2017

_____
Notary Public in and for the State of Texas

No. 13-0826-K277

FILED
at 2.6 o'clock P M
MAR 1 8 2015
Lisa David
District Clerk, Williamson Co., TX.

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 368th JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY |

## APPLICANT'S PRE-TRIAL MOTION FOR
## WRIT OF HABEAS CORPUS
## AND REQUEST FOR HEARING

COMES NOW, Crispin James Harmel, hereinafter referred to as Applicant, by and through his attorneys of record, Kristen Jernigan, Ryan Deck, and R. Scott Magee, and files this, his Applicant's Pre-Trial Motion for Writ of Habeas Corpus. In support of said motion, Applicant would show this Honorable Court the following:

### Background

On May 9, 2013, Applicant was indicted for the offenses of capital murder, aggravated kidnaping, and aggravated robbery. *See* Exhibit A. The State proceeded to trial on that indictment and on April 28, 2014, trial began. On May 7, 2014, the trial court granted a mistrial after it was discovered Applicant and his counsel were not provided with a copy of a Walmart surveillance video with timestamps. *See* Exhibit B at 25. On March 4, 2015,[1] Applicant was re-indicted for capital murder. *See* Exhibit C. In the re-indictment, the State alleges that Applicant committed capital murder by choking,

---

[1] The heading of the indictment indicates that it was handed down by the January 2013 Grand Jury of the 277th District Court although it was handed down on March 4, 2015. Contemporaneous with the filing of the instant application, Applicant has filed a Motion to Quash the Indictment.

1

strangling, or impeding the circulation of the blood of the victim by applying pressure to the victim's neck or by blocking her nose or mouth with a ligature, his hand, his hands, or an unknown object while committing or attempting to commit the offenses of kidnaping, robbery or aggravated sexual assault of the victim. *See* Exhibit C.

### *Availability of Pre-Trial Writ of Habeas Corpus*

It is well-settled that an accused may apply for a pre-trial writ of habeas corpus on double jeopardy grounds. *Ex parte Watkins*, 73 S.W.3d 264, 273-74 (Tex. Crim. App. 2002); *Headrick v. State*, 988 S.W.2d 226, 228 (Tex. Crim. App. 1999). In *Abney v. United States*, the United States Supreme Court observed that the preferred procedural vehicle for review of a double jeopardy claim was a pretrial writ of habeas corpus because:

> The rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence. To be sure, the Double Jeopardy Clause protects against being twice convicted for the same crime, and that aspect of the right can be fully vindicated on appeal following final judgment, as the Government suggests. However, the Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense.

*Abney v. United States*, 431 U.S. 651, 660-61 (1977).

### *Relevant Facts*

In the original trial, the defense was predicated primarily on a surveillance video obtained from a Walmart security camera. *See* Exhibit B at 7, Exhibit D at 147-48. The video that was provided to the defense, when played on the player provided by the State,

2



did not contain timestamps and based on trial counsels' review of the video, there were thirteen hours of surveillance. Based on that assumption, trial counsel argued that Applicant could not have been with the victim at the time she was attacked. Prior to trial, on April 13, 2014, counsel made a request in writing for a time-stamped copy of the video based on indications in the offense report that a time-stamped copy existed. *See* Exhibit E. The District Attorney, Jana Duty, replied on that same date that the video that she had, that she gave a copy to trial counsel, "is not time stamped." *See* Exhibit F. She continued, "I would like a time stamped copy myself, but that is not what I was given." *See* Exhibit F. On April 14, 2014, Ms. Duty sent a follow-up email indicating that Detective Pando "brought over another copy of the Wal-Mart videos and none of them are time stamped." *See* Exhibit G.

At trial, defense counsel focused their opening statement and cross-examination of the State's witnesses based on the copy of the video they received that did not contain timestamps. *See* Exhibit B at 7, Exhibit D at 150. Detective Larry Bond, the sponsoring witness of the video was called to testify on Friday, May 3, 2013 and completed his direct examination that day. *See* Exhibit B at 7. On Monday, May 6, trial counsel cross-examined Detective Bond regarding the defensive theory based on the video given to trial counsel. *See* Exhibit B at 6-7. On re-direct, the State then produced a video that contained timestamps. *See* Exhibit B at 5-7; Exhibit D at 139-40. Defense counsel expressed his frustration that First Assistant District Attorney Mark Brunner's re-direct focused on how silly the cross-examination of Bond was in light of the time-stamped

3



video. *See* Exhibit D at 151-52. Counsel pointed out the unfairness of attacking Applicant's defense with evidence it requested, but was not provided. *See* Exhibit D at 152. The State represented to the Court that they had learned to play the video with new software on Friday, May 3, 2013, but despite this fact, they never informed trial counsel of their discovery. *See* Exhibit B at 5-7, Exhibit D at 139-40. When confronted with the fact that the State never produced a time-stamped copy of the video, Brunner stated that he referenced the March player during Bond's direct testimony and that "It's only after I did some damage to their lovely cross that we're upset." *See* Exhibit D at 152. The Court stated "I'm not going to fault the Defense for the delay of trying to figure out where we are right now. I'm not going to fault them for that." *See* Exhibit D at 152.

As for Ms. Duty, she stated on the record, "For the past year, I've been working on the same system that he has. I've also been very frustrated by not having this. I have sent e-mails to Detective Pando, hey, there's a reference to time-stamps. He's like, when it downloads onto the disc, that we give you, that's how it downloads. Sorry. That's the way you've got it. We weren't purposefully hiding anything." *See* Exhibit D at 148-49. However, in a telling exchange, after the Court indicated its concern that the defense did not have the ability to prepare a defense, Brunner stated, "Your Honor, had they come to us pre-trial and said, Hey, we can't open this up. You're talking about time-stamps here, and there is this player, it's not working. We go on the March System, we can't get online because we're not law enforcement. We could have had this hearing two, three months ago. And I would have said, 'I'll bend whatever copyright rules I need to bend

4



for you, gentlemen, I'll get you that player.'" *See* Exhibit D at 150. The trial court had to point out to Brunner that according to Brunner's version of events, "But you didn't know then." *See* Exhibit D at 150.

When discussing the prejudice to Applicant, Defense Counsel stated that he was ill-prepared based on the State's presentation of a previously requested, but not produced piece of evidence, that deprived Applicant of a fair trial. *See* Exhibit D at 159. Counsel continued that the State's re-direct of Detective Bond unfairly made the defense "look bad." *See* Exhibit D at 159. To which Brunner replied, "Your Honor, it's part of my job to make them look [bad].[2] That's what trial is for." *See* Exhibit D at 159.

Because of the surprise and obvious prejudice to the defense, trial counsel requested a mistrial, which the court granted. *See* Exhibit B at 24-25. At the time, the mistrial was granted without prejudice because, despite the State's failure to inform Applicant of the existence of a time-stamped copy of the video until the re-direct testimony of Detective Bond, there did not, at the time, appear to be any other misconduct on the part of the State. *See* Exhibit B at 24.

Since the mistrial in this case, it has come to the attention of the undersigned that the State did in fact have a time-stamped video and did not disclose it to the defense. Royger Harris, a former investigator with the Williamson County District Attorney's Office has submitted an affidavit which indicates that prior to May of 2013, Harris, Jana Duty, and Vicki Vickers reviewed the case file of Applicant's previous conviction for

---

[2] The Reporter's Record reflects the word used was "back," but it is clear from the context of the comments that the word used was "bad."

5

credit card abuse in anticipation for an upcoming parole hearing. *See* Exhibit H. Harris, Duty, and Vickers reviewed the evidence submitted by the investigating agency including case reports, photos, and videos. *See* Exhibit H. One of the videos included within the casefile was a Walmart surveillance video on CD. *See* Exhibit H. The CD was located in a CD sleeve in a large binder and included within the sleeve were instructions on how to download the video and included the program for downloading the video. *See* Exhibit H. Approximately a day or two later, Harris downloaded the program onto Jana Duty's computer in her office in order to play the video. *See* Exhibit H. Harris and Duty then watched the Walmart surveillance video and reviewed the offense reports while watching the video to compare the offense reports with the video. *See* Exhibit H. The surveillance video included timestamps which allowed them to compare the timestamps with the offense report. *See* Exhibit H. Harris then took the video and the program to download the video to his office computer so that he could review it further since there were many hours of surveillance. *See* Exhibit H. A few days later, Harris went to Duty's office and found her watching the surveillance video with the timestamps on it. *See* Exhibit H. Duty expressed that she was concerned with a specific sequence of the tape because she thought Applicant might have had a taser in his hand and asked Harris to find a way to enhance that specific sequence and referenced the timestamp. *See* Exhibit H. Harris sent the video to the Round Rock Police Department to see if they could enhance it. *See* Exhibit H. Detective John Rowe notified Harris that they attempted to enhance several still shots, but they could not. *See* Exhibit H. Harris discussed with Duty the fact that

6



Harmel's attorney would need a copy of the video along with the instructions for playing it, otherwise he would not be able to play the video with the timestamps. *See* Exhibit H. Duty stated "I got this, don't worry about it." *See* Exhibit H.

Mr. Harris's affidavit is supported by the Case Supplemental Report entered by Detective John Rowe of the Round Rock Police Department. *See* Exhibit I. In his report, Detective Rowe details that he was contacted by Mr. Harris, while he was still employed at the Williamson County District Attorney's Office, and asked to review the Walmart surveillance video in an attempt to enhance a portion of the video. *See* Exhibit H. Detective Rowe was given "a DVD and a print out of times and corresponding actions as viewed from the Wal-Mart surveillance video." *See* Exhibit I. On November 17, 2014, trial counsel and licensed private investigator Inna Aguilar met with Detective Rowe and he clarified that when he watched the video, there were actual times, not a counter, on the videotape. *See* Exhibit J. During that meeting, Detective Rowe indicated his willingness to sign an affidavit to that effect. *See* Exhibit J. On Friday, March 13, 2015, the undersigned, Kristen Jernigan, met with Detective Rowe and they discussed the fact that the video he received contained timestamps. Together, they drafted a proposed affidavit, which Detective Rowe indicated was true and correct. *See* Exhibit K. Detective Rowe indicated that he wanted to show the affidavit to District Attorney Jana Duty before signing it and as long as she was "fine with it," he would sign it and return it. However, later that day, Detective Rowe called the undersigned and advised that the District Attorney had suggested he not sign the affidavit because it was overbroad and that he

7



should be called to testify instead.

### *Standard of Review*

It has long been held that the Fifth Amendment's Double Jeopardy Clause protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). Generally, when a trial court grants a mistrial at a defendant's request, double jeopardy does not bar a retrial. *Id.* at 672-73. However, double jeopardy bars a retrial where the prosecutor's conduct was intentional in provoking the request for a mistrial. *Id.* at 679. In determining whether the State intended to provoke the defense into moving for a mistrial, the Court should consider "the objective facts and circumstances of the prosecutor's conduct and the events which led to that conduct." *Ex parte Peterson*, 117 S.W.3d 804, 815 (Tex. Crim. App. 2003), overruled in part on other grounds *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007).

### *Analysis*

In this case, there can be no question that the State committed prosecutorial misconduct because it intentionally withheld a crucial piece of evidence despite a clear pre-trial request in writing for that evidence. On top of that, the State sandbagged Applicant by presenting that evidence at the last possible moment after listening to defense counsel give its opening statement and cross-examine witnesses based on the misrepresentation by the State that there were no timestamps on the video.

8



Next, the State clearly provoked the request for mistrial in this case because what else would anyone expect an attorney to do mid-trial, learning of a piece of evidence that changed the entire theory of their defense? Even if the State disputes the sworn testimony of Harris and the official Case Supplement Report of Detective Rowe, the State cannot argue in good faith that they did not intend the result when it is uncontested that they waited three days before revealing the existence of the timestamps and sprung them on defense counsel only after they cross-examined the sponsoring witness of the video.

It is possible that the State provoked the mistrial in an attempt to have a trial run at a cold-case, circumstantial evidence case where the theory was that the victim died of "delayed strangulation." Up to the point of the mistrial, defense counsel had made significant headway in showing Applicant was not present when the alleged offense took place. In addition, the theory of delayed strangulation, where witnesses testified they saw the victim walking around and talking after the alleged attack took place, has only been presented in a handful of jurisdictions and to varied results. The record reflects that after the mistrial was granted, First Assistant District Attorney Mark Brunner asked the Court, "Your Honor, if I may, just a suggestion: As if it was the end of trial, I know the jurors have been here forever and – I'd appreciate the chance to – I'm sure Counsel would, too, on the opposing side, to chat with them if they wish to stick around so that we can find out, again, what worked, what didn't work, what they had questions about." *See* Exhibit B at 25-26.



9

When considering "the objective facts and circumstances of the prosecutor's conduct and the events which led to that conduct," it becomes apparent that the State provoked the request for mistrial in this case. *See Oregon v. Kennedy*, 456 U.S. 667, 679 (1982); *Ex parte Peterson*, 117 S.W.3d 804, 815 (Tex. Crim. App. 2003), overruled in part on other grounds *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). Therefore, Double Jeopardy should bar a retrial in this case. *See Oregon v. Kennedy*, 456 U.S. 667 at 679.

### *Request for Hearing*

Based on the unavailability of Detective Rowe's sworn testimony by affidavit, Applicant requests a hearing on his Application for Pre-Trial Writ of Habeas Corpus. Applicant anticipates other witnesses may be called to testify at the hearing as well.

### PRAYER

WHEREFORE, premises considered, Applicant prays that this Court grant his Pre-Trial Motion for Writ of Habeas Corpus.

Respectfully submitted,

Kristen Jernigan
State Bar Number 90001898
207 S. Austin Ave.
Georgetown, Texas 78626
(512) 904-0123
(512) 931-3650 (fax)
kristen@txcrimapp.com

10



Ryan Deck
State Bar Number 24040781
107 N. Lampasas
Round Rock, Texas 78664
(512) 251-8920
(512) 251-2279 (fax)
ryandecklaw@gmail.com

R. Scott Magee
State Bar Number 24010204
107 N. Lampasas Street
Round Rock, Texas 78664
(512) 983-1675
(512) 354-7538 (fax)
scott@mageefirm.net

## CERTIFICATE OF SERVICE

I, Kristen Jernigan, attorney for Applicant Crispin James Harmel, do hereby affirm that a copy of the foregoing Applicant's Motion for Pre-Trial Writ of Habeas Corpus was hand-delivered to Jana Duty and Mark Brunner at the Williamson County District Attorney's Office on March 18, 2015.

Kristen Jernigan

11



No. 13-0826-K277

| THE STATE OF TEXAS | § | IN THE 368th JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY |

## ORDER

Applicant's Motion for Pre-Trial Application for Writ of Habeas Corpus is hereby:

_____ GRANTED                          _____ DENIED

ORDERED, this the _____ day of _____.

_____
Hon. Rick J. Kennon
Presiding Judge
368th District Court
Williamson County, Texas

12



| Capital Murder | 19.03 PC | Capital Felony |

Re- Indictment in the 277th Judicial
District Court of Williamson County,
Texas

No. 13-0826-K277

SID: TX06398134

DA CONTROL NO. 13-00905

# STATE OF TEXAS
## V.
## CRISPIN JAMES HARMEL

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The Grand Jury for the January 2013 term of the 277th Judicial District Court of Williamson County, Texas, having been duly selected, empaneled, sworn, charged and organized, presents and declares that, before the presentment of this indictment that,

## Capital Murder

on or about the 7th day of September, 2009, in Williamson County, Texas, Crispin James Harmel, hereinafter the "defendant," intentionally caused the death of Jessika Lynn Kalaher, by choking, strangling or by impeding the normal breathing or circulation of the blood of Jessika Lynn Kalaher by applying pressure to Jessika Lynn Kalaher's throat or neck or by blocking Jessika Lynn Kalaher's nose or mouth with the defendant's hand, hands, a ligature or an unknown object, in the course of committing or attempting to commit kidnapping, robbery, or aggravated sexual assault of Jessika Lynn Kalaher,

## Deadly Weapon Notice

And the State further gives notice that the defendant used or exhibited a deadly weapon, namely, **the defendant's hand, hands, a ligature or other unknown object**, during the commission of a felony offense or during immediate flight therefrom, or was a party to the offense and knew that a deadly weapon would be used or exhibited,

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Witness District Attorney

Foreman of the Grand Jury

FILED
at 11:25 o'clock AM

MAR 04 2015

District Clerk, Williamson Co., TX.



# EXHIBIT A



| Count 1: Capital Murder | 19.03 PC | Capital |
| Count 2: Aggravated Kidnapping | 20.03 PC | 1st Degree Felony |
| Count 3: Aggravated Robbery | 29.03 PC | 1st Degree Felony |

Indictment in the 277th Judicial District
Court of Williamson County, Texas

No. 13-0826-K277

SID: TX06398134

DA CONTROL NO. 13-00905

# STATE OF TEXAS
# V.
# CRISPIN JAMES HARMEL

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The Grand Jury for the January 2013 term of the 277th Judicial District Court of Williamson County, Texas, having been duly selected, empaneled, sworn, charged and organized, presents that before the presentment of this indictment,

### Count One

on or about the 7th day of September, 2009, in Williamson County, Texas, Crispin James Harmel, hereinafter "defendant," intentionally cause the death of Jessika Lynn Kalaher, by choking, strangling or by impeding the normal breathing or circulation of the blood of Jessika Lynn Kalaher by applying pressure to Jessika Lynn Kalaher's throat or neck or by blocking Jessika Lynn Kalaher's nose or mouth, in the course of committing or attempting to commit kidnapping, robbery, or aggravated sexual assault, of Jessika Lynn Kalaher,

### Count Two

And the Grand Jury further presents that on or about the 7th day of September, 2009, in Williamson County, Texas, Crispin James Harmel, hereinafter "defendant,"

#### Paragraph One

intentionally or knowingly abducted Jessika Lynn Kalaher, namely, restricted the movements of Jessika Lynn Kalaher without Jessika Lynn Kalaher's consent, by force, intimidation, or deception, so as to interfere substantially with Jessika Lynn Kalaher's liberty, by moving Jessika Lynn Kalaher from one place to another or confining Jessika Lynn Kalaher, with intent to prevent Jessika Lynn Kalaher liberation by secreting or holding Jessika Lynn Kalaher in a place where Jessika Lynn Kalaher was not likely to be found, or by using or threatening to use deadly force,

#### Paragraph Two

intentionally or knowingly abducted Jessika Lynn Kalaher, namely, restricted the movements of Jessika Lynn Kalaher without Jessika Lynn Kalaher's consent, by any means, namely, forcing Jessika Lynn Kalaher into a vehicle, by holding Jessika Lynn Kalaher captive, by choking, strangling or by impeding the normal breathing or circulation of the blood of Jessika Lynn Kalaher by applying pressure to Jessika Lynn Kalaher's throat or neck or by blocking Jessika Lynn Kalaher's nose or mouth, so as to interfere substantially with Jessika Lynn Kalaher's liberty, by moving Jessika Lynn Kalaher from one place to another or



confining Jessika Lynn Kalaher, with intent to prevent Jessika Lynn Kalaher liberation by secreting or holding Jessika Lynn Kalaher in a place where Jessika Lynn Kalaher was not likely to be found, or by using or threatening to use deadly force,

And said acts were done with intent to facilitate the commission of a felony, namely, robbery, or aggravated sexual assault,

## Count Three

And the Grand Jury further presents that on or about the 7th day of September, 2009, in Williamson County, Texas, Crispin James Harmel, hereinafter "defendant,"

### Paragraph One

in the course of committing theft and with intent to obtain or maintain control of property, intentionally, knowingly, or recklessly caused serious bodily injury to Jessika Lynn Kalaher by choking, strangling or by impeding the normal breathing or circulation of the blood of Jessika Lynn Kalaher by applying pressure to Jessika Lynn Kalaher's throat or neck or by blocking Jessika Lynn Kalaher's nose or mouth,

### Paragraph Two

in the course of committing theft and with intent to obtain or maintain control of property, intentionally, knowingly, or recklessly caused bodily injury to Jessika Lynn Kalaher by choking, strangling or by impeding the normal breathing or circulation of the blood of Jessika Lynn Kalaher by applying pressure to Jessika Lynn Kalaher's throat or neck or by blocking Jessika Lynn Kalaher's nose or mouth, and used or exhibited a deadly weapon, namely, the defendant's hand, hands or other unknown object,

## Deadly Weapon Notice

And the State further gives notice that the defendant used or exhibited a deadly weapon, namely, the defendant's hand, hands or other unknown object, during the commission of a felony offense or during immediate flight therefrom, or was a party to the offense and knew that a deadly weapon would be used or exhibited,

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Foreman of the Grand Jury

Witness: District Attorney

FILED
at 3:50 o'clock p.m.

MAY 09 2013

District Clerk, Williamson Co., TX.



# EXHIBIT B



(Open court, Defendant present, 10:18 a.m.)

THE COURT: Back on the record in Cause No. 13-0826-K277, State versus Crispin James Harmel.

Let the record reflect that counsel for the State is here, and counsel for the Defense, as well as the Defendant, Mr. Harmel.

We're all in the courtroom, but the jury has not been brought in as of yet.

Okay. I understand that there's a Defense motion; is that correct?

MR. DECK: That's correct, Judge.

THE COURT: Okay. And we need to put something on the record with regard to that; is that right?

MR. DECK: That's probably correct, Judge.

THE COURT: Okay. Go ahead.

MR. DECK: Judge, the Defense moves for a motion for mistrial without prejudice. The reasons, as alleged in the motion, Judge, is that we were only provided a video -- or two videos. We asked -- we were not able to play them.

We asked, How can we play them?

The State then gave us a software that allowed us to play them. They did not have time-stamps



with that software.

I specifically asked Ms. Duty in an e-mail I referred to, "Detective Dailey has a report dated 9/9. He discussed the Wal-Mart video and has exact times for different events. The report reads as if he was using a time-stamped video. I'm wondering if there is a TIME-STAMPED" -- in all caps -- "TIME-STAMPED version of the videos. If there is, I would like a time-stamped version of the videos."

The response from Ms. Duty on April 13th was, "Finally, the Wal-Mart video that I have, that you have a copy of, is not time-stamped. I would like a time-stamped copy myself, but that is not what I was given. I will ask Dailey" -- as in Detective Dailey -- "about it tomorrow and get back to you."

Later that same night, April 13th -- or excuse me, I apologize.

The next day, Monday, April 14th, Ms. Duty did respond again, and she said, quote, "Detective Pando brought over another copy of the Wal-Mart videos, and none of them are time-stamped. He says that he recalls when they were uploading the video at the store that the time-stamp was incorrect (the clock was wrong). Because they have a copy of the receipt for the dog food, the detectives were able to count off the exact minutes

between events in the footage."

From that information, Judge, the Defense was under the impression that there was no time-stamps available for that particular -- for those videos.

In the middle of trial, over the weekend, as I understand it, Mr. Brunner and Ms. Duty then found that there was, indeed, a version -- a software version that would reveal time-stamps. Those -- Mr. Brunner nor Ms. Duty did -- they did not call the Defense and inform the Defense immediately that they had finally found a way to view the videos with time-stamps.

I want to be very clear, the Defense was unaware that there was encrypted information in the videos that were given to us. Had the Defense known that there was encrypted information in the videos, i.e., the time-stamps, we would have done our investigation and we would have been able to find out -- someone or a software that would unlock that encryption. We did not know about that.

The State learned about that this weekend. They never told us about it when trial started. They didn't give us a call and say, Hey, we found -- you know, We found the software that unlocks the encrypted information.

That did not happen. Trial started and

information was elicited, and at that point in time, Judge, the State -- or the Defense had been -- had been unfairly prejudiced.

Had we known about this information, Judge, had we known about it, we would have tailored our defense entirely differently. The opening statement would have been different, we would not have spent three hours cross-examining Detective Bond -- which by the way, for the record, Detective Bond was cross-examined after that weekend, after that weekend in which the State knew that there was a way to unlock the encrypted information. Had we been given a call or something to that effect, we could have then went in and said, Whoa, Mr. Magee, we're going to have to change up our cross-examination.

That did not happen. And the bottom line is, Judge -- and I do not fault -- I want to say this for the record and for everyone listening, I do not fault Ms. Duty or Mr. Brunner in terms of doing anything underhanded. That is not what I am alleging today.

But what I am alleging, what I am saying emphatically, is that when I asked Ms. Duty for that information, the time-stamps, she said she was going to talk to Detective Dailey.

Detective Dailey has a report, as I

mentioned in my e-mail, where he specifically says "time-stamp."

But according to the e-mail response -- and I could be wrong, but according to the e-mail response, Ms. Duty did not speak to Detective Dailey. She spoke so Detective Pando. Detective Pando knew nothing about it, even though he's the lead detective in the entire case.

The other thing is, Judge, the State knew all along, I believe, based on the reports, that it was going to be Detective Bond -- Detective Bond who was going to elicit testimony about the timeline. What I don't understand is, why wouldn't the State then ask Detective Bond about the time-stamps.

Ultimately, Judge, what I'm saying is, one, they should have supplemented their discovery immediately. That did not happen. If they make -- if they make an argument that the information was given to us, the problem with that argument is, the information was given to us encrypted. We would not know and we didn't know it was encrypted.

And the bottom line is, Judge, Ms. Duty and Mr. Brunner, they had a duty, once -- first of all, pursuant to the discovery order, and also when I asked specifically for that -- for that information, they had

a duty to ask the right person in the CCPD.

Now, she could have wrote back and said, You know what, Ryan, I'm not going to do your work for you. Either get an order from the Judge or I'm not going to do anything.

Instead, what she writes, very specifically, is, I spoke to Detective Pando, we don't have it.

So am I then supposed to not trust Ms. Duty and then go speak to all these other detectives and say, Hey, you know, Ms. Duty said the sky was blue and I don't believe it, so let me ask a few questions?

No. I relied -- to my detriment, to my client's detriment, who is facing life in prison, I relied on Ms. Duty's representation that it had been taken care of, it had been discussed.

So whatever Mr. Brunner is about to discuss, I want to make sure we're very clear the video given to us was encrypted. And what's more, we did not know it was encrypted. And so therein lies the problem, Judge; this is an unfair surprise.

And, of course, I'm not going to go through all the stuff alleged in my motion. I will say for the record that everything I allege in my motion, you know, is -- are the reasons for my mistrial. The

reason why I'm making an argument here today, Judge, is so that I can say it to your face in open court why I believe that this client, this gentleman, this Defendant cannot get a fair trial.

The State can't make an argument that, We gave it to the Defense, but it's encrypted and we didn't tell them.

Think about that. Let's think about what would happen.

Judge, I gave everything to them.

You did? That's great.

Well, it's encrypted. We didn't let them know it was encrypted.

That's a problem. That is not complying with discovery. And to find out about it over the weekend and then not calling us and saying, Hey, Ryan, by the way, remember we talked about time-stamps? We got them.

It didn't happen.

For those reasons, Judge, I believe the only just result is a mistrial. That's the only just result. I'm not asking for prejudice. We can do it again. But this man's facing his entire life. I just want to try a case, Judge, where the deck is not stacked, and at this point, it is. Thank you.

THE COURT:  Let me ask you one more thing before you sit down.

I know you have it in your motion, but if you could, tell me on the record how this would have affected your preparation and your defense in this matter.

MR. DECK:  Yes, Judge.  That's -- thank you for asking.

I bet you, Judge, we've spent between 40 to 60 hours, if not more, staring at those videos, going off of what Ms. Duty said where -- where it says, "Because they have a copy of the receipt of the dog food, the detectives were able to count off the exact minutes between events and the footage."

We assumed, based on that, we're like, okay, this is a realtime video.

Needless to say, Judge, I'm not going to -- we're not going to sit there and spend three hours on a cross-examination trying to show the -- trying to show the jury, through Detective Bond, that they're off by an entire hour, when all along the encrypted information, that we did not have -- now, we had the information, but we did not know it was encrypted -- the encrypted information would have showed us:  By the way, that's not the correct defense.

I mean, it is absurd to think that if this trial goes forward and we've spent three hours on a cross-examination, pretty clearly to everybody in this courtroom, and certainly the jury, that's the crux of our defense, a defense we would not have made had we known about this encrypted information, at least over the weekend.

The fact of the matter is, it's not fair, Judge. Thank you.

THE COURT: And you understand that if a mistrial is granted, that it's without prejudice --

MR. DECK: Yes, sir.

THE COURT: -- and that this case will be retried --

MR. DECK: Yes, sir.

THE COURT: -- and that double jeopardy is not going to attach?

MR. DECK: Judge, and to that -- let me speak to that for one moment. I am not even asking for it. And if that gets me in trouble with any appellate court, I don't care. I'm not asking for it. I'm not asking for prejudice. That's not what I'm asking for.

I'm asking, let's try this again, let's make it fair. That's all I'm asking. His entire life -- this is not a possession of a controlled

substance.  His entire life is on the line.  I just want a fair shot.  That's all I want.

I'm not alleging that either Mr. Brunner or Ms. Duty did anything underhanded.  That is not what I'm saying.  My only issue with what they did is they asked the wrong person.  And because they asked the wrong person, it's to my client's detriment.

THE COURT:  And you're telling me you don't want this jury to make a final decision in this trial?

MR. DECK:  I am telling you that I do not want this jury to make a final decision in this trial.

THE COURT:  Okay.  Ms. Duty or Mr. Brunner?

MR. BRUNNER:  Your Honor, just going back in time a little bit, showing State's 8, we talked about these videos.  Just so we can talk about what was, at least potentially, let's just say, available, so there's no misunderstanding about what was made available and the status of it.

We'll get that up here in a second.

Information was made available, Your Honor, regarding these Wal-Mart security videos.  We had ongoing problems ourselves, again, trying to find out these time-stamps.  I wanted to show the Court

exactly what -- we can stop right here.

I've opened up State's 8.  Those files that we see here -- I feel like I'm still in trial, and I guess I am -- 1, 2, 3, 4, 5.  Those represent the actual -- it says, "Type: AVI file."  Those are the video files of the various security camera footage.  Underneath that is what's called a DVR player.  "Date of modification," you see there, Your Honor, "April 2007."  That is a piece of software that would -- that would and could play those clips that were created back in 2009.

The issue is, Your Honor, if you take this -- a copy of State's 8 is made off of what we were using, what we provided to the Defense.  The same information, the same four -- excuse me -- five AVI files, plus that, quote, "DVR player shortcut."  They have that same information, the same -- the same disc, or a copy thereof, of that same thing.

So here we are.  The problem is, Your Honor, today in 2014 -- or 2013, when we tried to prep for this case, if you take this disc -- or one like it that was delivered from Wal-Mart to Cedar Park, from Cedar Park to us, we kept recopying it, hoping to find some time-stamps -- if you just hit "play" on a modern computer, Your Honor, on that DVR player, you will get an error.  It will not open.  None of these clips will

show at all. Quandary; we don't know what to do next.

The answer is, Your Honor, we found out --

MS. DUTY: Mark, that's what you get when you click on it.

MR. BRUNNER: Someone did click on it here. We have an error: "March Network's DVR player. Specified path does not exist. Check the path. Try again."

You try again, it's going to get the same error, Your Honor. Okay. So we see that.

So whether we're the State or the Defense, we see that, and it's a dead-end. So what do we do?

When we learn that the Defense was going to make a large issue about the timeline, even though they had hinted to that ahead of time on these e-mails, Ms. Duty informed us, Guys, you've got to figure this out.

And I got with Detective Bond, who was going to be my witness, it was -- here it is coming into Friday, we're going to have the weekend, and I asked him about this: We keep seeing references to timelines. What can we do?

And as he told me, in preparation for his testimony on Friday -- and these are the questions I elicited from him was -- You've got to use the March

player, You've got to use the March player.  When you're sitting there in Wal-Mart and you can see this, you can see the timelines.

Okay.  We can't bring the jury back to the Wal-Mart security office in 2009.  We can't do that.  So how can we present this evidence in court in 2014, Your Honor?

Two ways to do that:  No. 1, find an old laptop.  This old device that we were talking about, there's nothing special about this, Your Honor.  It's just old, literally.  It's not been connected to the internet for years.  And "old," circa 2007.  If I put this disc in here and click on that DVR player, it will work.  Just trust me on that.  I'll demonstrate it if I have to, but we probably don't need to.

So if you can find an old laptop, and if you do, Your Honor, you'll get printouts and displays as in State's 48, 50, 51, 52, again, all of which we talked about and came in without objection from the Defense.

The second solution is to find a new player.  Using the old laptop, it wouldn't project here in the courtroom, so I couldn't use that.  I didn't want to wave this around to the jury when I'm trying to show them what was going on.  That just wasn't going to be effective.  So I needed something that I could really

display and show off, because that's the kind of guy I am.

So I wanted -- we had to get a newer player, then.  So the solution is go to the March Network's website, download something for free.  It's available for -- should be available freely without cost, download their newer player, then you get over this problem.

Then, again, under the old technology or the newest technology, you will see a video -- under the newer technology as in State's 49, we have a screenshot from that -- both of these systems will show you time-stamps.  Okay?

This was information that we pieced together, worked on, sweated over Friday night, Saturday during the day.  We found a way to not just show it for the jury but display it in court, make stills, make it real evidence that could come alive, Your Honor.  Instead of just talking in generalities about timelines, we have the actual timelines, finally, middle of trial.

Trial is dynamic, things happen.  I did not pick the phone up on Saturday afternoon and say, Guys, I got it, Opponent.  I've got the timelines and I'm going to run it up on you.

However, when first Detective Bond talked

extensively on Friday about the March System, we didn't wait till the weekend -- after the weekend to even talk about that. We talked about that extensively, hinting to them, to the Defense, that this is -- We're coming. We've got something for you here.

He made mention on the record that that was the, quote, "best way to view this evidence;" not on Windows Media Player, like we've been seeing in court, but on this system.

Come Monday morning, we elicit testimony further about that, I introduce these stills, State's 48 through 52, and it comes in, again, showing to the jury, explaining these different ways of viewing this.

The information, Your Honor -- I mean, again, the player is sitting here. Defense wishes to use the term "encryption." That may mean it's hidden. We didn't hide it. If we tried this case in 2009, Your Honor, we wouldn't have this issue. All our software would be state of the art, which was state of the art old. You click on that program and we're all happy. But technology has advanced to the point where they didn't have the mechanism -- their technology was simultaneously not old enough or not new enough for the March System current download to view this.

THE COURT: You would agree, would you

not, though, that up until Saturday, last Saturday, when you had an opportunity to review it on this new system, that the District Attorney's office was in the same position as the Defense was with regard to viewing the video without any time-stamps?

MR. BRUNNER: Yes, Your Honor. We were never able to pop it into any of our computers to get it to play. We could get over the error that we saw here in court. We could get over that by downloading another system, Windows Media Player, Windows Classic, some other system like that. But that would show how long the clip lasted, the duration that the Defense premised their arguments on, the duration of the clip, but not what time of the day or night those events that we're seeing are happening.

THE COURT: Right. And you would agree that, at least based on information I think provided by Detective Pando, that much of the timeline without the time-stamps with this new viewer, that you found an event that occurred -- I think it was actually the receipt for the dog food --

MR. BRUNNER: Yes, Your Honor.

THE COURT: -- that you looked at that to get a time, and you knew on the video, however many hours it was into it, that that time was the 1:44 a.m.,

and then you could go back or forward to figure out other timelines?

MR. BRUNNER: That's what he told us. That was not what I was relying on. I didn't want to have to switch between camera to camera to try to show, Well, it's 1:44 inside the store, outside the store there's something else going on three or four or five hours later. I wanted to be able to show time-stamp. This is when --

THE COURT: Well, I know that. But without the time-stamp ability, that would have been the way to figure those times out?

MR. BRUNNER: That would have been a way, Your Honor, yes.

THE COURT: And at that point, that was probably the only way I think that either the DA's office could have figured it out or that the Defense could have figured it out until we got this new program that we found that allowed us -- or this old laptop that allowed it to be played that actually showed the time-stamp?

MR. BRUNNER: Correct, Your Honor. That was a way to do that. But, again, it's not up to -- trial is dynamic, things happen, arguments are made. We did not make promises to the jury about what the defense

would be. The Defense chose their ground.

Again, the information, it's there, it would have been viewable if we were all trying this case on or about the time it happened. It's not viewable now easily, but it's -- we weren't trying to hide the ball, Your Honor.

THE COURT: But would you agree that if the Defense had had the viewer that showed the time-stamps on it, that it potentially could have changed their approach to their defense in this case?

MR. BRUNNER: I could not find a way to credibly argue otherwise, Your Honor. Potentially, yes. I'm sure definitely it would. However, I just, again, wanted to demonstrate that this information, at least it's -- it's seeable, it's viewable. I did it here in open court. It's not a trick. What we're seeing here now is what they have, as well.

Again, it may not -- there are some hurdles to jump to be able to get it to play in a manner that they could then use, like we used over the weekend, with time-stamps easily shown so we know that what we're seeing happened at a certain point in time. Your Honor, I just -- the information was out there and --

THE COURT: My understanding is you figured that out through Detective Bond; is that

correct?

MR. BRUNNER: Yes, Your Honor.

THE COURT: Okay. Anything else?

MR. BRUNNER: And just, again, just our work over the weekend, figuring this out and then getting it to display -- Detective Bond was my witness. We set up the precedent on Friday that this was -- we were going to have the -- the March System technology at least was going to be an issue in the trial, and Monday morning we were able to deliver on that, Your Honor. And that was just through our efforts. I did not inform this Defense that I had cracked the code, such as it was, or figured out the way to get around that. But I don't -- it's incumbent upon the Defense to provide -- the State to provide the information, and we gave them the information.

To the extent that they detrimentally relied upon statements made in the e-mail, I guess the lesson is, next time we'll be either -- we'll be less specific, Your Honor. And that's kind of a bad, harsh lesson to have. And I think that may chill speech between Defense and State, and we just get back down to, Well, we gave you what we have; We gave you what we have. That's a little tougher, Your Honor.

Thank you, Your Honor.

THE COURT: Anything further?

MR. BRUNNER: Not from the State, Your Honor.

MR. DECK: No, Judge.

THE COURT: Okay. First off, I'm going to say that I don't think that there was any indication that the District Attorney's office did anything improper. Every time they had their information they provided what they had to the Defense with regard to this video. And, in fact, it wasn't until the middle of trial that they found the proper -- or a different way to view the video, and because of that, it kind of changed the way things looked at that point in time because it did actually show the time-stamps.

But, however, I don't think that it's their fault that you did not -- or the Defense did not get that information prior to the start of this trial. Because they didn't have it, either.

And so the downside is, is that, unfortunately, I do believe that it has put the Defense at somewhat of a disadvantage based on their defense that has been presented in this trial.

And I know that both sides have spent a lot of resources and a lot of money in getting this case ready to go to trial. It's also disappointing that I

think we're seven days into hopefully a nine- or ten-day trial, not even counting the day that we picked a jury, and so it's unfortunate that we're this far into this before this -- I guess we found out this information.

However, I don't think there's any prosecutorial misconduct. I don't think there's anything that's been done wrong on behalf of the State or the prosecution in this matter. But I do believe that -- I'm in the position that I don't think I have any option other than to grant the mistrial because of the -- I think the difference in the way the defense would have been presented in this case if they would have had this video and the ability to play it showing the timeline.

And I think at this point the Defense is in such a precarious position based on the defense that they've raised to this point in time, that I'm not sure that it would allow Mr. Harmel to have a fair trial.

And because of that, I am going to grant the mistrial. Everyone understands that this is without prejudice. If everybody wants to, both sides, we can proceed to trial and let this jury make a determination.

I understand that the Defense does not want to do that --

MR. DECK: Correct, Judge.

THE COURT: -- and that you want the mistrial and understand you will have to retry this case at a later date; is that correct?

MR. DECK: True, Judge.

THE COURT: Okay. I think it's important, especially based on the semi-recent history with regard to Williamson County, that we make sure that both sides get a fair trial. And I don't want a trial tainted because of this 2007 video type player that we had to have in order to see this particular video in the proper format. And I don't want this trial tainted or Mr. Harmel convicted based on what then we had -- I can see years and years of appeals about how: If we had had this it would have been different and the State didn't tell us, and all kinds of things that we're going to have out there, and I don't think this is the way to do it.

And so to make sure that Mr. Harmel does get a fair trial, I am going to grant the mistrial at this time, and I'll release the jury.

MR. BRUNNER: Your Honor, if I may, just a suggestion: As if it was the end of trial, I know the jurors have been here forever and -- I'd appreciate the chance to -- I'm sure Counsel would, too, on the opposing side, to chat with them if they wish to stick

around so that we can find out, again, what worked, what didn't work, what they had questions about.

THE COURT: And I'm assuming that you would want to do that, and I'm going to go back and talk with them and tell them that you're going to want to meet with them. Obviously, they don't have to.

MR. BRUNNER: Sure.

THE COURT: They don't have to talk to me either if they don't want to. So let me go do that, and I will let them know that you are out here, and then if they -- I'm assuming that you would want to come back and talk with them as opposed to out here in the courtroom?

MR. BRUNNER: That's probably preferable. They usually feel better talking in the back with us, just so they can be free and easy without everybody watching.

THE COURT: Okay. That's what I would think, too.

Okay. So we're in recess. I'll talk to the jury, and I'll come and let you know when they're ready to meet with you.

(Proceedings adjourned)

# EXHIBIT C



Yes, I am. Yes, I am.

THE COURT: My concern is more your ability to prepare your defense and review everything sufficiently time-wise to get it done. So --

MR. MAGEE: That's true, Your Honor. And, you know, our whole defense has been predicated on all of this situation. And now here we are behind the eight ball because we're right in the middle of trial, we're nine-tenths done, and all of a sudden all this new information comes to light. We've got to all of a sudden scramble and prepare a defense, which it might have been different from the outset. So we're building an error into this case.

MR. BRUNNER: Your Honor, had they come to us pretrial and said, Hey, we can't open this up. You're talking about time-stamps here, and here is this player, it's not working. We go on the March System, we can't get online because we're not law enforcement.

We could have had this hearing two, three months ago. And I would have said, I'll bend whatever copyright rules I need to bend for you, gentlemen, I'll get you that player.

THE COURT: But you didn't know then.

MR. BRUNNER: I didn't know.

MR. MAGEE: Well, but here's the thing --

MR. DECK: I understand, but --

THE COURT: Wait. Stop, stop, stop. The remedy is, we've got to be able to let the Defense view this in the same format, however we need to do that.

MR. BRUNNER: Okay.

THE COURT: If Cedar Park says, Great, let them take it home, let them take it to the office and let them figure it out and watch it and they can keep it all night and they can look at everything they need to look at, fine.

If there's a way to let them download the software to where they can do it, fine. But we need to do that.

MS. DUTY: We'll make it work.

THE COURT: The second issue, which is the Defense saying, Getting it in the middle of a trial prejudices our ability to prepare a proper defense, is a different issue to me, that I guess we can -- if we need to, we can take up again tomorrow after they've had an opportunity to review the tape again and to figure out where they are at that point in time.

MR. DECK: I mean, let me just say this. I mean, Mr. Brunner's redirect was, How silly of the Defense to come up with this? How ridiculous is that?

Well, you know what, we would know whether

or not it was ridiculous if we would have had this thing to begin with.

THE COURT: I understand.

MR. DECK: And so if, in fact, everything what they're saying is true, and we come off as buffoons, if, in fact, that happens, that's not our fault. We used what was given to us.

THE COURT: I understand.

MR. BRUNNER: Your Honor, I mentioned these exhibits and how -- we talked about the March player last week when Detective Bond was on the stand the first time and how these are different and double frame and all that good stuff. We've been talking about this.

I know right now it's 4:30 on a Tuesday. I'm not saying that's a lot of extra time, but it's more time. We could have had this conversation earlier. It's only after I did some damage to their lovely cross that we're upset.

THE COURT: I'm not going to fault the Defense for the delay of trying to figure out where we are right now. I'm not going to fault them for that.

MR. MAGEE: Well, the problem is we have a media player that was given to us, and that was a March media player. We thought that's what we were to play it

on and that's what was given to us to play it on, and those do not show time-stamps, despite our repeated requests. We didn't know to go ask for another piece of software that we needed.

MS. DUTY: Nor we.

THE COURT: Okay. So let's figure out whatever we have to figure out to get them the software or the actual -- that other old player so that they can look at that tonight, and then tomorrow morning we'll see where we are on that. I mean, I don't know --

MR. BRUNNER: Can I call Mr. Davis up here while we're all here, either on the record or off the record, to explain -- because I don't know. It's all magician, behind-the-scene stuff how we actually got that.

THE COURT: That's fine.

MR. BRUNNER: Mr. Paul Davis, how the heck did you get that piece of software for us that Detective Bond told you about?

MR. DAVIS: He showed me on a mobile website, and I went to www.marchnetworks.com. There is -- about halfway down the page there's a place where you can download players. I never saw anything that said anything about it being for law enforcement purposes only. I mean, it may have said that. I

wasn't -- I was looking for a specific place that said "download." I wasn't reading the entire text of the page.

Then once you go into the players section, then there's a place to download the software. There's two different ones, Evidence Reviewer and -- it talks about encompassing a series of March Network software, 3,000, 4,000, 5,000, and a few others.

That's the one I downloaded, the Evidence Reviewer, and that's the one we've been using in court on the laptop.

MR. DECK: May I ask a question?

THE COURT: (Nods head.)

MR. DECK: Mr. Davis, this is -- Mr. Bond told you where to look?

MR. DAVIS: That's correct.

MR. DECK: Have you talked to Mr. Bond prior to this -- prior to that day about getting time-stamp copies?

MR. DAVIS: No.

MR. DECK: Why not?

MR. DAVIS: I wasn't aware I needed to.

MR. DECK: Ms. Duty never told you we needed time-stamped copies.

THE COURT: Wait, wait, wait. If we're

going to do cross-examination for a completely different hearing --

MS. DUTY: Now I'm on trial?

THE COURT: -- because I was thinking we might need tomorrow morning.

MR. DECK: No. I told you --

THE COURT: Right now I just want to figure out how you can get the software or the ability to play it in the same format. That's all I want to hear today.

MS. DUTY: If you have your laptop, do you want him to load it on your laptop or show you the website?

MS. MARTINEZ AGUILAR: I'm not connected to the wi-fi here. And if you have to have law enforcement, I am not law enforcement --

MR. MAGEE: We don't know --

MS. DUTY: But I know you don't --

MS. MARTINEZ AGUILAR: -- and I'm not allowed to click that button.

THE COURT: Wait, wait, wait. Everybody is talking at the same time.

MS. DUTY: Paul just said you don't have to be law enforcement. He didn't get it through being law enforcement.

MR. MAGEE: He said he wasn't sure if you had to be law enforcement or not.

MR. BRUNNER: We're going to take our guy and get with their guy and we're going to try to make this work right now, Judge. And if we can do it inside the building, wonderful. If I've got to drive to their office and get it done, we'll get it done.

THE COURT: Okay.

MR. BRUNNER: And we'll report back to you.

THE COURT: Well, that's my only issue.

MS. DUTY: All right.

THE COURT: Let's get that done, and I'm going to, obviously, release the jury, then, for the day.

Is everybody okay with me releasing them without having to bring them back in here again?

MR. BRUNNER: That's fine, Your Honor.

MR. DECK: That's fine.

MR. BRUNNER: Do y'all want in addition to or instead of that clunky old laptop? Just while we're all here --

MR. DECK: Whatever it is you guys -- that you believe the jury will be going back with, I'd like to look at.

MR. BRUNNER: I don't think the jury is going to go back with that clunky Cedar Park laptop because I can't certify what exactly is on that thing.

MR. DECK: I understand.

MR. BRUNNER: And that's a discussion later on. My intent was to give them a variety of formats and, you know, a computer that's got what we've been playing here in court. If y'all got a different system, I guess we can talk about which -- we'll have a fight about which viewer they can use. I don't know. That's a matter for another time. But we'll get -- try to get you that player.

THE COURT: Hang on.

(Judge instructs bailiff to discharge jury for the day)

MR. MAGEE: Are we back on the record?

THE COURT: Yes.

MR. MAGEE: Okay. And, Your Honor, the only concern our investigator has is that if the browser or software, or whatever you call it, that's to be downloaded from the March System is proprietary in the sense that only law enforcement and judicial people can use it, she feels uncomfortable as a licensed private investigator of clicking something and certifying something that is not accurate.

THE COURT: And then looking for a federal indictment later on?

MR. MAGEE: Right. You never know. There's a whole organization, you know, dedicated to that.

MR. BRUNNER: We'll click.

THE COURT: Let me ask a stupid question. That computer over there that you've been playing it on that whole time --

MR. BRUNNER: Yes.

THE COURT: -- can they take that one?

MR. BRUNNER: I don't remember what's on it.

MR. DAVIS: That -- this PC is actually a created one that we had set up a log-on for jury use. Actually, I had IT certify that everything was locked down that was network capable, that it can't connect to the internet without being enabled, which I could do. But then --

THE COURT: I thought that was the one that was going to be shown to the jury?

MR. BRUNNER: It is.

MR. DAVIS: But the one thing is, the player is already on it and it belongs to our office.

THE COURT: That's what I'm saying. Can't

they take that one and watch that? Will that work? Will that make it solve the problem?

MR. DECK: As long as I can -- we can look at it first, Judge. I just need to look at it. I mean, like I said, this is -- Judge, I take a lot of pride in being prepared for my cases. I do.

THE COURT: I understand that.

MR. DECK: And, you know, Ms. Duty can do whatever she'd like, but that's a fact. And the fact of the matter is, I'm ill-prepared for this case based on this thing that's sprung on us in the middle of trial. That's a fact.

And I'm mad because if, in fact, what Mr. Brunner was trying to prove with his redirect is exactly true, not only is it true, but then it makes us look bad. And that's a problem because that -- he needs a fair trial, Judge.

THE COURT: And I agree with you.

MR. DECK: And so needless to say, Judge, I'm going to take a look at it, but you can bet I'm asking for a mistrial. You can bet.

MR. BRUNNER: Your Honor, it's part of my job to make them look back. That's what trial is for. What they --

THE COURT: Well, I know, but this is a

different issue.

So the question to me really is, is it going to solve the problem by taking that laptop and they can watch it on that laptop and they can take it with them today, or is it better for them to get the program with all those other --

MR. DECK: We'll take the laptop.

MR. MAGEE: We'll take the laptop.

THE COURT: Okay. So if it's okay with the State, they can take the laptop, they can bring it back. Since that's the laptop that the jury is going to use to review it anyway and see it, it will be the same thing that they see.

MR. BRUNNER: Well, they need to review it anyway. So this gives them a chance to look at it and make sure that it is scrubbed down, that we're not sneaking something on there or we missed something.

MR. DECK: I didn't think you would.

MR. BRUNNER: I know, but inadvertently, like I almost put up the wrong exhibit, and everybody said, Don't do that. Thank y'all for that.

So we'll give y'all a chance to kill two birds with one stone, no pun intended, and just put that up there, take a look at it at your leisure. And if it's not the right system, it's not the right system,

and if you have problems, let me know.

THE COURT: Okay. Let's do that. So we'll recess for the day. You take the laptop and the disc, whatever you have. And I assume you already have the disc?

MR. DECK: Yeah. Yes.

THE COURT: Because Simone's not going to let you take the exhibits, so --

MR. MAGEE: As long as it's the same disc that's in evidence.

MR. DECK: I assume, right? Is that how it works?

MS. DUTY: It's the disc we've had all along, yes.

MR. BRUNNER: And the goofy part is, Judge, again I entered State's 7 and 8 -- you see it early in the line-up -- before --

THE COURT: I know.

MR. BRUNNER: You know, again, it was --

MR. DECK: I understand that.

MR. BRUNNER: I'm just trying to defend myself.

MR. DECK: No. I understand your point. You're saying that --

MR. BRUNNER: Y'all came with me so hot

about not having the timeline, that I kind of look back, like, you know, Guys, give us the freaking timeline. I was told it's there but buried.

I didn't like that answer. I wanted to unbury it.

MR. DECK: No. I understand that. And I'm sure you understand where I'm coming from.

THE COURT: Does that resolve the problem?

MR. BRUNNER: Yes, Your Honor.

THE COURT: Okay. Y'all look at that tonight, and then tomorrow morning we'll deal with the mistrial issue, I'm assuming.

Okay. Thank y'all. See y'all in the morning at 9:00.

(Proceedings adjourned)

# EXHIBIT D



need some time to look at it tonight -- we need today and some time to look at it this evening and come back to finish up tomorrow.

THE COURT: Is there any problem with that?

MR. BRUNNER: No problem with that, Your Honor. I can show them the website that we downloaded it from that --

MR. MAGEE: And -- I'm sorry. Go ahead.

MR. BRUNNER: -- that he told us how to get to it Friday. And with five minutes of investigation -- well, I won't say. Strike that.

I don't know how easy it is to find it. He turned us on to it, and we mentioned that yesterday --

MR. MAGEE: He could have come to us today --

THE COURT: Wait.

MR. DECK: I would like to know one thing.

MR. BRUNNER: I have no problem with it.

MR. DECK: I would like to put on the record: Ms. Duty, I asked you, I don't know, five times -- at least five times during this process, the discovery process, how to get a time-stamped copy. You said, We don't have it.

MS. DUTY:  Yes.  We didn't.

MR. DECK:  Fair enough.  And then the trial starts, and lo and behold here comes a time-stamped copy.  That's amazing.

MR. BRUNNER:  Let me back up on this.  Are we --

MR. DECK:  That makes me mad.

THE COURT:  Stop.

(Bench conference concluded)

THE COURT:  Ladies and gentlemen, I'm going to excuse you for right now for a short while.  We're going to have a hearing outside your presence.  So we'll bring you back in, hopefully, in about ten minutes or so.  Thank you.

(Jury leaves courtroom)

THE COURT:  My understanding is that Defense counsel wants an opportunity to either take whatever kind of recorder it is so that they can view this video -- State's 8?

MR. MAGEE:  Yes, Your Honor.

THE COURT:  -- State's Exhibit 8 in the same format that we've got photographs and that Detective Bond has testified.

My understanding is that the State is agreeable to that, but there also may be a way that they

can just download the program?

MR. BRUNNER: Your Honor, there's two different things going on here: No. 1, again -- and we've got both ways that we could do this -- one I can make a promise to you, one I cannot, but I think we can get over that.

So we've got that big old gray laptop thing that I don't -- it's not mine, it belongs to the City of Cedar Park -- we've checked it out. That is what this detective told me that he has reviewed this on. And if I can show some -- just as an exemplar, if you look at that under that system, you get, for example, what we see here in, like, State's 48 with what I call the double frame. Okay?

THE COURT: Right.

MR. BRUNNER: Well, it just looks like this, State's 48. Can everybody see me?

So when you load it up on that -- and, Detective, kick in here -- if you look at that State's 8 on that laptop, is this what you see?

DETECTIVE BOND: Yes, with the same disc. When you put it in and you -- on the bottom of that disc, it gives you the AVI files, and then it says DVR player. I don't know how -- what sort of explanation you want me to give you here.



But in 2009, when I got that disc, it had the DVR player, for lack of a better term, embedded on that disc, just like the AVI files.

MR. BRUNNER: Okay.

DETECTIVE BOND: In 2009, with whatever computers we were using in 2009, when you clicked on the DVR player, it would bring up the March system.

MR. BRUNNER: Okay.

DETECTIVE BOND: Now, roll forward four and a half or so years, with whatever new computers and the new software or what have you, the new updated computers 2013, '14, when you put it in -- I actually took that disc and tried to play it in three different computers. It just would give you a command that it won't execute, it won't play and that sort of thing.

I was told that sometimes it will -- if you can get it to on just some random computer, it will pull up in Windows Media Player, which is what we've seen earlier.

MR. BRUNNER: Okay.

DETECTIVE BOND: So what I did is got the old -- that old laptop, put the disc in, double click on -- or bring up that disc in that drive, double click on the DVR player, and because -- I only can assume that because it's the old -- old operating software or



whatever, it will play the actual March player as it was in 2009. That's the one that's on there.

MR. BRUNNER: Okay. And just from this -- what I see here, how we made these stills, Your Honor, 48, 50, 51 and 52, is playing it back on that -- on that old laptop -- let's just call it the old laptop -- had to save it to a certain format, put it on a memory stick, walk it over to a better computer and print it out. There just wasn't a way to hook that laptop up directly to our color printer. That's how we made those exhibits.

And you will notice, State's 49 -- again, we're talking about a different player, different frame. Okay? Everybody sees that?

So physically we were having problems showing the jury this. Okay? When the trial -- before the trial even started, Defense counsel came to me and they were hot, you know, or whatever, they were wondering why they didn't have copies of file-stamps when in the police reports they talk about file-stamps and timelines and that we didn't give them a copy that showed that.

And I was scratching my head, like, I don't know what the heck y'all are talking about. Even though I've seen the videos millions of times, I never

saw any timelines, and I just didn't clue into it like they did. So kudos to them for doing a better job of reviewing the offense reports than I did, even though I've had this case for a year and they've had it for three months. So I was worried --

THE COURT: You really want that on the record?

MR. BRUNNER: Yes, Your Honor. That's fine. Again, kudos to them. So --

THE COURT: Well, bottom line --

MR. BRUNNER: -- I was worried about showing it to the jury and getting cross-examined on timelines when I had no timelines. And it looks like we're hiding something from them.

So I was trying to figure out a way: How do we show this with timelines?

And Detective Bond told me, We've got this old laptop, so he brought it up here.

And then we were trying to figure out a way how to get that old rickety thing to play in front of this jury with the size -- you know, it's about an 8-inch screen -- we figured that would be a nightmare.

We couldn't -- we tried to even hook it up to the projector to show, and it wouldn't project. It projected a black image.

So what next? Detective Bond said Friday or Saturday, You need to go online and you can download the March System software proprietary from their website. And that's what we did, and guess what, it played, with time-stamps that match up.

So back to the two things, Your Honor. No. 1, no secret; I can show them the website that we went to to download that software. They can do whatever they want to. They're only going to have what shows up in State's 49. This is how it's going to look.

No. 2, I can try -- probably going to have the evidence technicians in Cedar Park, you know, need my first-born son as collateral, but I can try -- I don't want to give property over to them, but if they want to inspect it in our office or something -- I mean, I'm not trying to -- I can't just hand them a thousand-dollar piece of equipment and say, There you go, guys.

Not that they're going to spill coffee on it or something, but if they do, it's my butt on the sling.

MR. MAGEE: You can trust us.

The problem with the March player downloading, Your Honor, is, No. 1, when I looked at the website, and I did, it says it's available to law

enforcement and judicial offices only. It doesn't say it's available to defense counsel. So we cannot download it. It is physically impossible.

THE COURT: That's true.

MR. BRUNNER: I may be breaking a copyright law here, Your Honor -- and this is on the record, too -- but I'll give it to them. Somehow I'll get it to them. Because if you order it, I'll make it happen and if I've got to sign off whatever, we'll get it to them.

THE COURT: Well, I'm assuming that, unless someone wants to stay up here with you all night, that it's not like you're just going to want to stick it in there and watch it one time and that's it; that you're going to want to play it, replay it, whatever you've got to do to prepare whatever your cross is.

MR. MAGEE: Yeah. We'd like to look at it for, you know, some period of time so we can prepare cross and recross.

THE COURT: So from that standpoint, I'm assuming that you need to take it with you back to the office and be able to play it at the office somehow or other, correct?

MR. MAGEE: Yes, Your Honor.

MR. BRUNNER: Let me find out, Your Honor,

if I can.

What -- is it just some box we've got to click that says, Yes, this is for law enforcement or judicial purposes, or if we have to actually do something?

THE COURT:  Well, Detective Bond can probably tell us that.

DETECTIVE BOND:  Actually, I can't. Because what I did was I just let Mr. Paul Davis know it's on March -- www.marchnetwork.com, and it will -- it will bring it up.  And so it says Player Reviewer 4, or something of that nature.  I didn't download it.

MR. DECK:  Let me voice my frustration. My frustration is with the discovery process.  I've asked many times for this time-stamp copy.  Now, lo and behold, trial starts, and they find it.

Do I think they hid it from me?  No, I don't.

Do I think they didn't try as hard as they did once the trial started?  Absolutely, yes.

And that bothers me.  Because here I am saying, Look, man, we want to establish a timeline.  We need this time-stamp thing you're talking about.

You know what, we talked to somebody, they don't have it.  Talked to somebody, they don't have it.

Lo and behold, we get a jury sitting, they have it. That's amazing. That's amazing. And it frustrates me because I don't get to defend -- I don't get to prepare the way I should be able to.

And by the way, this thing is proprietary. It's an amazing situation. I mean, you could -- you can imagine, Judge, my -- my frustration when I've got about four e-mails saying, Hey, Ms. Duty, where is this thing?

We don't have it. We don't have it. We don't have it.

Jury starts, they have it.

MS. DUTY: Okay. I would be glad -- may I defend myself for a moment?

THE COURT: Yes, I understand your position. But also from the DA's standpoint, I'm going to let Ms. Duty say what she has to say.

MR. DECK: Sure.

THE COURT: But if they didn't have it, they didn't have it.

MS. DUTY: For the past year, I've been working on the same system that he has. I've also been very frustrated by not having this. I have sent e-mails to Detective Pando, Hey, there's a reference to time-stamps.

He's like, When it downloads onto the disc

that we give you, that's how it downloads. Sorry. That's the way you've got it.

We weren't purposefully hiding anything.

MR. DECK: I agree with that. I agree.

MS. DUTY: I've had the same darn discs that you have had and I've had the same frustrations.

MR. DECK: I don't deny it, and I'm not insinuating or saying anything about Ms. Duty.

MS. DUTY: Yes, you are, actually.

MR. DECK: Well, you can take it any way you'd like, Ms. Duty. That doesn't bother me.

What I'm telling you on the record, I am saying I'm not accusing her of that.

But what I am accusing somebody of in here -- probably the Cedar Park Police Department, Mr. Bond included, including Mr. Pando -- is that when it was asked of them by Ms. Duty, they couldn't find it. Come trial time, they can.

And I don't know what the difference is between the two. I don't know whether they thought that Ms. Duty was joking the first time and now she is serious once trial starts -- Mr. Pando can talk to that. But why is it when she asks during trial, they find it? During pretrial, they don't.

So am I putting Cedar Park PD on blast?

# EXHIBIT E





Nikki Reed <rdeckparalegal@gmail.com>

## Discovery
8 messages

Ryan Deck <ryandecklaw@gmail.com>                    Sun, Apr 13, 2014 at 7:20 PM
To: Jana Duty <jduty@wilco.org>, Mark Brunner <mbrunner@wilco.org>, Paul Davis <PDavis@wilco.org>
Bcc: rdeckparalegal@gmail.com

Here are additional discovery requests:

1) Det. Bond has a report dated on 11/5/09. In that report, he states "Detective Pando had found some information out about a "secret" that Matt Wood had that stated he would take the secret to his grave." (2nd page, 4th paragraph) - I would like to see what this information is. Is there a report, interview, video, etc about this?

2) Det. Bond has a report dated on 11/25/09. He discusses an interview with Charles and Kimberly Garner. The last paragraph states: "The printouts that they provided me have been added to the case file. A copy of the interview was submitted into evidence." I need the printouts and the interview video

3) Det. Barnett took pictures of Jessika's backside (see p.3 of Det. Pando's report on 9/7/09). I don't have those pictures.

4) Det. Dalley has a report dated on 9/9/09. He discussed the Wal-Mart video and has exact times for different events. The report reads as if he was using a time-stamped video. I'm wondering if there is a TIME STAMPED version of the videos. If there is, I would like a time-stamped version of the videos.

--
**Ryan H. Deck**
Attorney at Law
107 N. Lampasas
Round Rock, Texas 78664
(512) 251-8920 (Office)
(512) 251-2279 (Facsimile)
Email: ryandecklaw@gmail.com

CONFIDENTIALITY NOTICE:
Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in this email message is privileged and confidential attorney/client information intended only for the individual or entity named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, WE HEREBY NOTIFY YOU that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone and return the original message to us at the above address via the U.S. Postal Service at our expense. Thank you.

Ryan Deck <ryandecklaw@gmail.com>                    Mon, Apr 14, 2014 at 9:39 AM
To: Jana Duty <jduty@wilco.org>
Cc: Paul Davis <PDavis@wilco.org>, Ricky Pando <Ricky.Pando@cedarparktx.us>
Bcc: rdeckparalegal@gmail.com



# EXHIBIT F



My assistant verified that we don't have the Gamer dvd but she believes that's the dvd that won't copy and is at the DAs office. Is that correct? I believe Paul would know the answer to that.

Thanks for promptly looking into the other discovery matters. Look forward to hearing from you regarding what you find.

On Sunday, April 13, 2014, Jana Duty <jduty@wilco.org> wrote:
> I am familiar with Matt Wood's comment and believe that nothing came of it. If Matt was interviewed, then you should have a copy of that interview. I will check on that tomorrow. The Gamer's were interviewed and you should have received a copy of that disc. As far as "printouts", I will look into it and get back with you. As far as pictures of Jessika's "bottom", you have all of the pictures that I have. I have checked and double checked on any other pictures and there does not seem to be any others that were logged into evidence. I will double check just in case. Finally, the Wal-Mart Video that I have, that you have a copy of, is not time stamped. I would like a time stamped copy myself, but that is not what I was given. I will ask Dailey about it tomorrow and get back with you. Jana
> Sent via BlackBerry by AT&T

> From: Ryan Deck <ryandecklaw@gmail.com>
> Date: Sun, 13 Apr 2014 19:20:39 -0500
> To: Jana Duty<jduty@wilco.org>; Mark Brunner<mbrunner@wilco.org>; Paul Davis<PDavis@wilco.org>
> Subject: Discovery
> [Quoted text hidden]
[Quoted text hidden]

---

Ryan Deck <ryandecklaw@gmail.com>         Mon, Apr 14, 2014 at 9:51 AM
To: Paul Davis <PDavis@wilco.org>
Cc: Jana Duty <jduty@wilco.org>, Ricky Pando <Ricky.Pando@cedarparktx.us>, Mark Brunner <mbrunner@wilco.org>
Bcc: rdeckparalegal@gmail.com

Ok then, we have not been given a copy of interview. Please let me know when it will be ready for pick-up.

Regarding the backside photos, according to Pando's report, Det. Barnett took them. My guess is, he would be the one most likely to locate them.

On Monday, April 14, 2014, Paul Davis <PDavis@wilco.org> wrote:

> No, the video that plays but won't copy is the interview with Rhonda Garza. See image, attached.



Best Regards,


Paul


---

**Paul H. Davis**

Forensic Communication Assistant



# EXHIBIT G



**From:** Jana Duty
**Sent:** Monday, April 14, 2014 2:09 PM
**To:** 'Ryan Deck'
**Cc:** Paul Davis; Mark Brunner; Ricky Pando (Ricky.Pando@cedarparktexas.gov)
**Subject:** RE: Discovery

Hey Ryan,

Here is the latest information in answer to your questions.

1)  Detective Bond's report, dated 11-05-09 states the Melanie Lopez-Kilpatrick told Detective Bond that Matt Wood's "secret" is that he has sex with ugly, fat women" because he likes to have a lot of sex so therefore, he is not selective. Matt Wood was not interviewed by Bond or by any other Detective as far as I am aware. In Kimberly Gardner's interview (with her then husband Charles), Kimberly states that she "looked up Matt Wood's criminal history while working as a dispatcher" (which is illegal) and found that Matt Wood had been convicted of Agg. Sexual Assault. This is not true. She must have found another Matt Wood, as our Matt Wood has no criminal history.

2)  Detective Pando was unable to locate any "printouts" that the Gardner's provided to Bond. He is meeting with Bond today to see if they might be filed away somewhere else, but for now, no "printouts" from Kimberly and George's junior sleuthing have been located.

3)  Detective Pando says that some of the photos that Detective Barnett took as Jessika was being taken out of the car and loaded onto the gurney cannot be located. He did give me one more disc of pictures of the car as it sat in the impound lot and a disc with pictures of the evidence collected from the park. On this disc, there is a picture of some handcuffs. The handcuffs were used to show the size of the button collected at the scene.

4)  Detective Pando brought over another copy of the Wal-Mart Videos and none of them are time stamped. He says that he recalls when they were uploading the video at the store that the time stamp was incorrect (the clock was wrong). Because they have a copy of the receipt for the dog food, the detectives were able to count off the exact minutes between events in the footage.

That's it for now.

Jana

**From:** Ryan Deck [mailto:ryandecklaw@gmail.com]
**Sent:** Sunday, April 13, 2014 7:21 PM
**To:** Jana Duty; Mark Brunner; Paul Davis
**Subject:** Discovery



# EXHIBIT H



# AFFIDAVIT

STATE OF TEXAS                          §

COUNTY OF WILLIAMSON                     §


Affiant, Royger Harris, hereby states under oath the following:

"My name is Royger Harris. I am over the age of eighteen years and am capable to make this affidavit.

I was formerly employed at the Williamson County District Attorney's Office as an Investigator from January 1, 2013 until December of 2013. During my employment, I was assigned to the case of *State of Texas v. Crispin Harmel*. Prior to May of 2013, myself, Jana Duty, and Vicki Vickers reviewed the casefile of Mr. Harmel's previous conviction for credit card abuse in anticipation for an upcoming parole hearing. During our review of the file, we discussed the possibility of seeking a murder charge. We reviewed the evidence submitted by the investigating agency including case reports, photos, and videos. One of the videos included within the casefile was a Walmart surveillance video on CD. The CD was located in a CD sleeve in a large binder and included within the sleeve were instructions on how to download the video and included the program for downloading the video. Approximately a day or two later, I downloaded the program onto Jana Duty's computer in her office in order to play the video. We then watched the Walmart surveillance video and reviewed the offense reports while watching the video to compare the offense reports with the video. The surveillance video included timestamps which allowed us to compare the timestamps with the offense report. I then took the video and the program to download the video to my office so that I could review it further since there were many hours of surveillance. A few days later, I went to Jana Duty's office and found her watching the surveillance video with the timestamps on it. Ms. Duty expressed that she was concerned with a specific sequence of the tape because she thought Mr. Harmel might have had a taser in his hand and asked me to find a way to enhance that specific sequence and referenced the timestamp. I sent the video to the Round Rock Police Department to see if they could enhance it. Detective Rowe notified me they attempted to enhance several still shots but they could not.

Based on the timestamps on the video, I requested information from the Toll Authority to look for the victim's car to see if it passed through any tollbooths.



I discussed with Ms. Duty the fact that Harmel's attorney would need a copy of the video along with the instructions for playing it, otherwise he would not be able to play the video with the timestamps. Ms. Duty stated "I got this, don't worry about it."

_____
Royger Harris

Sworn and subscribed to before me, the undersigned authority, on this, the 11th day of March, 2015.

_____
Notary Public

KIM WIMBERLY
Notary Public, State of Texas
My Commission Expires
April 17, 2015



# EXHIBIT I



Round Rock Police Department

OCA: *1303080021*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| Case Status: *INACTIVE* | Case Mng Status: *NA* | Occurred: *03/08/2013* |
| Offense: *ASSIST AGENCY* | | |

| | |
|---|---|
| Investigator: *ROWE, J. D. (0513)* | Date / Time: *12/05/2014 07:15:24, Friday* |
| Supervisor: *ROWE, J. D. (0513)* | Supervisor Review Date / Time: *12/05/2014 07:18:17, Friday* |
| Contact: | Reference: *Lab Results* |

In June 2013, I attended video forensics training in Chicago, Illinois. The entire training focused on the forensic use of the Photoshop CS-6 Extended software suite. In the late summer or early fall of 2013, I was contacted by Royger Harris, former Investigator with the Williamson County District Attorney's Office, regarding video enhancement. The DA's office was preparing for a murder trial; and video from the scene had been secured from the Wal-Mart in Cedar Park. I was asked to review the video for possible identification enhancement.

I requested Investigator Harris provide a copy of the video for my use. I received a DVD and a print out of times and corresponding actions as viewed from the Wal-Mart surveillance video. I was asked to enhance video from the Wal-Mart parking lot, specifically from the point where a figure can be seen exiting a vehicle and then walking along the outer perimeter area of the parking lot and then appears to leave in a vehicle.

Upon receipt of the DVD video, I placed the DVD in the RRPD video forensic computer and opened Photoshop CS-6 Extended. I directed CS-6 Extended to the DVD file and then opened the file. I worked with the video for several hours. The video segment was captured at night and the only constant lighting sources were the parking lot lights. Despite numerous adjustments to the available pixels in the video, I was unable to identifiably enhance the requested video segment.

I contacted Investigator Harris and advised him that I was unable to provide an identifiable image from the video. Investigator Harris texted my RRPD cellphone several weeks later and requested I return the DVD to the DA's office as he was unable to locate a copy of the DVD. I immediately returned the DVD to Investigator Harris at the Williamson County DA's office.

No Further Information.
Sgt. J. Rowe #513



Investigator Signature                    Supervisor Signature

# EXHIBIT J



# AFFIDAVIT

STATE OF TEXAS                    §

COUNTY OF WILLIAMSON             §

Affiant, Inna Aguilar, hereby states under oath the following:

"My name is Inna Aguilar. I am over the age of eighteen years and am capable to make this affidavit.

I am a private investigator licensed with the Texas Department Public Safety Private Security Board. On November 17, 2014, myself, Ryan Deck, and Scott Magee met with Detective John Rowe. In that meeting, Rowe explained that he was asked to work on a video by the DA's Office and worked only a couple of hours on that request. Rowe believed he received the DVDs in the Fall of 2013. Royger Harris brought the DVDs to him with 2-3 pages of times. Rowe was specifically asked if the video reflected a counter, or actual times like 1:00 a.m. or 2:00 and Rowe verified they were actual times. He further stated that Royger Harris brought the videos to him with times on it. Harris explained to him that they had already gone through the video and provided him with the times they wanted them to go to on the video to try and enhance it. They (DA's office) were specific that they wanted a long shot enhanced. He further said, "I would never feel comfortable testifying as to who is on that video."

Rowe was asked if he would be willing to sign an affidavit about what he had told us in the meeting, and he said he would."

Further, Affiant sayeth not.

_____
Inna Aguilar

Sworn and subscribed to before me, the undersigned authority, on this, the 16th day of March, 2015.

IRENE BRIONES-ODOM
Notary Public, State of Texas
My Commission Expires
September 24, 2017

_____
Notary Public



# EXHIBIT K



# AFFIDAVIT

STATE OF TEXAS       §

COUNTY OF WILLIAMSON       §

      Affiant is John Rowe. I am over the age of eighteen and capable of making this affidavit.

      I am a Detective at the Round Rock Police Department. In June of 2013, I attended a video forensics training program in Chicago. In late summer or early fall of 2013, I was asked to review a Walmart surveillance video on a CD to possibly enhance a portion of the tape. I understood that the video pertained to the Crispin Harmel case. I received a hand-written list of times from Royger Harris. I reviewed the video, which included timestamps that corresponded to Harris's list. However, I was not able to provide any identifiable enhancement to the video.

      Further affiant sayeth not.


_____

John Rowe

Sworn and subscribed to before me, the undersigned authority, on this, the ____ day of

_____, 2015.


_____

Notary Public for
Williamson County, Texas





STATE OF TEXAS

COUNTY OF WILLIAMSON

CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ May 29 ___ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY

BY _____ CW Elwell _____ DEPUTY

No. 13-0826-K277

| THE STATE OF TEXAS | § | IN THE 368th JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY |

## ORDER

The parties, attorneys, and employees of the attorneys in this case are prohibited from communicating with the press/media regarding this case or publicly commenting on this case during the pendency of the proceedings.

ORDERED, this the ___9___ day of __April__, 2015

_____
Hon. Rick J. Kennon
Presiding Judge
368th District Court
Williamson County, Texas

FILED
at 10:56 o'clock P M

APR 1 0 2015

_Lisa David_
District Clerk, Williamson Co., TX.



1

STATE OF TEXAS

COUNTY OF WILLIAMSON

CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ *May 29* _____ AD, 20 *15*

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY

BY _____ *CWElwell* _____ DEPUTY

No. 13-0826-K277

| STATE OF TEXAS | § | IN THE 368TH JUDICIAL |
| v. | § | DISTRICT COURT OF |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY, TEXAS |

## STATE'S MOTION TO RESCIND UNCONSTITUTIONAL GAG ORDER

The State respectfully requests the Court to rescind the gag order entered on April 10, 2015 and will demonstrate that the order is unconstitutional on its face.

### I.     The Court issued a gag order

At the end of the pretrial hearing on March 31, 2015, the Court discussed the issuance of a gag order with the parties and the issuance of a gag order was not opposed. 3/31/2015 Hearing R.R. at 74. The Court directed Defense Counsel to draft the gag order, to which Ms. Jernigan responded that she would take care of it. R.R. at 76. At the next hearing, the Court confirmed that there was a gag order, but mentioned that the Court had not received a written gag order. 4/8/2015 Hearing R.R. at 89. Presumably, at some point after the April 8, 2015 hearing, Ms. Jernigan drafted the gag order in question and presented it to the Court. This is based on the fact that there was a gag order entered into the case file on April 10, 2015. *See* Exhibit "A." However, Ms. Jernigan did not send the gag order to the State for review and approval and the State was not given the opportunity to take issue with the inadequate findings in the Order.

### II.     The Court's gag order is unconstitutional

Even though the State requested a gag order, the State did not request or consent to an unconstitutional gag order that violates the constitutional rights under the State and Federal Constitution of both parties in this case.

FILED
at 2:45 o'clock P M
cwc
MAY 1 2 2015
ENT'D
Lisa David
District Clerk, Williamson Co., TX.

An order of a court that forbids communications before they occur constitutes a prior restraint on speech. *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 917 (Tex. App.—Dallas 2006, no pet.). Prior restraints on speech are presumptively unconstitutional. *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex. 1992). A prior restraint on speech is an "administrative and judicial order forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. U.S.*, 509 U.S. 544, 550 (1993). This protection is rooted in both the federal and state Constitutions. *See Davenport*, 834 S.W.2d at 10 (Texas Constitution provides greater rights of free expression than its federal equivalent).

The Texas Supreme Court has held that before the trial court may impose a gag order, it must make specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute and that (2) the judicial action represents the least restrictive means to prevent that harm. *Davenport*, 834 S.W.2d at 10; *see also Ex parte Tucci*, 859 S.W.2d 1, 5-6 (Tex. 1993); *see* Exhibit "B" for relevant cases. Without these specific findings, a gag order is unconstitutional for violating the parties' rights to free speech through the dissemination of public information.

In this case, the gag order, as written, violates Jana Duty's free expression rights under Article I, Section 8 of the Texas Constitution and the 1st Amendment of the United States Constitution. An unconstitutional, overly broad order in this case does not give any of the parties adequate notice as to how their rights are being restricted and does not contain the constitutionally required findings that are necessary when Jana Duty's constitutional rights are infringed upon. In the *In re Graves* case, the Court of Appeals addressed the constitutionality of a gag order that failed to include the necessary findings on a writ of mandamus. 217 S.W.3d 744



(Tex. App.—Waco 2007); *see also, San Antonio Express-News v. Roman,* 861 S.W.2d 265, 266

(Tex. App.—San Antonio 1993, orig. proceeding). The *Graves* court held:

> By this opinion, we do not hold that the circumstances of Graves's case will not support the issuance of a gag order. Rather, we hold that (1) there is no evidence in the record supporting the findings necessary for a gag order, (2) the limited record in this case does not support Respondent's decision to take judicial notice regarding pretrial publicity, and (3) Respondent's order does not contain sufficiently specific findings for such an order.
>
> Respondent committed a clear abuse of discretion by issuing a gag order *without making sufficiently specific findings* (emphasis added) to support a prior restraint on Graves's right to free expression under article I, section 8 of the Texas Constitution. *See Poe,* 98 S.W.3d at 215; *see also Grigsby,* 904 S.W.2d at 621; *Marketshare Telecom,* 198 S.W.3d at 920; *Markel,* 938 S.W.2d at 79-80; *Low,* 867 S.W.2d at 142; *San Antonio Express-News,* 861 S.W.2d at 268. Graves has no adequate remedy at law. *See Poe,* 98 S.W.3d at 215; *see also Grigsby,* 904 S.W.2d at 621; *Low,* 867 S.W.2d at 142; *San Antonio Express-News,* 861 S.W.2d at 266-67.

*In re Graves,* 217 S.W.3d at 753 (Tex. App.—Waco 2007).

The gag order filed in this case is comprised of a single sentence: "The parties, attorneys, and employees of the attorneys in this case are prohibited from communicating with the press/media regarding this case or publicly commenting on this case during the pendency of the proceedings." This order is unconstitutional on its face, is overly broad, and does not comply with the holding in *Davenport* requiring specific findings and evidence presented to infringe on any party's free speech rights under the Federal and State constitutions.

**III.    State requests that the Court rescind and declare void the current gag order and enter in a new order that does not infringe both Parties' Constitutional rights.**

The State respectfully requests that the Court rescind and declare void the current gag order that infringes on Jana Duty's constitutional rights and the court make findings that demonstrate a constitutional basis to infringe on the Parties' constitutional rights. The State also asks that it be given the chance to be heard before any new gag order is entered and be given a chance to raise objections to any orders that may infringe on Jana Duty's constitutional rights.

## Prayer for Relief

The State respectfully requests that the Court rescind and declare void the gag order entered into the Williamson County District Clerk's file for this case on April 10, 2015 and enter in a new gag order that is narrowly tailored and does not violate any parties' constitutional rights.

Respectfully submitted,

**Brent Webster**
Assistant District Attorney
Williamson County, Texas
(512) 943-1234
State Bar No. *24053545*



*Exhibit A*

No. 13-0826-K277

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 368th JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY |

## ORDER

The parties, attorneys, and employees of the attorneys in this case are prohibited from communicating with the press/media regarding this case or publicly commenting on this case during the pendency of the proceedings.

ORDERED, this the ___9___ day of ___April___, 2015

_____
Hon. Rick J. Kennon
Presiding Judge
368th District Court
Williamson County, Texas

**FILED**
at 10:56 o'clock P M

APR 1 0 2015

*Lisa David*
District Clerk, Williamson Co., TX.



1

## Exhibit B

*Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992)

*In re Benton*, 238 S.W.3d 587 (Tex. App.—Houston [14th Dist.] 2007)

*In re Graves*, 217 S.W.3d 744 (Tex. App.—Waco 2007)

*In re Houston Chronicle Pub. Co.*, 64 S.W.3d 103 (Tex. App.—Houston [14th Dist.] 2001)

*San Antonio Express-News, a Div. of Hearst Corp. v. Roman*, 861 S.W.2d 265 (Tex. App.—San Antonio 1993)

*U.S. v. Brown*, 218 F.3d 415 (5th Cir. 2000)



STATE OF TEXAS

COUNTY OF WILLIAMSON

CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ May 29 _____ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY

BY _____ CW Elwell _____ DEPUTY

No. 13-0826-K277

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 368th JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY |

## RESPONSE/CLARIFICATION TO
## STATE'S MOTION TO RESCIND GAG ORDER

COMES NOW, Crispin James Harmel, hereinafter referred to as Defendant, by and through his attorney of record, Kristen Jernigan, and files this, his Motion Response/Clarification to State's Motion to Rescind Gag Order. In support of said response, Defendant would show this Honorable Court the following:

On May 12, 2015, the State filed its motion to rescind the gag order in this case. In the motion, the State alleges that the undersigned drafted the gag order pursuant to the Court's request and presented the order to the Court without notice to the State. However, on April 9, 2015, at 11:37 a.m., the undersigned emailed a copy of the proposed order to the Court and the State. *See* Exhibit A. The State had notice of the order and its allegation that the undersigned presented it to the Court without the State's input is incorrect. *See* Exhibit A.

Moreover, the State requested the gag order in this case at an informal hearing held on March 20, 2015. Pursuant to the State's request, the Court issued

1

FILED
at 3:40 o'clock P M

MAY 1 2 2015

Lisa David
District Clerk, Williamson Co., TX.

ENT'D

an oral ruling in open Court granting said request. *See* Exhibit B. In fact, when the Court asked the parties if anyone was opposed to a gag order, Ms. Duty responded, "No" and Mr. Brunner responded, "Not at all." *See* Exhibit B. To say that the State had no input or chance to object to an order they requested, while in open Court is again, incorrect. *See* Exhibit B.

Respectfully submitted,

Kristen Jernigan
State Bar Number 90001898
207 S. Austin Ave.
Georgetown, Texas 78626
(512) 904-0123
(512) 931-3650 (fax)

## CERTIFICATE OF SERVICE

I, Kristen Jernigan, attorney for Applicant Crispin James Harmel, do hereby affirm that a copy of the foregoing Response/Clarification to State's Motion to Rescind Gag Order was hand-delivered to the Williamson County District Attorney's Office on May 12, 2015.

Kristen Jernigan

2



# EXHIBIT A



From: **Kristen Jernigan** Kristen@txcrimapp.com
Subject: order
Date: April 9, 2015 at 11:37 AM
To: jtredemeyer@wilco.org
Cc: mbrunner@wilco.org, Office Email scott@mageefirm.net, Ryan Deck ryandecklaw@gmail.com

Hi Jennifer -

Here is the gag order the Judge requested.

Thanks,
Kristen





# EXHIBIT B



bring it up on the 7th.

THE COURT: That's fine. Okay. If it doesn't -- isn't a problem, then turn it over by tomorrow.

MR. BRUNNER: Right, Your Honor. If there's any problems, we'll come to you, all of us.

THE COURT: The next issue is the gag order. Is anyone opposed to a gag order?

MS. JERNIGAN: We're not, Judge.

MS. DUTY: No.

MR. BRUNNER: Not at all.

THE COURT: Oh, good. That makes it easy. Okay. So --

MR. BRUNNER: We'll do one thing easy for you, Your Honor.

THE COURT: That's true. At one point -- so what we're doing from this point forward, then, no one should talk to the media about this case for any reason. That also means don't post anything on Facebook or any of those other social media outlets.

MR. DECK: Judge, the one thing I would say is sometimes we do post updates to our own Listserv, the defense attorney Listserv, just do updates amongst lawyers. We've done that. I assume that's not a problem?

MR. BRUNNER:  Your Honor, that's --

THE COURT:  And I'm assuming that's accessible to the public in general?

MS. JERNIGAN:  No.

MR. DECK:  Just like what happened today, what's in public, what everyone saw today, not every lawyer was here, they ask for updates, and we say, Hey, this is what happened.

MR. BRUNNER:  Your Honor, that's --

THE COURT:  I'd rather not.

MR. BRUNNER:  That's a backdoor way of just getting information out.  I'm not saying that that's bad intent from State -- I mean, from Defense -- old habits die hard; excuse me, gentlemen -- but just it's spreading word that can just be dropped right out to the world.

MR. MAGEE:  Well, and, likewise, I don't think you should be able to send your employees to go talk to the media, either, you know.

THE COURT:  Well, I agree.  When I say this, this applies to your employees, anyone else you have hired, it applies to the DA's Office and anybody that's hired or with the DA's Office.  And that solves the problem; nobody is talking to the media, then we don't have to worry about it.  Okay?

Someone draft me an order.

MR. BRUNNER:  Sounds good, Judge.

THE COURT:  Ms. Jernigan, you draft that order.

MS. JERNIGAN:  I'll take care of that, Your Honor.

THE COURT:  Okay.  And so at this point in time, then, we'll come back on the 7th, I'll review all the cases that have been presented and any briefs by April 6th -- is that right?  Yeah -- April 6th, and then we'll be back here on the 7th at 9:00 to decide what else is going to happen.

Okay.  Thank y'all.

(Proceedings adjourned, 11:01 a.m.)



From this point forward, I guess until the 13th, Mr. Prezas, you're still off this case.

MR. BRUNNER:  Your Honor, the gag order is still in effect?

THE COURT:  Yes.

MR. BRUNNER:  Thank you, Your Honor.

THE COURT:  I never got an order.

MR. BRUNNER:  You said it.

THE COURT:  I know, but I don't have a written order.

Thank y'all.

(Proceedings adjourned, 3:46 p.m.)

STATE OF TEXAS

COUNTY OF WILLIAMSON

CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ June 1 _____ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY

BY _____ DEPUTY

No. 13-0826-K277

| STATE OF TEXAS | § | IN THE 368TH JUDICIAL |
| --- | --- | --- |
| v. | § | DISTRICT COURT OF |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY, TEXAS |

## STATE'S MOTION TO ENTER A CONSTITUTIONAL GAG ORDER

COMES NOW, the State of Texas by and through her Assistant District Attorney for Williamson County, and files this Motion to enter a constitutional gag order in the above numbered and entitled cause and would respectfully show this Court the following:

I.

On May 12, 2015, the State made the Court aware of the fact that the standing gag order in this cause number was unconstitutional on its face. Furthermore, the State has made its objection to the wording of the order clear in a filing dated May 12, 2015, and has demonstrated that the Order violates Jana Duty's constitutional rights and all parties rights, as written.

II.

The Court has an obligation to make sure that its orders do not violate the constitutional rights of all parties, and upon notice by either Party of the unconstitutionality of any action, the Court has a duty to take action to comply with the State and Federal Constitutions. Past differences between the Judge and District Attorney Jana Duty have no bearing on whether or not the current gag order is unconstitutional as it currently stands. The fact that the State originally asked that a gag order be put in place has no bearing on the constitutionality of the standing gag order prepared by Defense Counsel.

FILED

at 3:15 o'clock P M

MAY 1 4 2015

ENT'D

Lisa David

District Clerk, Williamson Co., TX.

## III.

The State has drafted a proposed order that adheres to the guidelines set out in *Davenport v. Garcia,* 834 S.W.2d 4 (Tex. 1992), and complies with the Texas and United States Constitutions. The proposed Order is attached as "Exhibit A" to this motion.

## IV.

The proposed Order complies with the precedent in *Davenport v. Garcia,* by identifying specific communications that were perceived by the Court that need to be "gagged," making the necessary findings about imminent harm to the litigation, and explaining why the perceived harm cannot be cured by remedial action. The Texas Supreme Court has held that before the trial court may impose a gag order, it must make, "specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute and that (2) the judicial action represents the least restrictive means to prevent that harm." *Id.* at 10 The Court held in *Davenport,*

> Applying this test to the facts of this case, there can be no doubt but that the gag orders violated article one, section eight of the Texas Constitution. The orders fail to identify any miscommunication that the trial court may have perceived, does not indicate any specific, imminent harm to the litigation, and offers no explanation of why such harm could not be sufficiently cured by remedial action. For instance, had any miscommunication stemmed from improper statements by Relator, as implied by the court, the proper response may have been to sanction her conduct. By stopping not only the purported miscommunications but *any* communications, the broadly worded injunction certainly fails the second part of our test.

*Id.* at 11. The current standing gag order in this case is not narrowly tailored, but is similar to the gag order in *Davenport.* It has a blanket prohibition against communication with the press and making public comments, which is synonymous with the "any communications" prohibition found in *Davenport. Id.*



## Prayer

NOW WHEREFORE, the State prays that this Court follow the law in this matter and expeditiously enter the proposed order that complies with the Constitutions of Texas and the United States. The State renews its companion request to rescind the current unconstitutional gag order.

Respectfully submitted,

Brent Webster
Assistant District Attorney
Williamson County, Texas

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing motion has been, or will be, sent by e-mail to counsel for the Defendant on May 14, 2015.

Respectfully submitted,

Brent Webster
Assistant District Attorney
Williamson County, Texas



# Exhibit A

# PROPOSED CONSTITUTIONAL GAG ORDER



No. 13-0826-K277

| STATE OF TEXAS | § | IN THE 368TH JUDICIAL |
| v. | § | DISTRICT COURT OF |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY, TEXAS |

## ORDER RESTRAINING PARTIES FROM MAKING EXTRAJUDICIAL STATEMENTS

This Court has a duty to preserve the State's and the Defendant's rights to a fair trial by an impartial jury and, if possible, to ensure that potential jurors will not be prejudiced by pre-trial publicity. The Court is also mindful of the First Amendment rights of the parties, counsel for the parties, the media, as well as Article 1, Section 8, Section 10, and the Open Courts Provision of the Texas Constitution. In efforts to balance these sometimes competing interests, courts have found that prior restraint may be imposed only in extraordinary circumstances, and only if there is the threat of imminent, severe harm. Accordingly, before issuing a gag order, a court must find that extensive media coverage will harm the judicial process.

This Court takes judicial notice of:

1) On May 9, 2013, the Defendant was indicted on a Capital Murder charge. The Defendant's case generated substantial publicity.

2) The Defendant pled not guilty to the State's allegations and the case was tried before a jury beginning on April 28, 2014. On May 7, 2014, the Court declared a mistrial and discharged the jury.

3) The Defendant's case, before, during, and after the first trial, generated extensive media coverage and publicity.

4) The Defendant's counsel filed a pre-trial Motion for Writ of Habeas Corpus on March 18, 2015 alleging the Defendant's rights against double jeopardy



had been violated due to alleged prosecutorial misconduct.

5) Counsel for the Defendant gave numerous media interviews that have been published and broadcasted by local media.

6) The unusually emotional nature of the issues involved in this case.

The Court FINDS that counsels' willingness to give interviews to the media would only serve to increase the volume of pre-trial publicity.

The Court FINDS that counsels' discussion of this case on social media websites would only serve to increase the volume of pre-trial publicity.

The Court FINDS that defense counsel's discussion of this case on the Williamson County Criminal Defense Lawyers Association Listserv would only serve to increase the volume of pre-trial publicity and add to the potential for leaks to the media.

The Court FINDS that the increase in pre-trial publicity jeopardizes the Court's ability to seat an impartial jury in this case.

The Court FINDS that the granting of interviews to the media would interfere with the State's and the Defendant's rights to a fair trial by an impartial jury.

The Court FURTHER FINDS that no less restrictive means exists to treat the specific threat to the judicial process generated by this pre-trial publicity.

The Court FURTHER FINDS that an order restricting extra-judicial commentary by counsel for the parties is necessary to preserve all venue options and a delay in proceedings would not lessen the publicity generated by this case.

Accordingly, in its sound discretion and in light of the relevant facts and circumstances of this particular case, the Court ORDERS, ADJUDGES, AND DECREES that prior to and during the trial of this case:

1) All attorneys involved in this case shall strictly adhere to the letter and spirit



of the provisions of the Texas Code of Professional Responsibility governing comments to the media. Specifically, all attorneys shall refrain from making "extrajudicial statements that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." TEX. DISCIPLINARY R. PROF'L CONDUCT 3.07, *REPRINTED IN* TEX. GOV'T. CODE, tit. 2 subtit. G app. A (TEX. STATE BAR R. art. 10 sec. 9).

2) All attorneys, their staffs, and law enforcement officers involved in this case shall not discuss this case with the media.

3) All attorneys, their staffs, and law enforcement officers shall not discuss this case on social media websites.

4) All attorneys and their staffs shall not discuss this case on the Williamson County Criminal Defense Lawyers Association Listserv.

5) Witnesses who have previously given statements to law enforcement personnel, representatives of the District Attorney's Office, or who have testified in investigative or adjudicative proceedings and witnesses who give statements after the date of entry of this order shall not discuss this case with the media.

6) This order shall not be interpreted to prohibit attorneys from communicating with the parties in order to prepare for trial, nor shall it be interpreted to prohibit the third parties from attending any live sessions before the Court or from publishing any information they have already obtained or may obtain in the future. The term "third parties" includes any person or organization, not a party, not an attorney for a party, or not a person employed by the parties or attorneys for the parties for the purposes of assisting in this litigation.

This Order does not include any of the following:

1) Factual statement of the accused person's name, age, residence, occupation, and family status.

2) The nature and text of the charge as reflected in the indictments and public records.

3) Quotations from, or any reference without comment to, public records of the Court in this case, and to other public records heretofore disseminated to the public.



4)      The scheduling and result of any stage of the judicial proceeding held in open Court in an open and public session.

5)      A request for assistance in obtaining information, evidence, or the name of possible witnesses.

It is ORDERED that this Order shall remain in full force and effect until this case has been disposed of or until further Order of this Court.

The Court hereby rescinds and voids the gag Order signed on the 9th day of April, 2015.

This Court shall entertain reasonable requests to modify this Order as the need arises.


SIGNED AND ORDERED THIS \_\_\_\_ DAY OF MAY, 2015.


_____
Presiding Judge



STATE OF TEXAS

COUNTY OF WILLIAMSON

CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ May 29 _____ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY

BY _____ Cardwell _____ DEPUTY

No. 13-0826-K277

| STATE OF TEXAS | § | IN THE 368TH JUDICIAL |
| v. | § | DISTRICT COURT OF |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY, TEXAS |

## ORDER DENYING STATE'S MOTION TO VOID GAG ORDER

The Court is in possession of State's motion to rescind ~~unconstitutional~~ gag order filed May 12, 2015 and State's motion to enter a constitutional gag order, filed May 14, 2015. On May 29, 2015, at a hearing in this case, the State renewed its objection to the gag order and orally asked the court to void the gag order previously entered on April 9, 2015.

The Court denies State's request to void the gag order signed April 9, 2015.

Ordered this the ___29___ day of May, 2015.

Honorable Rick Kennon
Presiding Judge, 368th District Court

FILED
at 12:00 o'clock P M
MAY 2 9 2015
Lisa David
District Clerk, Williamson Co., TX.

STATE OF TEXAS
COUNTY OF WILLIAMSON
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE COPY IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____5/29_____ AD, 20_15_

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY
BY _____ DEPUTY

54453

CAUSE NO. 15-0486-C368

EX REL JANA DUTY

In the 368th Judicial District Court
Of Williamson County, Texas

## NOTICE OF HEARING TO SHOW CAUSE

TO: Jana Duty District Attorney of Williamson County

GREETING:

WHEREAS the Honorable Judge Rick Kennon of the County of Williamson, State of Texas did on this the 14th day of May, 2015, file in the 368th District Court of Williamson County a Motion for Contempt in the above numbered and entitled cause, and makes allegations set forth in the Motion attached hereto and accompanying this writ.

AND WHEREAS, the Honorable Rick Kennon, Judge of said Court, has entered the following order, to-wit:

Motion to Hold Jana Duty in Contempt and Order to Show Cause and Amended Order To Show Cause.

AND WHEREAS, the said Motion will be heard by the said Court at Georgetown in Williamson County, Texas on the 6th day of July, 2015 at 9:00 o'clock AM.

YOU ARE, THEREFORE, ordered to appear at the time and place as above stated, and answer said Order showing cause, if any you can, why same should not be granted.

GIVEN under my hand and seal of office in Georgetown, Williamson County, Texas on this the 15th day of May, 2015.

Lisa David, District Clerk
Williamson County, Texas

By _____
Cathy Mendoza, Chief Deputy District Clerk

## OFFICER'S RETURN

Came to hand the 15th day of May 2015 at 9:09 o'clock A M and executed the 15th day of May 2015 at 10:18 o'clock A M at 405 MLK Georgetown in Williamson County, Texas by delivering to the within named Defendant Jana Duty in person a true copy of this writ, application, affidavits and Orders of the Court.

Fee $____

RECEIVED 2015 MAY 15 AM 9:09
KEVIN STOFLE
CONSTABLE, PRECINCT 3
WILLIAMSON COUNTY, TEXAS

Kevin Stofle, Constable
Williamson County, Pct. 3

By _____

Sheriff/Constable
_____ County, Texas

Deputy
Constable

FILED
at ____ o'clock ____ M

MAY 15 2015

Lisa David
District Clerk, Williamson Co., TX.

ORIGINAL

STATE OF TEXAS

COUNTY OF WILLIAMSON

CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ 5/29 _____ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY
BY _____ DEPUTY

CAUSE NO. 15-0486-C368

|                      |   |                        |
|----------------------|---|------------------------|
|                      | § | IN THE DISTRICT COURT  |
|                      | § |                        |
| EX REL JANA DUTY     | § | WILLIAMSON COUNTY, TEXAS |
|                      | § |                        |
|                      | § | 368TH JUDICIAL DISTRICT |

## MOTION TO HOLD JANA DUTY IN CONTEMPT

Movant, Rick J. Kennon, files this Motion for Contempt and sanctions, complaining of Respondent, Jana Duty. In support of this motion, Rick J. Kennon, respectfully shows as follows:

1.  Movant is the District Judge for the 368th Judicial District in Williamson County, Texas. Movant is also the presiding judge in *State of Texas v. Crispin Harmel*, Cause No. 13-0826-K277.

2.  Respondent, Jana Duty, is the elected District Attorney for Williamson County, Texas and is one of the prosecutors on the *Harmel* case.

3.  On or about April 9, 2015 at the request of the District Attorney's Office, Movant entered an order that prohibited the attorneys in the *Harmel* case from communicating with the press/media regarding the case or making any public comments about the case. Respondent and her First Assistant, Mark Brunner, were both present at the time the order was entered and agreed to the entry of said Order.

4.  On May 6, 2015, Movant received an email from Jana Duty, the elected District Attorney for Williamson County, Texas that advised Movant that she planned to

Page 1 of 3

contact the media with regard to an article that was published in the Austin American Statesman related to pleadings filed by the defense in the *Harmel* case.

5. On May 7, 2015, Movant received a copy of the online article published by the Austin American Statesmen which contains alleged quotes from Respondent regarding the *Harmel* case.

6. Respondent, Jana Duty's, conduct is in direct violation of the April 9, 2015 court order entered by the Court.

7. On May 7, 2015, Movant sent an email to all counsel in the *Harmel* case to appear in court on May 8, 2015 at 10:30 a.m. Respondent failed to appear for this hearing.

8. Late on May 8, 2015, Movant received an email from Respondent advising that she refused to appear at the 10:30 hearing on May 8, 2015 because she felt she was not given enough respect and therefore, she would not give respect to the Court by showing up for the hearing.

9. The Court has been damaged in that Respondent, Jana Duty's, conduct has hindered, obstructed, and interfered with the functioning of the Court and the administration of justice.

10. A copy of Movant's Affidavit in support of this Motion is attached hereto as Exhibit "A" and incorporated herein as if set forth at length.

WHEREFORE, PREMISES CONSIDERED, Movant prays that Jana Duty be cited to appear and show cause why she should not be held in contempt of court for the



actions described above and for such other and further relief to which the Court deems proper.

Respectfully submitted:

_Rick Kennon_

Rick J. Kennon
Presiding Judge – 368th District Court
405 Martin Luther King St., Box 8
Georgetown, Texas 78626
Telephone: (512) 943-1368
Telecopier: (512) 943-1285
rkennon@wilco.org

### Verification

| State of Texas | § |
| County of Williamson | § |

Before me, the undersigned notary public, on this day personally appeared "Rick J. Kennon, known to me, who after being duly sworn, upon his oath stated that he is the Movant in this above-captioned cause; that he has read the foregoing document; and that every statement contained therein is true and correct within his personal knowledge.

_Rick J. Kennon_

Rick J. Kennon

SUBSCRIBED AND SWORN TO before me on this the ___14___ day of May, 2015, to which I place my signature and official seal.



JENNIFER L. TREDEMEYER
MY COMMISSION EXPIRES
February 20, 2016

_Notary Public_

Notary Public

Page 3 of 3



**State of Texas**                §
                                  §
**County of Williamson**          §

## AFFIDAVIT OF JUDGE RICK J. KENNON

Before me, the undersigned notary public, on this day personally appeared the Honorable Judge Rick J. Kennon, known to me, who after being duly sworn, upon his oath stated that:

"I am the District Judge for the 368th Judicial District in Williamson County, Texas. I am the presiding judge in *State of Texas v. Crispin Harmel,* Cause No. 13-0826-K277.

On or about April 9, 2015, at the request of the District Attorney's Office, I entered an order that prohibited the attorneys in the *Harmel* case from communicating with the press/media regarding the case or making any public comments about the case. A copy of the April 9, 2015 order is attached hereto as Exhibit 1.

On May 6, 2015, I received an email from Jana Duty, the elected District Attorney for Williamson County, Texas that advised me that she planned to contact the media with regard to an article that was published in the Austin American Statesman related to pleadings filed by the defense in the *Harmel* case. A copy of this email is attached hereto as Exhibit 2.

On May 7, 2015, I received a copy of the online article published by the Austin American Statesmen which contains alleged quotes from Ms. Duty regarding the *Harmel* case. A copy of this article is attached hereto as Exhibit 3.

Ms. Duty's conduct is in direct violation of the April 9, 2015 court order entered by this Court.

EXHIBIT "___A___

On May 7, 2015, I sent an email to all counsel to appear in court on May 8, 2015 at 10:30 a.m. A copy of this email is attached hereto as Exhibit 4. Ms. Duty failed to appear on that date.

Late on May 8, 2015, I received an email from Ms. Duty advising that she refused to appear at the 10:30 hearing on May 8, 2015 because she felt she was not given enough respect and therefore, she would not give respect to the Court by showing up to the hearing. A copy of this email is attached hereto as Exhibit 5.

The Court has been damaged in that Ms. Duty's conduct has hindered, obstructed, and interfered with the functioning of the Court and the administration of justice."

Further Affiant sayth not.

_____
Honorable Judge Rick J. Kennon

SUBSCRIBED AND SWORN TO before me on this the __14__ day of May, 2015, to which I place my signature and official seal.

JENNIFER L. TREDEMEYER
MY COMMISSION EXPIRES
February 20, 2016

_____
Notary Public



No. 13-0826-K277

| THE STATE OF TEXAS | § | IN THE 368th JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| CRISPIN JAMES HARMEL | § | WILLIAMSON COUNTY |

## ORDER

The parties, attorneys, and employees of the attorneys in this case are prohibited from communicating with the press/media regarding this case or publicly commenting on this case during the pendency of the proceedings.

ORDERED, this the ___9___ day of __April, 2015__

Hon. Rick J. Kennon
Presiding Judge
368th District Court
Williamson County, Texas

FILED
at 10:56 o'clock P M
APR 1 0 2015
Lisa David
District Clerk, Williamson Co., TX.

1

EXHIBIT "___1___"

## Rick Kennon

| | |
|---|---|
| **From:** | Jana Duty |
| **Sent:** | Wednesday, May 06, 2015 4:43 PM |
| **To:** | Rick Kennon |
| **Subject:** | On-line AAS story |

Judge,

The Austin American Statesman has an on-line story filled with accusation from Deck's latest pleadings. I will be commenting before this story goes to print tomorrow. Just so that you know. I will not discuss the facts of the case, I will simply defend myself.

Jana

Sent from my iPhone

EXHIBIT "___2___"

1



**Statesman** | ≡ SECTIONS | ☁ 74° | 🚗 TRAFFIC | 🔍

CRIME

Open carry supporters rally at Austin police headquarters


Open carry supporters rally at Austin police headquarters

via MyStatesman.com
Travis County prosecutor Gary Cobb announces run for district attorney




**COLOR YOUR SUMMER**
ymcagwc.org
Register your kids for SUMMER CAMP

*Claire Osborn*
*American-Statesman Staff*


# Williamson prosecutors accused of withholding evidence from hearing

⏱ 11:59 a.m. Wednesday, May 6, 2015 | Filed in: Crime


## MyStatesman

Get complete, in-depth analysis and more with our interactives

Access to MyStatesman included for Statesman subscribers. **EXPLORE →**

A hearing on whether or not the Williamson County district attorney's office withheld evidence before a capital murder trial was rescheduled Tuesday after defense attorneys said prosecutors withheld information for the hearing.

The hearing in the case of Crispin Harmel had been set for Thursday but was moved to May 29 after defense attorneys asked for more time. Their motion for a continuance alleges that prosecutors withheld evidence again by giving defense attorneys only 1 percent of the results they had requested in April from a search of District Attorney Jana Duty's computer.

Duty said Wednesday that the district attorney's office has never withheld evidence in the case.

**SIGN UP FOR E-NEWSLETTERS**

Want more news? Sign up for free newsletters to get more of the Statesman delivered to your inbox.

Prosecutors released a report to the defense April 24 that showed there were about 300 hits on certain keywords on Duty's computer, the motion said.

A defense expert learned Monday — from the detective who did the computer search — that there were 29,000 hits on the keywords requested, according to the motion.

Duty said Wednesday that the detective doing the search for 10 keywords on her computer didn't have seven to 10 days to download the 29,000 hits, so he just sent a sampling of them. "One phone call to Acevedo (the detective) would have cleared this issue up, but instead, the defense attorneys crank out another ridiculous motion claiming that we 'withheld' roughly 28,600 pieces of evidence," Duty said.

Harmel is accused of strangling Jessika Kalaher in 2009 in Cedar Park after following her out of a Walmart.

EXHIBIT "___3___"

Harmel's first trial was declared a mistrial in May 2014. Halfway through it, prosecutors discovered software that would put time stamps on a crucial surveillance video from the Wal-Mart. The time stamps were at odds with the defense's timeline of events.

He was scheduled to be retried March 30 before defense lawyers filed court documents alleging that the district attorney's office had withheld time stamp information from the video, which violated Harmel's right to due process. The defense also alleged in other court documents that Duty knew the time stamps were on the video before the first trial because a former court employee — Royger Harris — said he saw them when he watched the video with her.

"Although Royger downloaded the correct player to my computer, I was using the default player on my computer, not realizing there was a difference," Duty said Wednesday.

The motion for continuance filed Tuesday said that the results of the computer search showed the program used to view the video with time stamps "was used on Ms. Duty's computer on several different dates including as late as February 27, 2014."

The trial started in late April 2014.

Duty also said Wednesday that the defense was given the correct video with the time stamps on it at the beginning of the trial but they didn't know how to use the player to show the time stamps.

"When we discovered, during the first trial, that there was a better way to watch the footage (with the correct player) we did not tell the defense attorneys, as they had the correct player all along," Duty said.

District Judge Rick Kennon will consider during the hearing May 29 an allegation from one of Harmel's attorneys that Harmel cannot be tried again because that would be double jeopardy.

Double jeopardy "bars a retrial where the prosecutor's conduct was intentional in provoking the request for a mistrial," according to court documents filed by the defense attorney.



## Rick Kennon

| | |
|---|---|
| **From:** | Jana Duty |
| **Sent:** | Friday, May 08, 2015 4:06 PM |
| **To:** | Office Email |
| **Cc:** | Rick Kennon; Mark Brunner; ryandecklaw@gmail.com; Kristen Jernigan |
| **Subject:** | Re: Harmel |

Judge,

I would like to take a minute to explain why I was not in court today. You notified us at about 5:30 yesterday to check our schedules. I had plans for today but I was willing to go to the courthouse if it was important. I asked you to let me know what the meeting was about so I could judge if I really needed to be there. You did not respond. This meant one of two things, one, it wasn't that important or two, you did not respect me enough to give me an answer. Your next response was, "be in my courtroom at 10:30", even tho I had not responded that that time would work for me, nor had you answered my question.

Judge, getting the respect that I feel I am owed in this courthouse has been difficult. To get an email at 5:30 saying, "can you be here"? then ignoring my request for an explanation as to why, followed by, "be here at 10:30" reeked of disrespect. I felt, if you don't respect me enough to give me the information I requested, I will not give you respect and show up.

If you feel I need to be reprimanded for communicating with The Statesman, I understand. But making a public spectacle out of punishing me just hurts everyone. No one will come out unscathed. And if I am disciplined, I believe defense counsel should also be disciplined as their Motion for Continuance was drafted in such a way as to purposefully gain media interest (unnecessarily so) and so therefore violated the spirit of the gag order. They knew or should have known that due to the way it was drafted, it was going to be covered by the media.

So, that's all I have to say about that. If you would like to meet, to talk one on one about our need for building a relationship of mutual respect, I look forward to that meeting.

Have a great weekend.

Jana

Sent from my iPhone

On May 7, 2015, at 6:19 PM, Office Email <scott@mageefirm.net> wrote:

> The defense will be there. Thank you, Your Honor.
>
> R. Scott Magee
> Attorney at Law
> 107 N. Lampasas Street
> Round Rock, Texas 78664
> 512.983.1675 (tel)
> 512.354.7538 (fax)
>
>
> On May 7, 2015, at 5:54 PM, Rick Kennon <Rkennon@wilco.org> wrote:



1     EXHIBIT " 5

Please meet in my courtroom at 10:30 a.m.  Thank you.

Sent from my iPhone

On May 7, 2015, at 5:51 PM, "Jana Duty" <jduty@wilco.org> wrote:

> Judge,
>
> I will be glad to rearrange my schedule for tomorrow, however, I would like some notice as to what this meeting will be addressing. Thank you.
>
> Jana
>
> Sent from my iPhone
>
> On May 7, 2015, at 5:22 PM, Rick Kennon <Rkennon@wilco.org> wrote:
>
>> Counsel:
>>
>> I was trying to schedule everyone to come to court on Monday, May 11th; however, it is my understanding that Ms. Duty will be out of town on Monday.  I prefer not to schedule late next week so I want to meet with all counsel tomorrow.  I can be available at any time.  Please consult with each other to come up with an agreeable time to meet in my courtroom tomorrow morning or afternoon.  Please email me back when a time has been agreed upon.  I believe we will only need 10-15 minutes.  Thank you.
>>
>> Rick
>>
>> Rick J. Kennon
>> 368th District Judge
>> 405 Martin Luther King, Box 8
>> Georgetown, Texas 78626
>> Telephone: (512) 943-1368
>> Telecopier: (512) 943-1285

STATE OF TEXAS
COUNTY OF WILLIAMSON
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____ 5/29 _____ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY
BY _____ DEPUTY

CAUSE NO. 15-0486-C368

|  | § | IN THE DISTRICT COURT |
|  | § | |
| EX REL JANA DUTY | § | WILLIAMSON COUNTY, TEXAS |
|  | § | |
|  | § | 368TH JUDICIAL DISTRICT |

## ORDER TO SHOW CAUSE

IT IS ORDERED that Jana Duty appear before this Court on the **29ᵗʰ** day of **June**, 2015 at **9:00** **A** m., at the 368ᵗʰ Judicial District Court in Williamson County, Texas, to show cause why Jana Duty should not be held in contempt of court for direct violation of the April 9, 2015 court Order prohibiting the attorneys in Cause No. 13-0826-K277, State of Texas v. Crispin James Harmel, from communicating with the press/media regarding the *Harmel* case.

IT IS FURTHER ORDERED that a writ of scire facias issue commanding Jana Duty to appear at the time and place set forth above, for the purpose of showing cause why she should not be held in contempt of court because of the allegations set forth above and in the Motion for Contempt that has been filed in this cause, and that a summons accompany a certified copy of the writ of scire facias, to be delivered to Jana Duty by any sheriff or constable of any Texas county.

SIGNED AND ENTERED on the **14** day of **May**, 2015.

_____
Presiding Judge

**FILED**
at 2:15 o'clock P M

MAY 1 4 2015

Lisa David ed
District Clerk, Williamson Co., TX.

STATE OF TEXAS
COUNTY OF WILLIAMSON
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____5/29_____ AD, 20 15

- LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY
BY _____ DEPUTY

CAUSE NO. 15-0486-C368

|  | § | IN THE DISTRICT COURT |
|---|---|---|
|  | § |  |
| EX REL JANA DUTY | § | WILLIAMSON COUNTY, TEXAS |
|  | § |  |
|  | § | 368TH JUDICIAL DISTRICT |

## AMENDED ORDER TO SHOW CAUSE

IT IS ORDERED that Jana Duty appear before this Court on the **6**th day of _**July**_, 2015 at **9:00** **A** m., at the 368th Judicial District Court in Williamson County, Texas, to show cause why Jana Duty should not be held in contempt of court for direct violation of the April 9, 2015 court Order prohibiting the attorneys in Cause No. 13-0826-K277, State of Texas v. Crispin James Harmel, from communicating with the press/media regarding the *Harmel* case.

IT IS FURTHER ORDERED that a writ of scire facias issue commanding Jana Duty to appear at the time and place set forth above, for the purpose of showing cause why she should not be held in contempt of court because of the allegations set forth above and in the Motion for Contempt that has been filed in this cause, and that a summons accompany a certified copy of the writ of scire facias, to be delivered to Jana Duty by any sheriff or constable of any Texas county.

SIGNED AND ENTERED on the **15**th day of _**May**_, 2015.

_____
Presiding Judge

STATE OF TEXAS
COUNTY OF WILLIAMSON
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE _____5/29_____ AD, 20 15

LISA DAVID
DISTRICT CLERK OF WILLIAMSON COUNTY
BY_____ DEPUTY

FILED
at 804 o'clock 9 M

MAY 15 2015

*Lisa David*
District Clerk, Williamson Co., TX.

| | |
|---|---|
| **From:** | Rick Kennon |
| **Sent:** | Saturday, June 27, 2015 2:58 PM |
| **To:** | Jana Duty; Mark Brunner; Kristen Jernigan; ryandecklaw@gmail.com; Scott Magee |
| **Subject:** | Harmel |

Dear counsel:

I just wanted to let you know that I have not made a ruling on the Harmel double jeopardy motion. I have seen the article in the statesman by Claire Osborn indicating that I have made a ruling but this is completely inaccurate. She posted that online last night and I was notified. I called Ms. Osborn last night and left her a voicemail letting her know she was wrong in her assessment of the situation and to pull the article. She has not responded.

 Rick

Sent from my iPad

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00320-CV

**In re Jana Duty**

## ORIGINAL PROCEEDING FROM WILLIAMSON COUNTY

## M E M O R A N D U M   O P I N I O N

**PER CURIAM**

The petition for writ of mandamus is denied and the emergency motion for temporary relief is dismissed as moot. *See* Tex. R. App. P. 52.8(a).

Before Chief Justice Rose, Justices Goodwin and Field

Filed:   May 28, 2015

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00360-CV

**In re Jana Duty**

## ORIGINAL PROCEEDING FROM WILLIAMSON COUNTY

## M E M O R A N D U M   O P I N I O N

**PER CURIAM**

The petition for writ of mandamus is denied. *See* Tex. R. App. P. 52.8(a).

Before Chief Justice Rose, Justices Goodwin and Field

Filed:   June 17, 2015

Page 1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 13-0826-K277

| | |
|---|---|
| STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| vs. | ) WILLIAMSON COUNTY, TEXAS |
| | ) |
| CRISPIN JAMES HARMEL | ) 368TH JUDICIAL DISTRICT |

_____

STATUS HEARING

_____

On the 20th day of March, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Rick J. Kennon, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

654e9fa7-9753-473c-81ee-4b4a97b06fdd

APPEARANCES


Ms. Jana Duty
SBOT NO. 24000244
        -and-
Mr. Mark Brunner
SBOT NO. 24006917
        -and-
Mr. Brent Edward Webster
SBOT NO. 24053545
Williamson County District Attorney
405 Martin Luther King
Suite 1
Georgetown, Texas  78626
Telephone:  (512) 943-1234
COUNSEL FOR THE STATE


Ms. Kristen Jernigan
SBOT NO. 90001898
Law Office of Kristen Jernigan
2007 South Austin Avenue
Georgetown, Texas  78626
Telephone:  (512) 904-0123
E-mail:  Kristen@txcrimapp.com
COUNSEL FOR THE DEFENSE


Mr. Ryan Herbert Deck
SBOT NO. 24040781
The Office of Ryan Deck
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 251-8920
E-mail:  Ryandecklaw@gmail.com
COUNSEL FOR THE DEFENSE


Mr. Randall Scott "Scott" Magee
SBOT NO. 24010204
R. Scott Magee, Attorney At Law
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 983-1675
E-mail:  Scott@mageefirm.net
COUNSEL FOR THE DEFENSE

654e9fa7-9753-473c-81ee-4b4a97b06fdd

VOLUME 1

Status Hearing

March 20, 2015

                                        PAGE VOL.

Reporter's Certificate .........................32   1

654e9fa7-9753-473c-81ee-4b4a97b06fdd

Page 24

MR. BRUNNER:  I just figured it's the same issue on both sides, Your Honor.

THE COURT:  I agree.

MR. BRUNNER:  Last, Your Honor, and I'm sure everyone is happy to hear me say that, as they always are when I'm in court standing up, is the issue of -- of the gag order.  I think this is -- you know, we had a motion filed by the State this week, and then, you know, here it is 15 days before trial, they file a motion, and then the first impulse is -- filing a motion, wonderful.  They are entitled to a defense.  Mr. Harmel is entitled to a defense -- a vigorous defense.  They're not required to lay over and let us steamroll them; however, the first impulse being, right after it's filed, let's call a press -- issue a press release.

That is fraught with peril because it puts us in this position of we either don't respond and let it sit there or respond.  If I over-respond or someone else over-responds, then, you know, they may be facing -- just talking hypothetically here, not talking about this crew -- hypothetically, someone says the wrong thing to the press, if they're the Defense, the worst that can happen to them is maybe an ethical violation and maybe a chewing out by the Judge.

Page 25

The worst thing that can happen to the State, if we start over-talking to the press, is a mistrial with prejudice, prosecutorial misconduct. That's basically a gun to our heads.

And so when talking to the press, the press has a job to do, and they do headlines like they had this week in court, quote, "Prosecutor lied about evidence" 12 days before trial, you know --

THE COURT: That was a headline in the paper?

MR. BRUNNER: Yes, Your Honor.

THE COURT: American Statesman?

MR. BRUNNER: Yes, Your Honor.

MS. DUTY: Yes.

THE COURT: I saw you guys on TV I guess two days ago -- or two nights ago, which tells me that the press was notified pretty quickly, since they were here, I think, within an hour of the time it was filed.

MR. BRUNNER: Your Honor, that's how I heard about this, not from Defense counsel. Maybe they sent me an e-mail and I wasn't watching, but I heard it from the press first.

THE COURT: Okay.

MR. BRUNNER: And, Your Honor, it's just we don't want to turn this into -- we can't control the

654e9fa7-9753-473c-81ee-4b4a97b06fdd

press.  You can't control the press, we can't, Defense can't.  You can control our actions, but I don't want this to turn into a dual of who can say what, snakily, to the press.

We can have a situation where, you know, someone walks up to, let's say, hypothetically, Mr. Deck, or another member of the Defense team:  Ryan, do you like Slurpees?  Do you prefer Slurpees, or do you like -- do you like Icees?  Slurpees or Icees?

Mr. Deck may say, You know what?  I prefer Icees.

To have someone overhear that --

MR. MAGEE:  Your Honor, I'm going to object to this.  We're having a hearing.

MR. BRUNNER:  This is -- no.  No.

THE COURT:  Go ahead.  Go ahead.

MR. BRUNNER:  And they said, I heard Mr. Deck said he likes ISIS.

And so the headline is -- they file an affidavit and the headline is, quote, "? Defense attorney supports Jihad terrorists?"

How is he going to respond to that?  He's going to pick up the phone and tell the media, That's bunk.

Okay?  Just as, you know, if -- my first

654e9fa7-9753-473c-81ee-4b4a97b06fdd

Page 27

impulse when the headline is "Prosecutor lies about evidence" is to pick up the phone and say, That's wrong.

And if one of us says the wrong thing, we are jeopardizing the flow of the trial.

So what I'm asking for, Your Honor, is if we can just stop this --

THE COURT:  How restrictive of a gag order do you want?

MR. MAGEE:  Well, Your Honor, that's it; is there a legal standard we're addressing here? Because I've never heard -- I haven't heard anything. What are we talking about?  I mean, that's all very entertaining.

MR. BRUNNER:  I'm talking about a gag order.

MR. MAGEE:  That's all very entertaining and comical, and I get that.  But we sent out a press release, and we take our queues from -- you know, the State sends out press releases all the time.  I don't hear them complaining about press releases then.

So, you know, with us, we're just making sure what we give out is very careful.  That's why we did a press release, because we wanted to be careful. That's all very entertaining, but what legal standard are we addressing here?

654e9fa7-9753-473c-81ee-4b4a97b06fdd

MR. BRUNNER: Your Honor, you have control over the flow of information from this court, and you have the authority to order the parties to not discuss this case with the media, to not make any postings with the media. I'm not looking for sanctions or ribbing them, Your Honor, for doing what they did.

THE COURT: Okay. Let me do this. Looks like we have another issue to take up on the 31st. But what I can do between now and then is, let's not have any discussions with the media until the 31st. And if you want to present a whole big, giant issue about what type of a gag order, how restrictive it needs to be, I'm fine with dealing with that.

I can understand -- I have some problems with that headline. That being said, I don't know where the person got the headline. And, I agree, I know how the media is, they're going to do whatever they can do to sell newspapers or get on the news.

So I have some concerns with that particular headline, if that's all it said. I mean, if it said, "Defense claims based on the motion" -- I can understand if they quoted something that was in the motion that was filed. That's a little different than "State withholds evidence."

And I think it's very important, and I

think we addressed this a little bit at the last trial -- on the mistrial, is because of the history of Williamson County, people are looking at this county I guess much more severely than they might some other counties just because of the things that have gone on over the last several years.  And so we do need to be careful with that, and I don't think it's appropriate that derogatory comments are made about other attorneys involved in cases, including this one, but any case, to tell you the truth.  And so we need to make sure that that's -- that everybody stays within those ethical guidelines.

But at this point in time, let's not have any conversations or discussions with the media, and on the 31st of March, we will deal with that issue and see if we need to have some kind of permanent order dealing with that restriction.  Anything else today?

MR. MAGEE:  Not from the Defense, Your Honor.

MR. BRUNNER:  (Shakes head.)

THE COURT:  Okay.  Now, next question is, based on all these new things that we have to deal with, are we going to be able to do this in a day, or do we need to go into the next day?  And it doesn't matter if we do.

654e9fa7-9753-473c-81ee-4b4a97b06fdd

MS. JERNIGAN:  I still think we can probably get it done in a day.

THE COURT:  Okay.  And my concern is, if we don't, we will be into April Fools' Day. Mr. Brunner, I know that's an issue.

MR. BRUNNER:  Just another day for me, Your Honor.  It's not a Holy Day of Obligation or anything, even in my household.  Your Honor, it's -- no. I'm very confident we can get this all resolved in one day.

THE COURT:  Okay.  Good deal.

MR. BRUNNER:  And I literally didn't see in the red file -- in the -- sorry, not in the red file, but in the clerk's summary on the computer that Ms. Jernigan was appointed.  Trust me, I looked for it. It wasn't there, or at least I didn't see it.  So I wasn't trying to mischaracterize that she wasn't appointed by the Court.

THE COURT:  No.  I'm fine with that.  I remembered that she was.

MR. MAGEE:  It was an Ake motion, which is permitted by law.  And so now, here we are.  It's under Ake Motions of Oklahoma.

MR. BRUNNER:  Okay.  I just thought she was volunteering out of the charity of her heart.

654e9fa7-9753-473c-81ee-4b4a97b06fdd

Page 31

THE COURT:  She's like that.

MR. BRUNNER:  Yeah.  That's fine.  Good to know.  Okay.

THE COURT:  Okay.  Thank y'all.

MR. BRUNNER:  Thank you, Your Honor.

THE COURT:  Anything comes up between now and then, let me know.

MR. MAGEE:  Thank you, Your Honor.

(2:31 p.m.)

Page 32

STATE OF TEXAS

COUNTY OF WILLIAMSON

I, SIMONE M. WRIGHT, Official Court Reporter in and for the 368th District Court of Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $121.60 and was paid/will be paid by Williamson County.

WITNESS MY OFFICIAL HAND on this, the 26th day of May, 2015.

/s/Simone M. Wright___

SIMONE M. WRIGHT, CSR
Texas CSR 3266
Official Court Reporter
368th District Court
Williamson County, Texas
405 Martin Luther King, Box 8
Georgetown, Texas  78626
Telephone:  (512) 943-1280
Job No. 161        Expiration:  12/31/2016

654e9fa7-9753-473c-81ee-4b4a97b06fdd

Page 1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 13-0826-K277

| | |
|---|---|
| STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| vs. | ) WILLIAMSON COUNTY, TEXAS |
| | ) |
| CRISPIN JAMES HARMEL | ) 368TH JUDICIAL DISTRICT |

_____

PRETRIAL HEARING

Motion to Disqualify Defense Counsel

Motion to Disqualify DA's Office

Motion to Preserve Evidence

_____

On the 31st day of March, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Rick J. Kennon, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

1801ae93-ae67-4241-b14b-9a101fe9167b

APPEARANCES

Ms. Jana Duty
SBOT NO. 24000244
     -and-
Mr. Mark Brunner
SBOT NO. 24006917
Williamson County District Attorney
405 Martin Luther King
Suite 1
Georgetown, Texas  78626
Telephone:  (512) 943-1234
Counsel for the State


Ms. Kristen Jernigan
SBOT NO. 90001898
Law Office of Kristen Jernigan
2007 South Austin Avenue
Georgetown, Texas  78626
Telephone:  (512) 904-0123
E-mail:  Kristen@txcrimapp.com
COUNSEL FOR THE DEFENSE

Mr. Ryan Herbert Deck
SBOT NO. 24040781
The Office of Ryan Deck
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 251-8920
E-mail:  Ryandecklaw@gmail.com
COUNSEL FOR THE DEFENSE

Mr. Randall Scott "Scott" Magee
SBOT NO. 24010204
R. Scott Magee, Attorney At Law
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 983-1675
E-mail:  Scott@mageefirm.net
COUNSEL FOR THE DEFENSE

1801ae93-ae67-4241-b14b-9a101fe9167b

VOLUME 1

Pretrial Hearing

March 31, 2015

                                            PAGE VOL.

Announcements ...................................4    1

Ruling on Motion to Disqualify Defense Counsel   11   1

Ruling (RESERVED) on Motion to Disqualify DA .....67   1

Ruling on Motion to Preserve Evidence ............73   1

Gag Order Issued ...............................74   1

Adjournment  ...................................76   1

Reporter's Certificate ..........................77   1

1801ae93-ae67-4241-b14b-9a101fe9167b

bring it up on the 7th.

THE COURT: That's fine. Okay. If it doesn't -- isn't a problem, then turn it over by tomorrow.

MR. BRUNNER: Right, Your Honor. If there's any problems, we'll come to you, all of us.

THE COURT: The next issue is the gag order. Is anyone opposed to a gag order?

MS. JERNIGAN: We're not, Judge.

MS. DUTY: No.

MR. BRUNNER: Not at all.

THE COURT: Oh, good. That makes it easy. Okay. So --

MR. BRUNNER: We'll do one thing easy for you, Your Honor.

THE COURT: That's true. At one point -- so what we're doing from this point forward, then, no one should talk to the media about this case for any reason. That also means don't post anything on Facebook or any of those other social media outlets.

MR. DECK: Judge, the one thing I would say is sometimes we do post updates to our own Listserv, the defense attorney Listserv, just do updates amongst lawyers. We've done that. I assume that's not a problem?

Page 75

MR. BRUNNER: Your Honor, that's --

THE COURT: And I'm assuming that's accessible to the public in general?

MS. JERNIGAN: No.

MR. DECK: Just like what happened today, what's in public, what everyone saw today, not every lawyer was here, they ask for updates, and we say, Hey, this is what happened.

MR. BRUNNER: Your Honor, that's --

THE COURT: I'd rather not.

MR. BRUNNER: That's a backdoor way of just getting information out. I'm not saying that that's bad intent from State -- I mean, from Defense -- old habits die hard; excuse me, gentlemen -- but just it's spreading word that can just be dropped right out to the world.

MR. MAGEE: Well, and, likewise, I don't think you should be able to send your employees to go talk to the media, either, you know.

THE COURT: Well, I agree. When I say this, this applies to your employees, anyone else you have hired, it applies to the DA's Office and anybody that's hired or with the DA's Office. And that solves the problem; nobody is talking to the media, then we don't have to worry about it. Okay?

1801ae93-ae67-4241-b14b-9a101fe9167b

Page 76

Someone draft me an order.

MR. BRUNNER:  Sounds good, Judge.

THE COURT:  Ms. Jernigan, you draft that order.

MS. JERNIGAN:  I'll take care of that, Your Honor.

THE COURT:  Okay.  And so at this point in time, then, we'll come back on the 7th, I'll review all the cases that have been presented and any briefs by April 6th -- is that right?  Yeah -- April 6th, and then we'll be back here on the 7th at 9:00 to decide what else is going to happen.

Okay.  Thank y'all.

(Proceedings adjourned, 11:01 a.m.)

Page 77

STATE OF TEXAS

COUNTY OF WILLIAMSON

    I, SIMONE M. WRIGHT, Official Court Reporter in and

for the 368th District Court of Williamson County, State

of Texas, do hereby certify that the above and foregoing

contains a true and correct transcription of all

portions of evidence and other proceedings requested in

writing by counsel for the parties to be included in

this volume of the Reporter's Record in the above-styled

and numbered cause, all of which occurred in open court

or in chambers and were reported by me.

    I further certify that this Reporter's Record of the

proceedings truly and correctly reflects the exhibits,

if any, offered by the respective parties.

    I further certify that the total cost for the

preparation of this Reporter's Record is $324.00 and was

paid/will be paid by The State.

    WITNESS MY OFFICIAL HAND on this, the 4th day of

April, 2015.

                              /s/Simone M. Wright

                         SIMONE M. WRIGHT, CSR
                         Texas CSR 3266
                         Official Court Reporter
                         368th District Court
                         Williamson County, Texas
                         405 Martin Luther King, Box 8
                         Georgetown, Texas  78626
                         Telephone:  (512) 943-1280
Job No. 149              Expiration:  12/31/2016

1801ae93-ae67-4241-b14b-9a101fe9167b

Page 1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 13-0826-K277

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| vs. | ) | WILLIAMSON COUNTY, TEXAS |
| | ) | |
| CRISPIN JAMES HARMEL | ) | 368TH JUDICIAL DISTRICT |

_____

PRETRIAL HEARING

Motion to Disqualify District Attorney

_____

On the 8th day of April, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Rick J. Kennon, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES

Ms. Jana Duty
SBOT NO. 24000244
        -and-
Mr. Mark Brunner
SBOT NO. 24006917
        -and-
Mr. Brent Edward Webster
SBOT NO. 24053545
Williamson County District Attorney
405 Martin Luther King
Suite 1
Georgetown, Texas  78626
Telephone:  (512) 943-1234
COUNSEL FOR THE STATE

Ms. Kristen Jernigan
SBOT NO. 90001898
Law Office of Kristen Jernigan
2007 South Austin Avenue
Georgetown, Texas  78626
Telephone:  (512) 904-0123
E-mail:  Kristen@txcrimapp.com
COUNSEL FOR THE DEFENSE

Mr. Ryan Herbert Deck
SBOT NO. 24040781
The Office of Ryan Deck
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 251-8920
E-mail:  Ryandecklaw@gmail.com
COUNSEL FOR THE DEFENSE

Mr. Randall Scott "Scott" Magee
SBOT NO. 24010204
R. Scott Magee, Attorney At Law
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 983-1675
E-mail:  Scott@mageefirm.net
COUNSEL FOR THE DEFENSE

Page 3

VOLUME 1

Pretrial Hearing

April 8, 2015

|                                                    | PAGE | VOL. |
|----------------------------------------------------|------|------|
| Announcements                                      | 4    | 1    |
| Argument by Ms. Jernigan                           | 5    | 1    |
| Argument by Mr. Brunner                            | 14   | 1    |
| Argument by Mr. Webster                            | 28   | 1    |
| Argument by Ms. Duty                               | 54   | 1    |
| Court's Ruling                                     | 76   | 1    |
| Instruction to John Prezas                         | 89   | 1    |
| Instruction that gag order remain in place         | 89   | 1    |
| Adjournment                                        | 89   | 1    |
| Reporter's Certificate                             | 90   | 1    |

340dd04f-b37a-42f8-9b5f-53e02b9b2f76

Page 89

From this point forward, I guess until the 13th, Mr. Prezas, you're still off this case.

MR. BRUNNER:  Your Honor, the gag order is still in effect?

THE COURT:  Yes.

MR. BRUNNER:  Thank you, Your Honor.

THE COURT:  I never got an order.

MR. BRUNNER:  You said it.

THE COURT:  I know, but I don't have a written order.

Thank y'all.

(Proceedings adjourned, 3:46 p.m.)

Page 90

STATE OF TEXAS

COUNTY OF WILLIAMSON

     I, SIMONE M. WRIGHT, Official Court Reporter in and for the 368th District Court of Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $342.00 and was paid/will be paid by Williamson County.

     WITNESS MY OFFICIAL HAND on this, the 10th day of April, 2015.

                              /s/Simone M. Wright

                         SIMONE M. WRIGHT, CSR
                         Texas CSR 3266
                         Official Court Reporter
                         368th District Court
                         Williamson County, Texas
                         405 Martin Luther King, Box 8
                         Georgetown, Texas  78626
                         Telephone:  (512) 943-1280
Job No. 150              Expiration:  12/31/2016

340dd04f-b37a-42f8-9b5f-53e02b9b2f76

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 13-0826-K277

| | |
|---|---|
| STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| vs. | ) WILLIAMSON COUNTY, TEXAS |
| | ) |
| CRISPIN JAMES HARMEL | ) 368TH JUDICIAL DISTRICT |

_____

CONTEMPT OF COURT

_____

On the 8th day of May, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Rick J. Kennon, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

APPEARANCES


Ms. Jana Duty (NOT PRESENT)
SBOT NO. 24000244
      -and-
Mr. Mark Brunner
SBOT NO. 24006917
      -and-
Mr. Brent Edward Webster
SBOT NO. 24053545
Williamson County District Attorney
405 Martin Luther King
Suite 1
Georgetown, Texas  78626
Telephone:  (512) 943-1234
COUNSEL FOR THE STATE


Ms. Kristen Jernigan
SBOT NO. 90001898
Law Office of Kristen Jernigan
2007 South Austin Avenue
Georgetown, Texas  78626
Telephone:  (512) 904-0123
E-mail:  Kristen@txcrimapp.com
COUNSEL FOR THE DEFENSE


Mr. Ryan Herbert Deck
SBOT NO. 24040781
The Office of Ryan Deck
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 251-8920
E-mail:  Ryandecklaw@gmail.com
COUNSEL FOR THE DEFENSE


Mr. Randall Scott "Scott" Magee
SBOT NO. 24010204
R. Scott Magee, Attorney At Law
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 983-1675
E-mail:  Scott@mageefirm.net
COUNSEL FOR THE DEFENSE

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

VOLUME 1

Contempt of Court

May 8, 2015

                                        PAGE VOL.

Judge finds Ms. Duty in contempt of court ........11    1

Adjournment  ...................................16    1

Reporter's Certificate .........................17    1

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

Page 4

(Open court, 10:41 a.m.)

THE COURT: Okay. I'm going to call this under the Harmel case number only because I don't have another case number to call it under right now. It's Cause No. 13-0826-K277, State of Texas versus Crispin Harmel. Where is Ms. Duty?

MR. BRUNNER: The State's here, Your Honor.

THE COURT: Where is Ms. Duty? That's the question I asked you. I need an answer.

MR. BRUNNER: I don't know. She's not --

THE COURT: Really? Because she sent me an e-mail yesterday that said she would clear her schedule and be here at any time of the day that we schedule it. I sent an e-mail to all counsel, including Ms. Duty, to be here at 10:30. Where is she?

MR. BRUNNER: She's not in this room.

THE COURT: Okay. Then here's what we're going to do. We're not going to have this little proceeding right now. What we're going to do -- I have two options: You can get ahold of her and you can get her here, or I will issue a capias and I will get her here. Which do you prefer?

MR. BRUNNER: I'll try to get ahold of her, Your Honor.

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

Page 5

THE COURT:  Get on it.

MR. BRUNNER:  Can you tell me what this hearing is for?

THE COURT:  Do what?

MR. BRUNNER:  Can you tell me what this hearing is for?

THE COURT:  You'll know when she shows up.

MR. BRUNNER:  Okay.  Thank you, Your Honor.

(Recess from 10:42 to 11:09)

(Open court)

THE COURT:  We're back on the record. Mr. Brunner, were you able to contact Ms. Duty?

MR. BRUNNER:  I was, Your Honor.

THE COURT:  And?

MR. BRUNNER:  I let her know what you said earlier and that her presence was requested in court. She said that she didn't -- she didn't think the e-mail said that she would for sure be here, that she was trying to clear her schedule, that she didn't know -- not knowing what this hearing was about, she didn't -- she said words to the effect of, you know, "If the Court is not going to give me the respect to let me know what this is about, there's no need to be there."  The State is going to be represented by us.

Page 6

THE COURT:  So bottom line is, she's not coming?

MR. BRUNNER:  I don't know that, Judge.

THE COURT:  Okay.  Well, we're starting, and she's not here.

MR. BRUNNER:  Okay.

THE COURT:  Okay.  For the record, yesterday afternoon, I sent an e-mail to all counsel -- and sorry, Ms. Jernigan, you weren't involved with kind of everything that was going on, and I forgot to put you on the list, although I assumed that you would be notified -- that indicated that I was trying to get everyone to come in on Monday.  However, I understood that Ms. Duty was going to be out of town on Monday for a funeral or something.  And so I didn't want to wait till the end of next week, and so I requested that we do this today.

I received responses back.  The defense indicated they were available after 10:00.  Ms. Duty sent me an e-mail at 5:51 p.m. stating that she would be glad to rearrange her schedule for today.  However, she would like some notice as to what it was about.

I indicated at the time that I didn't think it would take more than 10 or 15 minutes for the hearing -- that was in the first e-mail -- but it was

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

pretty clear that I needed all counsel here today.

I responded to that e-mail, including everyone, that said to meet in my courtroom at 10:30 a.m. this morning.

The reason that we were here today, and it doesn't really have anything to do with the murder trial, per se, as far as facts or discovery or forensics or any of this other mess. What we're here today to do is to address some issues that I think have come to a head this week regarding the disrespect to fellow attorneys and to the Court that I have observed.

When I started back in November of 2013, I expected some testing, being a new judge. And initially, there was some conduct that I felt was a little over the line. But, unfortunately, it's gotten worse since that point in time.

Now I think it's to the point that we need to get something -- that we need to do something about it. And I will tell you, this comes both from the DA's office as well as from the criminal defense bar, and also, to some extent, from the civil and the family law bar, although not as much because they're really not in court as much as the others.

I will tell you, Mr. Brunner -- and this obviously needs to go to Ms. Duty, as well -- that

respect flows downhill. In the DA's office, the employees and the assistant DAs will follow the lead of Ms. Duty as the elected DA and you as the first assistant. If you don't show respect for the other attorneys or the Court, then neither will your staff or the other attorneys that work in your office. And I don't want you to think I'm just picking on the DA's office. Because even though it seems to be more prevalent there, at least in the last months or so, Mr. Magee, you were way out of line earlier this week in the way that you dealt with Mr. Webster. I understand that you have extended an apology to Mr. Webster, and you also apologized to the Court. And I appreciate that, but we never should have ever gotten to that point.

                    To me, this case has gotten completely out of hand. It seems that all the attorneys want to make this some personal game among the lawyers, and that's not what it is. This is a case about the DA trying to put together evidence in their case to prosecute and convict a guy that they believe committed murder. From the defense side, it's about trying to get a fair trial for Mr. Harmel and do whatever they can to present the best defense possible and get an acquittal for their client. That's what you're here to do. It's not about

the lawyers.

The family and friends of the victim in this case don't care if you like each other. The defendant's family doesn't care if you like each other. But they do care when the conduct jeopardizes the integrity of the court proceedings and it takes away from what this case is really about.

Everybody at some point in their career, when they try cases, gets involved in a case that becomes somewhat personal, for whatever reason that may be. However, as attorneys, you can't let that dictate how you deal with each other, you can't allow that to cause you to act disrespectful to each other, and definitely can't allow that to cause you to fail to follow the proper protocol in court.

As attorneys, you are held to a higher standard. Your clients expect it, the other lawyers expect it, the State Bar expects it, and I expect it.

The main reason we ended up here today is, back a few weeks ago, actually, on April 9th, 2015, when we were here in court, Mr. Brunner, you asked and made a request from the Court that a gag order be put in place, and the defense actually agreed to it. I signed that order on April 9th, 2015 that states, "The parties, attorneys, and employees of the attorneys in this case

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

are prohibited from communicating with the press/media regarding this case or publicly commenting on this case during the pendency of the proceedings."

Unfortunately, there's been a violation of that court order. And Ms. Duty on Wednesday of this week sent me an e-mail indicating that she intended to violate that order by contacting the Austin American-Statesman to, quote, "defend" herself regarding an article that had something to do with the pleadings that were filed by the defense in this case.

I kind of hoped that she would think a little better of that and not follow through with it, but yesterday I received a copy of an article by, I think, Ms. Osborne with the American-Statesman that appears to have several quotes from Ms. Duty about the case and about the filings that were made by the defense.

This is in direct violation of the order that was put into place. And, unfortunately, it was put in place at the State's request. And, yet, even though they got what they wanted, they continued to violate that order.

I generally probably wouldn't have thought much of it, other than to admonish the attorneys to comply with the court order, but it's not this one

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

instance. In the last several months there's been multiple incidences about disrespect to the Court, one in particular about what appears to be a misrepresentation to another district judge about the status of contact with witnesses -- I'm sorry -- with victims that may very well have affected the plea or the sentence in that case. And now I've got a direct violation of the court order from the elected DA.

So that's one of the reasons why I needed -- or wanted Ms. Duty here. I don't think I necessarily have to have her here, that's why we're proceeding forward today. And so I believe that Ms. Duty's conduct constitutes contempt of court, and it's a direct violation of the Court's orders.

And my understanding -- I've looked at a couple different things, and the procedure, I understand, is a little different, depending on how you look at it. One procedure is, Judge Stubblefield would need to appoint a judge to review the contempt issue, a special prosecutor would have to be appointed, and then a hearing would be held to determine whether or not Ms. Duty's conduct would be considered in contempt of court, and then a punishment would be assessed.

The other option indicates that I would need to go ahead and make a finding of contempt and

issue a punishment and then, if Ms. Duty wanted to contest that, then that process would go into place and a judge and a special prosecutor would be appointed.

Because Ms. Duty is not here, that probably doesn't matter. So at this point, what I'm going to do is, I do find that her conduct was in violation of -- direct violation of a court order by violating the April 9th, 2015 order prohibiting contact with the press or the media. And because of that, I will submit an affidavit and I will talk to Judge Stubblefield and we will get the proper procedure started, and appropriate notice will be sent to everyone involved.

It's unfortunate that we've come to this. You know, I've been a judge for, what, a year and a half, a little over that, and I really never thought that there would be an issue to come up to where I would have to deal with contempt of an attorney, especially an elected official. But, unfortunately, I don't see any other choice. The fact that she's not here today kind of tells me that I'm doing the right thing because she doesn't believe and doesn't respect the Court or the other attorneys involved that I -- from what I can tell -- although, I will say that a lot of -- she's acted a little more civilly than a lot of people have in

this case.  But the fact that she's not here tells me that she has no respect for this Court.  And so she can deal with that in another proceeding at another time.

I hope that people can learn a lesson, that you guys can act respectfully to each other, respectful to the Court, and just act like lawyers.

We're adjourned.

MR. BRUNNER:  Your Honor, if I may, off the record or on the record?

THE COURT:  I don't really need a response.  But if you really think you have to, go ahead.

MR. BRUNNER:  Well, if I didn't think I had to, I wouldn't be talking right now, Your Honor.

MR. MAGEE:  Are we on the record?

THE COURT:  Yes, we're on the record.

MR. BRUNNER:  Just a clarification, because I have to relay this to someone who is not in the room right now.  Was this a finding of contempt, Your Honor?

THE COURT:  That's the question.  I've found two different procedures:  One indicated that I need to submit an affidavit with a different judge to review.  If that judge felt that there was sufficient grounds, I guess, to hold a hearing, that judge would

Page 14

then issue a show cause order --

MR. BRUNNER:  Correct.

THE COURT:  -- and a hearing would be held.

MR. BRUNNER:  Correct.

THE COURT:  I've also seen other procedures where it says I actually need to make a finding of contempt and issue a punishment.  And then at that point, if Ms. Duty wanted to appeal that or contest that, then that procedure would go into place and a judge would be appointed and a special prosecutor would be appointed and they would go through that procedure at that point in time.

MR. BRUNNER:  Your Honor, I'm not trying to say my research trumps yours, but based on my short research on this issue, I think the first path may be the more legally safer path.

THE COURT:  And you may be correct.  And that's kind of what my plan is at this point in time, primarily because Ms. Duty is not here.

MR. BRUNNER:  Okay.

THE COURT:  And I will prepare an affidavit, I will talk to Judge Stubblefield, we'll get a judge appointed, and then a hearing at some point in time will be conducted and that judge can deal with it.

simonewrightcourtreporter@gmail.com

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

It's not my issue at that point.

MR. BRUNNER:  Your Honor, just while we've got everybody here, I think the -- the spirit of the gag order was to not just start leaking prejudicial information all over the place and to -- I think Ms. Duty's frustrations stem from the fact of using pleadings as a de facto way to just kind of like -- instead of file for a motion for continuance, it's yet another:  "Oh, my gosh, we've just uncovered yet another vast conspiracy.  Won't they please stop doing this.  P.S.  We need a continuance."

And after a while that gets a little old, and I understand her frustration.

THE COURT:  And I understand her frustration, as well.  You know what the answer is?  The answer is, file a responsive pleading.  Okay?

MR. BRUNNER:  Agreed, Your Honor.

THE COURT:  You file a responsive pleading, she can say all the same stuff that she wants to say to respond to whatever they've got there, and then you're not in violation of the court order.

MR. BRUNNER:  Gotcha, Your Honor.

THE COURT:  It really seems pretty simple.

MR. BRUNNER:  Great.  Thank you, Your Honor.

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

Page 16

THE COURT:   Okay.

(Proceedings adjourned, 11:21 a.m.)

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

Page 17

STATE OF TEXAS

COUNTY OF WILLIAMSON

    I, SIMONE M. WRIGHT, Official Court Reporter in and for the 368th District Court of Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

    I further certify that the total cost for the preparation of this Reporter's Record is $75.00 and was paid/will be paid by Williamson County.

    WITNESS MY OFFICIAL HAND on this, the 15th day of May, 2015.

                     /s/Simone M. Wright

                     SIMONE M. WRIGHT, CSR
                     Texas CSR 3266
                     Official Court Reporter
                     368th District Court
                     Williamson County, Texas
                     405 Martin Luther King, Box 8
                     Georgetown, Texas  78626
                     Telephone:  (512) 943-1280
Job No. 160          Expiration:  12/31/2016

dc2526fa-e518-4c6c-9a88-334dfdcc01e1

Page 1

REPORTER'S RECORD
VOLUME 1 OF 2 VOLUMES
TRIAL COURT CAUSE NO. 13-0826-K277

STATE OF TEXAS                ) IN THE DISTRICT COURT
                                 )
vs.                        ) WILLIAMSON COUNTY, TEXAS
                                 )
CRISPIN JAMES HARMEL      ) 368TH JUDICIAL DISTRICT

_____

HEARING ON MOTION TO RECUSE/DISQUALIFY DA'S OFFICE

AND

HEARING ON WRIT OF HABEAS CORPUS/DOUBLE JEOPARDY
_____

On the 29th day of May, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Rick J. Kennon, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

5946e212-947b-4ffa-bb95-c71002d1e87c

APPEARANCES


Ms. Jana Duty
SBOT NO. 24000244
        -and-
Mr. Mark Brunner
SBOT NO. 24006917
        -and-
Mr. Brent Edward Webster
SBOT NO. 24053545
Williamson County District Attorney
405 Martin Luther King
Suite 1
Georgetown, Texas  78626
Telephone:  (512) 943-1234
COUNSEL FOR THE STATE


Ms. Kristen Jernigan
SBOT NO. 90001898
Law Office of Kristen Jernigan
2007 South Austin Avenue
Georgetown, Texas  78626
Telephone:  (512) 904-0123
E-mail:  Kristen@txcrimapp.com
COUNSEL FOR THE DEFENSE


Mr. Ryan Herbert Deck
SBOT NO. 24040781
The Office of Ryan Deck
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 251-8920
E-mail:  Ryandecklaw@gmail.com
COUNSEL FOR THE DEFENSE


Mr. Randall Scott "Scott" Magee
SBOT NO. 24010204
R. Scott Magee, Attorney At Law
107 N. Lampasas Street
Round Rock, Texas  78664
Telephone:  (512) 983-1675
E-mail:  Scott@mageefirm.net
COUNSEL FOR THE DEFENSE

5946e212-947b-4ffa-bb95-c71002d1e87c

VOLUME 1

Hearing on Motion to Recuse/Disqualify DA's Office and

Hearing on Writ of Habeas Corpus/Double Jeopardy

May 29, 2015

                                              PAGE VOL.

Announcements ...................................6    1

Argument by Defense on Recusal/Disqualification ...7    1

Argument by State on Recusal/Disqualification ....12   1

Rule Invoked ...................................17   1

DEFENSE WITNESSES (ON RECUSAL/DISQUALIFICATION):

Jana Duty                        Direct    Cross   V.Dire
   By Mr. Deck                    25 v1
   By Mr. Brunner                           66 v1
   By Mr. Deck                    75 v1

Defense rests on Recusal/Disqualification .......83   1

STATE'S WITNESSES (ON RECUSAL/DISQUALIFICATION):

Rod Henegar                      Direct    Cross   V.Dire
   By Mr. Brunner                 84 v1
   By Mr. Magee                             86 v1

State rests on Recusal/Disqualification ........89   1

Closings Wavied (on Recusal/Disqualification) ....90   1

Court's Ruling ...................................90   1

                         (continued)

Rule Invoked ...................................98   1

DEFENSE WITNESSES (ON DOUBLE JEOPARDY WRIT):

| Jana Duty | Direct | Cross | V.Dire |
|---|---|---|---|
| By Mr. Deck | 100 v1 | | |
| By Mr. Brunner | | 178 v1 | |
| By Mr. Deck | 217 v1 | | |
| By Mr. Brunner | | 227 v1 | |

| Detective Pando | Direct | Cross | V.Dire |
|---|---|---|---|
| By Mr. Deck | 232 v1 | | |
| By Mr. Brunner | | 250 v1 | |
| By Mr. Deck | 257 v1 | | |
| By Mr. Brunner | | 262 v1 | |
| By Mr. Deck | 264 v1 | | |
| By Mr. Brunner | | 270 v1 | |

| Detective Bond | Direct | Cross | V.Dire |
|---|---|---|---|
| By Mr. Deck | 271 v1 | | |
| By Mr. Brunner | | 288 v1 | |
| By Mr. Deck | 299 v1 | | |

Adjournment  ...................................307   1

Reporter's Certificate .........................308   1

5946e212-947b-4ffa-bb95-c71002d1e87c

ALPHABETICAL INDEX OF WITNESSES

|                             | Direct   | Cross    | V.Dire |
|-----------------------------|----------|----------|--------|
| Bond, Detective Larry       | 271 v1   | 288 v1   |        |
|                             | 299 v1   |          |        |
| Duty, Jana                  | 25 v1    | 66 v1    |        |
|                             | 75 v1    | 178 v1   |        |
| Duty, Jana                  | 100 v1   | 227 v1   |        |
|                             | 217 v1   |          |        |
| Henegar, Rodney Carroll     | 84 v1    | 86 v1    |        |
| Pando, Detective Ricky      | 232 v1   | 250 v1   |        |
|                             | 257 v1   | 262 v1   |        |
|                             | 264 v1   | 270 v1   |        |

5946e212-947b-4ffa-bb95-c71002d1e87c

EXHIBITS OFFERED BY THE STATE

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Handwritten notes by Jana Duty | 187 v1 | 187 v1 |
| 2 | Victim/Suspect Timeline created by Detective Pando | 263 v1 | 263 v1 |

EXHIBITS OFFERED BY THE DEFENSE

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | DVD - KXAN Video | 24 v1 | 24 v1 |

A.   Probably Brent and I spoke at some point, maybe, about some issues.  My husband --

Q.   (BY MR. DECK) Did you ever -- did you ever speak to any of the detectives in this case regarding your testimony?

A.   As it relates to my computer and what was found on my computer, yeah, we talked about that.

THE COURT:  Before we keep going, the testimony right now, my understanding, is going to be limited just to the recusal issue, correct, the disqualification?

MR. DECK:  Correct.

THE COURT:  Not the double jeopardy issue.

MR. DECK:  Fair enough, Judge.  I'll move along.

MR. BRUNNER:  Thank you, Your Honor.

Q.   (BY MR. DECK) Ms. Duty, I'm going to ask you about the alleged violation of the gag order.  And I'm sure you're aware of that, yes?

A.   Yes.

Q.   On April 9th of this year, the judge, Judge Kennon, entered an order that --

MR. BRUNNER:  May we approach, Your Honor?

THE COURT:  Yes.

(Bench conference on the record)

Page 28

MR. BRUNNER:  She is subject to criminal contempt.

THE COURT:  I know that.  I was about to do this --

MR. BRUNNER:  This is not proper.  Sorry.

THE COURT:  Well, they can ask, and you can warn Ms. Duty about her right to testify or not to testify and plead the Fifth Amendment.  It's her decision.

MR. BRUNNER:  Okay.

THE COURT:  I mean, I don't know what else to do with that.

MR. DECK:  That's fine.

MR. BRUNNER:  I don't want to -- if that's the one question that gets us there, but we don't need five or ten of them.

THE COURT:  Well, I kind of -- well, actually, I think they can ask, and she has to plead the Fifth on it every time.

MR. BRUNNER:  We're wasting time, but --

MS. JERNIGAN:  But, Judge, I'll proffer to the Court, if she's going to plead the Fifth as to that kind of question, we'll move on, Judge.  We can't force her to testify about that issue.

THE COURT:  Okay.

5946e212-947b-4ffa-bb95-c71002d1e87c

MR. BRUNNER:  Well, on her behalf, Your Honor, as to the -- as to the -- as to the alleged violation of the gag order, I'll plead the Fifth for her.

MS. JERNIGAN:  No.  Your Honor, under the case law, she has to assert her right.

THE COURT:  I understand that.  Let's do it on the record real quick.

MR. WEBSTER:  This isn't civil.  It has to be all or nothing.  If she pleads the Fifth -- for civil, it's every question.  Criminal, she pleads the Fifth or not.  So if that's the case, we're done here.

MS. JERNIGAN:  Can we be included?

MR. WEBSTER:  You walked away.

THE COURT:  Well, that's why I wanted you back up here.

MR. BRUNNER:  Don't walk away.

THE COURT:  Their argument is that if she pleads the Fifth on any issue, her testimony is over because it's criminal as opposed to civil.

MR. WEBSTER:  As far as the proceeding today.

MR. DECK:  Well, that's just one issue.

MS. JERNIGAN:  I mean, if they're going to try and King's X us on developing a record for our

recusal motion, then we will have to, I guess, let the contempt go first and then have our --

MR. BRUNNER:  Just ask the question. That's fine.  I'll withdraw my objection, Your Honor -- or my approaching.  Let's just pretend it didn't happen.

THE COURT:  Okay.

(Bench conference ends)

Q.  (BY MR. DECK) Ms. Duty, I'm going to ask you some questions regarding the violation of the gag order. Do you understand that?

A.  The alleged, yes.

Q.  Fair enough.  The alleged violation of the gag order.  Do you understand?

A.  Yes.

THE COURT:  Before you do that, Ms. Duty, I know you know this, and I think you probably talked to Mr. Brunner about this --

THE WITNESS:  Right.  I know that I'm subject to --

THE COURT:  Okay.  You have the right to remain silent and not say anything.  Do you understand that?

THE WITNESS:  Yes.  Yeah.

THE COURT:  Okay.  Thank you.

Q.  (BY MR. DECK) Do you choose to go forward and

5946e212-947b-4ffa-bb95-c71002d1e87c

answer questions here today regarding the alleged violation of the gag order?

A.   Yes.

Q.   Going back to the question I had before, before the approach, on April 9th, Judge Kennon entered an order that prohibited the attorneys in the Harmel case from communicating with the press or media regarding the case or any public comments about the case.  Do you remember that order?

A.   The written order?

Q.   Yes.

A.   I didn't know about the written order until much later because it was never sent to me, so I never knew it was offered to the judge for his signature and then filed.  So at that time, I did not know that a written order had been put in place.

Q.   And you know, of course, that -- at least now you know that that written order was actually given to your first assistant, Mark Brunner, yes?

A.   It was sent to him on the same day that it was signed, yes.

Q.   That's correct.  And it's not uncommon, right, for you and Mr. Brunner to talk about these -- about this case, right?

A.   Right.

5946e212-947b-4ffa-bb95-c71002d1e87c

Q.    In fact, if Mr. Brunner had that in his e-mail in-box and he saw it, you would expect him to tell you, I assume?

MR. BRUNNER:  Objection, Your Honor. That's speculative and it's work product.  She would expect me that, if I saw something, I would tell her about it?

THE COURT:  Overruled.

Q.    (BY MR. DECK) You would expect your first assistant, with whom you've worked many, many, many months with, that if he found -- if he saw something in his in-box regarding a written order, he would tell you about it, wouldn't he?

A.    If it was something worthy of telling me about and if he saw it, yes.

Q.    Is a violation of a gag order worthy?

MR. BRUNNER:  Objection --

Q.    (BY MR. DECK) Excuse me.  Is a gag order worthy?

MR. BRUNNER:  Objection, speculative.

MR. DECK:  I'm asking her opinion.

THE COURT:  Overruled.

A.    If Mr. Brunner had seen the gag order and wanted to come discuss it with me to say, Hey, I've gotten this, let's talk about it -- I mean, yeah,

generally that's how it happens.  But he never came to talk to me about it, so as far as I know, he didn't see it.

Q.   (BY MR. DECK) And, of course, you were in court when the judge verbally said those things, that we were not to talk to the media anyway?  You were in court, were you not?

A.   Where we all agreed, in theory, that there was going to be a gag order put in place?  Yes.

Q.   No, no.  Actually, it wasn't in theory.  We actually agreed, did we not?

A.   That a gag order was going to be put in place, yes.

Q.   In fact, if I remember correctly, the judge did order it, and then he asked for a written order later, and I believe your first assistant, Mark Brunner, said, "Judge, you just said it," as in:  You just ordered it. Do you remember that?

A.   Uh-huh.  There were several -- several things that we specified -- or somebody specified that needed to be in the order, and those things weren't in the order, either.

Q.   So, Ms. Duty, I have a question:  If the very -- if later this afternoon, after what Mister -- excuse me -- Judge Kennon had ordered orally, if I

went -- immediately went and called KXAN, would you have felt -- honestly, would you have felt that I violated Judge Kennon's order?

A.   I think it depends on what you say.  Because most gag orders that I have seen are very specific about what is prohibited and what is not prohibited.  And so I guess it depends on what you were saying to the media of whether or not it would fall within the parameters of being a violation.

Q.   So just so we're real clear, under oath, what your testimony is today in front of this court and everybody here, you're saying that if that afternoon I went and called Austin American-Statesman and started making comments about the Harmel case -- any comments, Ms. Duty, any -- you're telling me that may not have been a violation of the order that Judge Kennon gave us in front of you?  That's what you're saying under oath?

A.   No.  I think if you made comments about the case, that would probably fall within the parameters of being a violation of the order.

Q.   And it would have angered you, would it not, if I would have done that?

MR. BRUNNER:  Objection, speculative.

THE COURT:  No.  That's overruled.  That's not speculative.

5946e212-947b-4ffa-bb95-c71002d1e87c

Page 35

MR. BRUNNER:  About angry?  What her emotional state would be to something hypothetically that he says, Your Honor?

THE COURT:  I think based on the circumstances in this case, she can probably answer that question.

MR. BRUNNER:  Okay.

A.   Generally, in most gag orders that are -- that are very specific, which is how they're supposed to be written, talking about the facts of a case are what is -- that's generally what's prohibited in a gag order.

So if you called the Statesman and you were talking about the facts of the case, that, I would think, would fall within the parameters of being a violation.

Q.   (BY MR. DECK) And by the way, I mean, if we're going to call the Statesman about the Harmel case, wouldn't we not be talking about the facts of the case? I mean, isn't that why you would talk to the Statesman, or any news outlet, for that matter?

A.   No.  No.  When you're talking to the Statesman, you can be talking about a lot of things.  For example, accusations that are being made against me, that I violated some, you know, ethical rule or that I've -- you know, I'm withholding evidence in a case, that has

nothing to do with the facts of the Harmel case, that has to do with an attack on me.

And so the -- the ethical rules and -- I believe most gag orders, the way they're written, they allow you to defend yourself.

Q.   Is it your testimony -- is it your sworn testimony, Ms. Duty, that when you spoke to the Austin American-Statesman, you did not believe that there was an order in place for the attorneys of the Harmel case to not speak to the news media in any way regarding the Harmel case?  Is that your sworn testimony this morning?

A.   I knew that we had agreed in court that we would put a gag order in place.  I did not know that there was a written order in place because I never saw it; it was never sent to me.  And I would assume that if a written order was in place, that it would have been a proper order.

Q.   Now, you know, like we've talked about, it was certainly spoken about, was it not?

A.   Yes.

Q.   Okay.  And, in fact, it was spoken about roughly three weeks before you spoke to the Austin American-Statesman; is that fair enough?

A.   Probably.  That's about right.

Q.   Now, the fact that it was spoken about and

three weeks have gone by -- and you know, of course -- you would agree with me, right, the judge did ask for a written order, did he not?

A.   Yes.

Q.   Okay.  You certainly could have gone down to the clerk's office, said, "Hey, do you mind if I look at the file," and verified that, in fact, there was a written gag order?  You could have done that, could you not?

A.   Yes.

Q.   You did not, did you?

A.   No.

Q.   In three weeks, you could have, couldn't you have?

A.   I don't know that it was in place for three weeks, but --

Q.   Roughly?

A.   -- yeah, sure.  Okay.

Q.   Okay.  And you know, of course, that you guys -- excuse me -- the State has filed, yesterday or a couple days ago, an emergency motion to stay these proceedings?

MR. BRUNNER:  Objection.  That's not relevant, Your Honor.  That's a separate issue.

THE COURT:  That's sustained.

Q.   (BY MR. DECK) On May 6th, which is almost a month after April 9th, which is when the Judge entered the order, you sent an e-mail to the judge, did you not?

A.   I'm assuming that date is correct.

Q.   If at any point, Ms. Duty -- honestly, you know I'm not going to try to trick you.  I don't do it that way.  If at any point you would like me to show you something to jog your memory, I certainly will do that.

What I'm representing to you is that, based on this e-mail that I'm looking at, you sent an e-mail on May 6th to the judge.  Does that sound about right?

A.   Yes.

Q.   Now, you agree, of course, that -- and, in fact, the State has argued in this very case that ex parte communications are frowned upon, aren't they?

A.   Yes.

Q.   You don't like it if a defense attorney has ex parte communications regarding any aspect of a case, do you?

A.   No.

Q.   Now, you knew our e-mail address, didn't you?

A.   Yes.

Q.   You certainly -- and, in fact, you've actually sent e-mails to the judge, cc'd every single lawyer in

this case; you've done that before, haven't you?

A.    Yes.

Q.    But on May 6th, Ms. Duty, you did not, did you?

A.    Not that I recall.

Q.    And, Ms. Duty, you would agree with me that that is an ex parte communication, is it not?

A.    Well, ex parte communications are about the facts of the case.

Q.    Okay.  So your testimony -- your sworn testimony is that you don't believe that that communication to the judge was ex parte communications?  Is that your sworn testimony, Ms. Duty?

A.    Yes.  I do not believe that that was an ex parte communication because it had nothing to do with the facts of the case.

Q.    Is there any particular reason why you did not cc the defense team, when you cc'd the defense team almost every other time that I know of you've e-mailed the judge?

A.    I guess because it wasn't about the facts of the case.

Q.    So that's the reason that you did not cc the defense team on your communication with the judge via e-mail on May 6th?

A.    Yeah, or I just didn't think about it.

Q.   It never entered your mind --

A.   No.

Q.   -- that we might -- if you don't mind, I've got to make this clear for the record.

It never entered your mind that it might be something we'd like to know that you're talking about the judge -- you're talking to the judge about speaking to a news outlet, knowing that we were in court when the judge said we were not to speak to the news outlets?

A.   It's not about the facts of the case, so, therefore, I didn't think that it was relevant to you.

Q.   Does it surprise you to know, Ms. Duty, that we would be very interested in a communication like that? Does that surprise you to know that right now?

A.   Well, of course you would be.

Q.   Right.  So you knew that we would want to know about that communication, but you actively did not include us --

A.   No, I didn't --

Q.   Ms. Duty.  Excuse me.  You actively did not include us in that communication; isn't that fair to say?

A.   I didn't think that through.

MR. BRUNNER:  Your Honor, that's been asked and answered about three times.

5946e212-947b-4ffa-bb95-c71002d1e87c

A.   I didn't think it through about how interested you would be in me talking to the Statesman reporter about defending myself against all of your ridiculous allegations.  No, I did not think that through.

Q.   (BY MR. DECK) And on May 7th, the very next day, the Austin American-Statesman, in fact, had an article, did it not?

A.   Yes.

Q.   And in that article, there are quotes from you; isn't that true?

A.   Yes.

Q.   And the reason why there are quotes from you is that you contacted a reporter with the Austin American-Statesman and you gave that reporter quotes, did you not?

A.   Yes.

Q.   And the very next day -- excuse me -- the same day that article came out, Judge Kennon sent an e-mail to all counsel, including you, to meet the very next morning, that Friday morning; isn't that true?

A.   I'm assuming your dates are right.

Q.   Fair enough.

A.   I could have sworn the article came out on Wednesday.  Is that right?  The article came out on Wednesday?

I don't recall how close in time everything happened, but, yes, I did get an e-mail from the judge.

Q.   It came out May 7th; is that fair to say?  I can jog your memory if you'd like.

A.   Is that a Wednesday or a Thursday.

Q.   I don't know that, Ms. Duty.  I'm not -- Thursday.

A.   All right.  Then, yes.

Q.   Okay.  So it comes out on Thursday with your quotes, and the very -- the very same day, the judge sends an e-mail to all counsel, making it very clear that he wanted to meet us the very next morning; is that fair to say?

A.   Yes.

Q.   Now, is it your sworn testimony, Ms. Duty --

THE COURT:  Before you go on, Counsel, can you approach?

(Bench conference on the record)

THE COURT:  I kind of know where you're going with all this, but what does it have to do with disqualification or recusal?

MS. JERNIGAN:  Violations of the court order and multiple professional conducts are what we're talking about now, Judge.  Because if you're going to

rule that we can't recuse her, we've got to build a record to show those violations.  We have to show her willful disdain for the rules of the court and our client's rights.

MR. BRUNNER:  "Our client's rights" and the "rules of the court" are two different things, Your Honor.  Mr. Harmel wasn't even at the meeting that we were all summoned to, Your Honor.  This was a lawyers-only meeting.  We'll proffer she wasn't here on Friday, the 8th.  We'll proffer that.

THE COURT:  Okay.  I understand what you're saying, but I agree that Friday conference/meeting, whatever you want to call it, really -- and I think I said it on the record -- didn't really have to do with, quote, "the facts or the issues in the Harmel case, it had to do with the violation of that court order."

MS. JERNIGAN:  Well, I realize that, Your Honor.  But prior to Your Honor taking the bench, I asked your bailiff if our client was going to be here, because I do think that behavior and conduct of this nature shows that she has personal animosity and has thrown all the rules out the window with respect to prosecuting my client.

MR. BRUNNER:  So because she didn't like

Page 44

Mr. Harmel, she didn't show up for court?  I think that's a stretch, Your Honor.

THE COURT:  Let's do it quick.

MR. DECK:  Okay.  Gotcha.

THE COURT:  To me, that's like a one- or two-question deal.

MR. DECK:  I get it.  I can.

THE COURT:  Okay.

(Bench conference ends)

THE COURT:  Go ahead, Mr. Deck.

MR. DECK:  Thank you, Judge.

Q.   (BY MR. DECK) The fact of the matter is, the judge set a hearing the very next morning; isn't that correct -- excuse me -- a meeting, I should say, at least, on May 8th?

A.   Yes.

Q.   Okay.  And, of course, you weren't there?

A.   Correct.

Q.   And isn't it true that later on May 8th you sent an e-mail to the judge?

A.   Yes.

Q.   And in that e-mail, you did cc all counsel in this case?

A.   I didn't?

Q.   No.  You did.

5946e212-947b-4ffa-bb95-c71002d1e87c

A.   Okay.  Okay.

Q.   Is that fair to say?

A.   I'm assuming so, yes.

Q.   Okay.  And also in that e-mail, you stated that you didn't show up because you were not given enough respect from the Court, and so therefore, you would not give respect to the Court by showing up to the hearing. Do you remember something to that effect?

A.   Something to that effect, yeah.

Q.   So it wasn't because your child was sick or anything like that, you didn't show up as a show of disrespect to the Court?

A.   No.  Actually, I had plans for that day.  I had that day off because I had family in town.

And so I said, I will attempt to rearrange my schedule if this is something important that I need to be there for.

And when I saw that it was going to be a 10-to-15-minute meeting, I thought, okay, well, it must not be something major if it's going to be so short. And the fact that the judge didn't tell me what it was about, I thought, well, I will send my co-counsel because I have plans for the day, and I'm not going to come up to the courthouse for 10 to 15 minutes if my co-counsel can be there.

5946e212-947b-4ffa-bb95-c71002d1e87c

Q.   And that's all fine and well, Ms. Duty, but I want to ask you about a specific sentence in your e-mail.

A.   Yes.

Q.   Okay.  "If you don't respect me enough to give me the information I requested, I will not give you" -- "you" being Judge Kennon; is that fair to say?

A.   Yes.

Q.   -- "I will not give you respect and show up." Isn't that what you wrote?

A.   Well, that's part.

Q.   Is that what you wrote, Ms. Duty?

A.   Yes, but that's only part of it.  The other part was that there -- it's one of two things:  One is, it wasn't important enough for me to be there --

Q.   Ms. Duty, unfortunately that's not my question, and your answer at this point is nonresponsive.  I just need you to answer my question, if you don't mind. Okay?

A.   Uh-huh.

Q.   One of the other lines in your e-mail -- and I'm going to quote you, and if for any reason you need to read your e-mail, of course, I have it -- quote, "But making a public spectacle out of punishing me just hurts everyone.  No one will come out unscathed."

Page 47

Did you write that Ms. Duty?

A.    Yes.

Q.    What did you mean by that?

A.    Well, when we have a battle, everybody -- everybody gets wounded.

Q.    Now, when I read that, Ms. Duty, I read that as a threat.  Was it a threat?

A.    No.  It's just the truth.  When public officials fight, it's -- it's ugliness, it's always in the media, and everybody ends up looking bad.

Q.    Isn't it true, Ms. Duty, that we -- and by "we" I mean all the counsel in this case, including the judge, including the court reporter -- we met on May 5th in the grand jury room, which is in your office; isn't that fair to say?

A.    Yes.

Q.    And isn't it also fair to say, Ms. Duty, that at that time, you had in your possession -- you had read the Defense's motion for continuance; isn't that fair to say?

A.    I'm sure I had it in my possession, but I probably hadn't read it.

Q.    Well, I mean -- let's talk about that for a moment.  I mean, because I know we had some discussions in Judge's chambers, and I remember you being very, very

5946e212-947b-4ffa-bb95-c71002d1e87c

upset about the allegation, according to you, that not all evidence was given to us from Detective Acevedo. I mean, obviously, did someone tell you that, or did you read it for yourself?

A.   I don't know how I knew that that was the allegation. Maybe I read it or maybe Mark and I talked about it and he said, you know, The allegation is that all the information is not on here. And that was the first that I had heard of it. Because I didn't actually look at the discs, so I didn't know what was on there.

Q.   So it's fair to say, then, one way or the other, you knew what was being asserted in that motion for continuance, roughly, at least; is that fair to say?

A.   Yes.

Q.   Okay. Now, you also, I assume, would agree with me that nothing -- nothing was going to stop you -- nothing could have stopped you, I should say, between bringing it up to the judge while we're there in the grand jury room, "Hey, Judge, I would like to speak to the news outlet," despite the fact of what you said in open court? You could have done that in that grand jury room, could you not have?

A.   At that time, it was not public -- I mean, it wasn't being reported on.

Q.   But you were certainly angry about it?

A.   Yeah.

Q.   And you know, of course, that anything filed with the clerk is public?

A.   Well, since you guys immediately sent it to the media, yeah.

Q.   That did not happen, Ms. Duty, but let's move on.  Okay?

I just want to make sure we're clear.  You knew that that motion for continuance was essentially in the public because it was in the clerk's office, did you not?

A.   But it had not been reported on.

Q.   But you knew it was -- it was free for the public to look at --

A.   Yes.

Q.   -- didn't you?

A.   Yes.

Q.   Okay.  Yet, you did not bring up to the judge at that point in time, with us present, that you might want to speak to any news outlets, did you?

I just need you to answer the question. Did you or did you not bring it up to the judge?

A.   At that time, no.

Q.   Ms. Duty, we know you contacted the Austin American-Statesman after the gag order was issued.  Did

5946e212-947b-4ffa-bb95-c71002d1e87c

you contact any other news or media outlets?

A.   No.   They're the only ones that did a story.

Q.   Okay.   So you didn't contact KXAN?

A.   No.

Q.   KEYE?

A.   No.

Q.   KVUE?

A.   No.

Q.   Excuse me.   Georgetown Advocate?

A.   No.

Q.   Ms. Duty, I would like to now kind of switch gears and talk about the video.   Okay?

And, of course, you wrote a State's response to Defense's supplemental motion to recuse/disqualify the District Attorney's Office, and in that response, you address a video.   So we know what video we're talking about, right?

A.   Yes.

Q.   Did you play any part in the production of that video?

A.   No.

Q.   You knew nothing about the video until it was completed and given to you by your husband, Daniel Hunsicker; is that correct?

A.   That's correct.

5946e212-947b-4ffa-bb95-c71002d1e87c

Page 71

A.   Yes.

Q.   And have things been said in staff meetings in the privacy of our own office that maybe sometimes are a little unprofessional?

A.   Yes.

Q.   Things we wouldn't want to see in the newspaper the next day, correct?

A.   Yes.

Q.   But we say it anyway?

A.   Yes.

Q.   Talking about newspapers, let's talk about this gag order.

When we -- when you asked the Court for an order, do you assume that the Court is going to issue a valid order?

A.   Yes.

Q.   Do you assume the Court is going to issue a constitutional order?

A.   Yes.

Q.   When we asked the Court in this case to issue a gag order to prevent talking to the media, did we also ask for the -- to limit, let's say, the Defense from posting to an e-mail LISTSERV and trying to use that as a proxy to get information out that way?

A.   Yes.

5946e212-947b-4ffa-bb95-c71002d1e87c

Q.   And did the judge agree to that?

A.   Yes.

Q.   Was that other part of our request and the judge's order to have the Defense not post things to the LISTSERV, did that make it to the written order that he signed -- the judge signed?

A.   No.

Q.   So that was said in open court to everybody here, correct?

A.   Correct.

Q.   The judge asked Defense counsel, Ms. Jernigan, to write the order, correct?

A.   Correct.

Q.   And she didn't write the entire order, did she?

A.   No.

Q.   Or at least everything the judge said?

A.   Correct.

Q.   He asked for more things, and there was only: No one can talk to the media.  Right?

A.   Yes.

Q.   There was nothing about a LISTSERV in there, was there?

A.   No.

Q.   Did we sit down and let the judge know that we agreed with the proposed order that Ms. Jernigan

5946e212-947b-4ffa-bb95-c71002d1e87c

proffered to the court?

A.   No.  I never saw it.

Q.   Was the order signed the same day as it was e-mailed out to us?

A.   Well, it wasn't e-mailed to me, but, yes.

Q.   And was it e-mailed only to me?

A.   Yes.  As far as -- as far as I know.

Q.   So, again, could have been cc'd to you -- you're the district attorney, correct?

A.   Yes.

Q.   Are you also the first chair attorney in this trial?

A.   Yes.

Q.   Also, we have an appellate attorney that's helping us out, Mr. Webster?

A.   Yes.

Q.   Was he cc'd on that gag order?

A.   No.

Q.   The wisdom of going against the gag order and reaching out to Claire Osborn from the Austin American-Statesman, was that stemming from a desire to deprive this gentleman down on my far right, Mr. Harmel, a fair trial?

A.   Absolutely not.

Q.   Was it in a sense of any animosity towards

Mr. Harmel?

A.   No.

Q.   Was it in a sense of any animosity towards the judge?

A.   No.

Q.   Were you fed up with the accusations of withholding evidence?

A.   Yes.  That's --

Q.   Did that get a little old?

A.   -- an understatement.  Yes.

Q.   Did you feel at that time you had had enough?

A.   Yes.

Q.   And maybe that's not an explanation -- a good excuse for possibly violating the gag order, but that's the explanation, isn't it?

A.   It is.

Q.   Didn't call a press conference?

A.   No.

Q.   Didn't go down your rolodex and call everybody else, right?

A.   No.

Q.   One reporter wrote a story, and you contacted that one reporter, didn't you?

A.   Yes.

Q.   Ms. Duty, are prosecutors allowed to believe

that the Defendant committed a crime?

A.    Yes.

Q.    If a defense attorney believes that his client committed a crime, is a defense attorney still allowed to defend that person?

A.    Yes.

Q.    If a judge believes that someone committed a crime, are they still -- if they keep it to themselves, at least, are they still able to judge the case and listen to the evidence and weigh it fairly?

A.    Yes.

Q.    In fact, are we the only ones in that equation between defense attorney, judge, and State, we're the only ones that have to believe that the Defendant did it, correct?

A.    Yes.

Q.    If we didn't believe that someone did it, we'd have to dismiss the case, wouldn't we?

A.    Yes.

Q.    So the fact that you have said things either in public or privately that you believe Mr. Harmel is guilty, well, that's why we're all here, correct?

A.    Yes.

Q.    If you didn't believe that, you wouldn't be first chair, and we wouldn't be prosecuting this case,

would we?

A.    Correct.

          MR. BRUNNER:  I'll pass the witness.

          THE COURT:  Mr. Deck?

          MR. DECK:  Thank you, Judge.

                REDIRECT EXAMINATION

BY MR. DECK:

Q.    Ms. Duty, I want to talk about the ideal way that a lawyer would handle the gag order situation. Okay?

          MR. BRUNNER:  Your Honor, this is not relevant.  We're now getting into a CLE lecture here. This is --

          THE COURT:  You brought it up, Mr. Brunner, in your questioning.  I'm going to allow a little bit of it, but not a lot.

          MR. BRUNNER:  Those are the magic words, Your Honor.  Thank you.  I'll settle for that.

Q.    (BY MR. DECK) Ms. Duty, what a lawyer could do in that situation, the situation you found yourself in, a lawyer could go down to the clerk's office and verify whether or not there is a written gag order issued by the judge.  Couldn't a lawyer do that?

A.    Yes.

Q.    And if she did and she found that there was a

5946e212-947b-4ffa-bb95-c71002d1e87c

gag order and she found that that gag order, for whatever reason, was unconstitutional, couldn't that lawyer then file a motion stating that the gag order was unconstitutional?  Could she do that?

A.   Yes.

Q.   Could that lawyer then set that motion for a hearing in front of Judge Kennon, the judge who issued the order, and have him hear it to determine whether or not that order was constitutional?

A.   Yes.

Q.   And if that judge found that the order was, indeed, constitutional [sic], and turns out you're allowed to speak to the media and then you do, wouldn't that be the most ideal, the most legal way of handling a gag order situation?

A.   If I knew it was there, I would have gone down that direction, yes.

Q.   Ms. Duty, we're going to go back to the first question.  Could a lawyer go down to the clerk's office and check?

A.   Yes.  Yes.

Q.   But you didn't do any of those things, did you, Ms. Duty?

A.   I don't even have to go to the clerk's office. I can just pull it up on my computer.

5946e212-947b-4ffa-bb95-c71002d1e87c

Page 78

Q.   Even better.  You didn't even do that, Ms. Duty, did you?

A.   I did not look to see if there was an order in place.

Q.   And as the judge mentioned in the hearing -- I think it was the one that you weren't there for -- the other thing a lawyer could do is she could file a responsive pleading, taking issue with the assertions made in the Defendant's pleading.  Could a lawyer not do that?

A.   Yes.  I did.

Q.   A lawyer could do that instead of talking to a news outlet, without verifying whether or not there's an order.  Couldn't a lawyer do that?

A.   I -- yeah.  I did file a responsive pleading, yes.

Q.   You did, Ms. Duty.  But isn't it true that you did it after you spoke to a news media outlet, in direct contradiction of what Judge Kennon said in open court?

A.   What he said in open court was that there was going to be an order put in place.

Q.   Okay.  So --

A.   And as far as I knew, there was not yet an order put in place, a written order, to my knowledge --

Q.   Fair enough.

5946e212-947b-4ffa-bb95-c71002d1e87c

A.    -- at that time.

Q.    So just you felt like anyone could speak to the media after that day in court?  Anyone could have spoken to the media right up to the point that a written order was signed by the judge?  Is that your interpretation of what happened that day, Ms. Duty?

A.    Very limited circumstances of what you could talk about, yes.

MR. DECK:  One moment, Judge, please.

Q.    (BY MR. DECK) Ms. Duty, you were in court on April 8th regarding this case, were you not?

A.    I'm assuming so.

Q.    Right.  Because you were in court for everything regarding this case except for one time; isn't that fair to say?

A.    Probably, yes.

Q.    And, again, if you need your memory refreshed, of course, we have the transcript.

Mr. Brunner said near the end of that -- near the end of the hearing on April 8th, "Your Honor, the gag order is still in effect?"

That was a question.

The Court said, "Yes."

Mr. Brunner said, "Thank you, Your Honor."

So is it your sworn testimony here today,

Page 80

Ms. Duty, that there was not an order in effect, even though your first assistant asked that exact question in front of you to this judge?  Is it your sworn testimony, Ms. Duty, that it was not in effect?

A.   Well, if it's a valid gag order and it's in effect, then that allows you to still do certain things.

Q.   Ms. Duty --

A.   So I'm assuming that if the judge is saying, "Yes, there's a gag order in place," that it's a valid gag order.  And a valid gag order is very specific. It's not one sentence.  It's usually about a page long, and it talks about what's restricted and what is not. And under most gag orders that I have seen, being able to defend yourself is excluded.  You can do that.  You just can't talk about the facts of the case.

Q.   Ms. Duty, you've never felt like you couldn't -- in these hearings, you've never felt like you couldn't speak up to the judge in these hearings, right?  I mean, you've always been able to speak up to the judge if you wanted to, right?

A.   Yes.

Q.   And so if Mr. Brunner asks, "Your Honor, the gag order is still in effect?" and he response, "Yes," and your first assistance says, "Thank you, Your Honor," could you not have said, "Judge, hold up.  Let's talk

about that order.  What exactly does it entail?"  Could you not have done that?

A.   I was assuming that Ms. Jernigan --

Q.   I'm asking you -- no, no.  I'll be very clear.

A.   Yes.  Could I have done that?  Yes.

Q.   And, of course, you did not?

A.   No, I didn't.

Q.   And isn't it true that your office challenged the gag order at the Court of Appeals just this week, and your petition was denied?

MR. BRUNNER:  Objection, Your Honor.  This is not relevant.

THE COURT:  Actually, Ms. Duty has made it relevant.

So go ahead and ask the question.

MR. BRUNNER:  How is that, Your Honor?

THE COURT:  Because her whole point is it's not a valid order.

MR. BRUNNER:  Okay.

Q.   (BY MR. DECK) So isn't it true, Ms. Duty, that your office filed with the Court of Appeals a challenge to the gag order?  Isn't that true?  That just happened this week?

A.   Yes.

Q.   And isn't it also true that we found out very

5946e212-947b-4ffa-bb95-c71002d1e87c

Page 82

late yesterday that your petition was denied?  Isn't that true?

    A.   On procedural grounds, yes.  So it will be refiled.

    Q.   But that's not -- wait.  Just so we're clear, that's not what it said, though, right?  It didn't say --

    A.   It --

    Q.   Wait a minute.  Let me be very clear.

            Did it say it's denied on procedural grounds?  Because I don't remember hearing -- seeing that.  Is that what it said?

    A.    It cites a specific statute section, and that's what that section stands for.

            THE COURT:  Have you read the order? Because, no, it doesn't.

            THE WITNESS:  It cites a specific statute.

            MR. BRUNNER:  Your Honor, we're talking about legal conclusions here, and we're going to have lawyers arguing about what other lawyers --

            THE COURT:  Pull the order.  If you want to read the order, read the order.

            MS. JERNIGAN:  If I could just have a moment to pull it up, Your Honor?

    Q.   (BY MR. DECK) While she's pulling it up,

Page 83

Ms. Duty, I mean, if you don't remember, you don't remember, and that's totally fine.

THE COURT:  I have it, if you need it.

MR. DECK:  Okay.  Do you mind if we approach, Judge?

THE COURT:  Sure.

Q.   (BY MR. DECK) Ms. Duty, I assume that if I showed you the actual order, it would jog your memory?

A.   Well, I haven't seen it.

THE COURT:  It does cite a rule, just so you know.

Q.   (BY MR. DECK) Okay.  But you haven't seen it, Ms. Duty?

A.   No.

Q.   Ms. Duty, did you -- just one question.  You haven't seen it, Ms. Duty?

A.   I have not actually physically seen it.

Q.   Okay.  Fair enough.

And you just -- under sworn testimony, you said that it actually states something.  Where did you get that information, Ms. Duty?

A.   Mr. Webster called me yesterday afternoon -- yesterday afternoon when he got notice of that.

Q.   Okay.  So your impression is -- when it says, "The emergency temporary relief is dismissed as moot,"

Page 84

your impression is that it was dismissed solely on procedural grounds?

A.   The specific rule that is cited implies that it is -- there was, like, something, a box not checked or something missed or something not, you know, attached; that it's not an actual -- it's not -- it's not a ruling on the merits.

MR. BRUNNER:  Your Honor, it's been denied.  It's been denied.  We know that.  And so what her interpretation of it is --

MS. JERNIGAN:  She gets to be impeached.

THE COURT:  Well, I'm not sure why -- where she's getting the information that she's getting, but I've seen the order, and it doesn't say anything like that.

That being said, I'm not sure why it has anything to do with this at this point in time, anyway.

MR. BRUNNER:  Thank you.  I renew my relevance objection, Your Honor.

THE COURT:  That's sustained.

MR. DECK:  Pass the witness.

MR. BRUNNER:  No further questions.

THE COURT:  Thank you, Ms. Duty.

MR. DECK:  Judge, we rest.

THE COURT:  Do you have any witnesses on

5946e212-947b-4ffa-bb95-c71002d1e87c

for murder, and I don't expect her to think he's a great guy and say great things about him.

So I understand that, especially in the motion that's been filed by the State on the motion to -- I mean, sorry -- by the Defense on the motion to recuse and disqualify has a long list of allegations that the Defense believes are violations of the Texas Rules of Professional Conduct by Ms. Duty with regard to this case and how it affects Mr. Harmel and due process violations.

That being said, looking at -- I still think under the case law, unless the Court of Criminal Appeals gives us another opinion that expands that, I don't think I have authority to disqualify her in this case, except under very, very limited circumstances. And violations, even if I believe that they were violations of the Rules of Professional Conduct, I don't think that gives me authority to disqualify her.

So I'm going to deny the Defense's motion to disqualify the District Attorney's Office in this case.

Are y'all ready to start the double jeopardy issue?  Okay.  Let's -- go ahead, Mr. Brunner.

MR. BRUNNER:  You saw me move, Judge.

We can start that.  Just some procedural

matters real quick, Your Honor, about some other filings that we had made that I would seek rulings on, but that would be very fast.

THE COURT:  Okay.  Well, let's take a 15-minute break.  Let's start back at 11:00.

MR. BRUNNER:  11:00, Your Honor.  Thank you.

(Recess from 10:42 to 11:04)

(Open court, Defendant present)

THE COURT:  Okay.  We're back on the record in Cause No. 13-0826-K277, State versus Crispin Harmel.

We're ready to proceed on the Defense's pretrial motion for writ; is that correct?

MR. DECK:  Sure are, Judge.

MR. WEBSTER:  Judge?

THE COURT:  Yes.

MR. WEBSTER:  If I can interject, prior to this I filed a motion asking the Court to void the gag order, and I wanted to ask the Court to either grant or deny that motion.

THE COURT:  That's denied.

MR. WEBSTER:  That's denied?  Thank you, Judge.

THE COURT:  Are you talking about voiding

5946e212-947b-4ffa-bb95-c71002d1e87c

Page 96

the one that's there or enter the new one that you wanted?

MR. WEBSTER:  My request is that you void -- the first motion was to void the gag order that is currently present.

THE COURT:  Okay.  And on what grounds?

MR. WEBSTER:  I would just reassert my argument that was made in that motion that was filed with the Court and the Defense.

THE COURT:  Based on you think it's unconstitutional?

MR. WEBSTER:  Yes, Your Honor.

THE COURT:  I'm assuming you're aware of the Doctrine of Estoppel?

MR. WEBSTER:  I'm just asserting my motion.

THE COURT:  I'm assuming you're aware of the Doctrine of Estoppel?

MR. WEBSTER:  I don't believe it applies in this case, Your Honor.

THE COURT:  Really?  One of the cases that you gave me clearly said that you can't object to an order that you agreed to be entered.

MR. WEBSTER:  At this time we're objecting to it, and we're asking you to declare it void.

THE COURT:  Okay.  I'm going to deny that motion.  And my reason for denying that motion is the State requested the motion; the Defense did not object to that motion; I said on the record what my ruling was; Mr. Brunner said, "That's great, Your Honor," agreeing to the language of the order; and there was no objection to it.

And so if y'all want to agree to vacate that order, if you guys want to go yell at the media all day long, you can if you want to.  The only reason I entered this is because that's what you wanted, and nobody objected to it.

If you want to enter a different gag order, then you need to put on evidence that meets all the criteria that you wanted in the proposed gag order that you filed in your other motion.  But you would have to present evidence that would justify those findings in order to enter that particular type of order.

MR. WEBSTER:  For the record, then, Judge, I would at least like to, in a similar fashion, object to your ruling and take exception to your ruling on the unconstitutionality of the current gag order.

THE COURT:  Sure.

MS. JERNIGAN:  May I state something just for the record, Judge?

5946e212-947b-4ffa-bb95-c71002d1e87c

THE COURT:  Sure.

MS. JERNIGAN:  There's been a lot of discussion about the fact that I drafted the order that was at the Court's request.  And just so the record is clear, I didn't come up with that language on my own, that's language that I found in a case that ratified a gag order using that exact same language.

So just so the Court is clear, I didn't come up with the language for the gag order.  I modeled it after what Your Honor asked and after reviewing case law to determine the proper language.

THE COURT:  Okay.  Thank you.

Anything else?

MR. WEBSTER:  Just so I'm clear, it's an expressed denial of our request to void the gag order?

THE COURT:  That is correct.  If you have an order that you want me to sign, I'll be glad to sign it.

MR. WEBSTER:  Thank you, Judge.

MR. BRUNNER:  Thank you, Your Honor.  We have no more particular motions at this time.

THE COURT:  Okay.

MR. DECK:  The Defense calls Jana Duty, Judge.

And, of course, Judge, we're going to

5946e212-947b-4ffa-bb95-c71002d1e87c

A.   Yes.

Q.   When Mr. Harris was still working with us, correct?

A.   Yes.

Q.   And at that time, when you were kind of wrapping your brain around the case, you may or may not have been using, quote, the "proper player," correct?

A.   Correct.

Q.   You don't recall exactly, do you?

A.   I don't.

Q.   When you were in trial mode and preparing discrete exhibits, prepping your trial team -- which did not include Mr. Harris at the time, correct, did it?

A.   That's correct.

Q.   When you were in trial mode, as you say, were you using the correct player?

A.   No.

Q.   When you were in trial mode, did that correspond when Mr. Deck was kind of in trial mode and was really ramping up his request for, quote, "the copies with the time-stamps"?

A.   I'd say that's right.

Q.   And at that time, you were not using the right player, were you?

A.   I was not.

5946e212-947b-4ffa-bb95-c71002d1e87c

Q.   And all along, they had, quote, "the copy with the time-stamps," right?

A.   Yes.

Q.   To the extent that anything is encrypted, hidden, whatever, on these videos, time-stamps are not obvious, you didn't make them not obvious, right?

A.   No.

Q.   That's just how it came to us, correct?

A.   Yes.

Q.   And we had the same technical problem they had for weeks, correct?

A.   A lot longer than weeks.  I mean, the whole time that we had this case, yes.

Q.   Persisting into the start of the trial, correct?

A.   Yes.

Q.   To prevail on a double jeopardy motion against the State, Defense has to prove that the State was trying to cause -- intentionally cause a mistrial.

Were you intentionally trying to cause a mistrial through any of your actions in this case?

A.   Absolutely not.

Q.   To legally prevail, they have to prove that we were trying to prevent an acquittal.  Were we trying to prevent an acquittal, Ms. Duty?  Were you at any time in

5946e212-947b-4ffa-bb95-c71002d1e87c

STATE OF TEXAS

COUNTY OF WILLIAMSON

I, SIMONE M. WRIGHT, Official Court Reporter in and for the 368th District Court of Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $        and was paid/will be paid by Williamson County.

WITNESS MY OFFICIAL HAND on this, the 8th day of June, 2015.

                              /s/Simone M. Wright

                         SIMONE M. WRIGHT, CSR
                         Texas CSR 3266
                         Official Court Reporter
                         368th District Court
                         Williamson County, Texas
                         405 Martin Luther King, Box 8
                         Georgetown, Texas  78626
                         Telephone:  (512) 943-1280
Job No. 164              Expiration:  12/31/2016

CODE OF CRIMINAL PROCEDURE

TITLE 1. CODE OF CRIMINAL PROCEDURE

CHAPTER 4. COURTS AND CRIMINAL JURISDICTION

Art. 4.04. COURT OF CRIMINAL APPEALS

Sec. 1. The Court of Criminal Appeals and each judge thereof shall have, and is hereby given, the power and authority to grant and issue and cause the issuance of writs of habeas corpus, and, in criminal law matters, the writs of mandamus, procedendo, prohibition, and certiorari.  The court and each judge thereof shall have, and is hereby given, the power and authority to grant and issue and cause the issuance of such other writs as may be necessary to protect its jurisdiction or enforce its judgments.

Sec. 2. The Court of Criminal Appeals shall have, and is hereby given, final appellate and review jurisdiction in criminal cases coextensive with the limits of the state, and its determinations shall be final.  The appeal of all cases in which the death penalty has been assessed shall be to the Court of Criminal Appeals.  In addition, the Court of Criminal Appeals may, on its own motion, with or without a petition for such discretionary review being filed by one of the parties, review any decision of a court of appeals in a criminal case. Discretionary review by the Court of Criminal Appeals is not a matter of right, but of sound judicial discretion.

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.

Amended by Acts 1971, 62nd Leg., p. 2536, Sec.6, eff. Aug. 30, 1971;  Acts 1981, 67th Leg., p. 802, ch. 291, Sec. 103, eff. Sept. 1, 1981.

CODE OF CRIMINAL PROCEDURE

TITLE 1. CODE OF CRIMINAL PROCEDURE

CHAPTER 44. APPEAL AND WRIT OF ERROR

Art. 44.01. APPEAL BY STATE.  (a)  The state is entitled to appeal an order of a court in a criminal case if the order:

(1) dismisses an indictment, information, or complaint or any portion of an indictment, information, or complaint;

(2) arrests or modifies a judgment;

(3) grants a new trial;

(4) sustains a claim of former jeopardy;

(5) grants a motion to suppress evidence, a confession, or an admission, if jeopardy has not attached in the case and if the prosecuting attorney certifies to the trial court that the appeal is not taken for the purpose of delay and that the evidence, confession, or admission is of substantial importance in the case;  or

(6) is issued under Chapter 64.

(b) The state is entitled to appeal a sentence in a case on the ground that the sentence is illegal.

(c) The state is entitled to appeal a ruling on a question of law if the defendant is convicted in the case and appeals the judgment.

(d)  The prosecuting attorney may not make an appeal under Subsection (a) or (b) of this article later than the 20th day after the date on which the order, ruling, or sentence to be appealed is entered by the court.

(e) The state is entitled to a stay in the proceedings pending the disposition of an appeal under Subsection (a) or (b) of this article.

(f) The court of appeals shall give precedence in its docket to an appeal filed under Subsection (a) or (b) of this article.  The state shall pay all costs of appeal under Subsection (a) or (b) of this article, other than the cost of attorney's fees for the defendant.

(g) If the state appeals pursuant to this article and the defendant is on bail, he shall be permitted to remain at large on the existing bail.  If the defendant is in custody, he is entitled to reasonable bail, as provided by law, unless the appeal is from an order which would terminate the prosecution, in which event the defendant is entitled to release on personal bond.

(h) The Texas Rules of Appellate Procedure apply to a petition by the state to the Court of Criminal Appeals for review of a decision of a court of appeals in a criminal case.

(i) In this article, "prosecuting attorney" means the county attorney, district attorney, or criminal district attorney who has the primary responsibility of prosecuting cases in the court hearing the case and does not include an assistant prosecuting attorney.

(j) Nothing in this article is to interfere with the defendant's right to appeal under the procedures of Article 44.02 of this code.  The defendant's right to appeal under Article 44.02 may be prosecuted by the defendant where the punishment assessed is in accordance with Subsection (a), Section 3d, Article 42.12 of this code, as well as any other punishment assessed in compliance with Article 44.02 of this code.

(k) The state is entitled to appeal an order granting relief to an applicant for a writ of habeas corpus under Article 11.072.

(l)  The state is entitled to appeal an order entered under:

(1)  Subchapter G or H, Chapter 62, that exempts a person from complying with the requirements of Chapter 62; and

(2)  Subchapter I, Chapter 62, that terminates a person's obligation to register under Chapter 62.

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.

Amended by Acts 1981, 67th Leg., p. 812, ch. 291, Sec. 123, eff. Sept. 1, 1981;  Acts 1987, 70th Leg., ch. 382, Sec. 1;  Subsec. (a) amended by Acts 2003, 78th Leg., ch. 13, Sec. 7, eff. Sept. 1, 2003.  Subsec. (k) added by Acts 2003, 78th Leg., ch. 587, Sec. 2, eff. June 20, 2003.
Amended by:

Acts 2005, 79th Leg., Ch. 1008 (H.B. 867), Sec. 1.04, eff. September 1, 2005.

Acts 2007, 80th Leg., R.S., Ch. 1038 (H.B. 1801), Sec. 2, eff. September 1, 2007.

## Section Five. Proceedings in the Court of Criminal Appeals

## Rule 72. Extraordinary Matters

### 72.1. Leave to File

A motion for leave to file must accompany an original petition for writ of habeas corpus, mandamus, procedendo, prohibition, certiorari, or other extraordinary writ, or any other motion not otherwise provided for in these rules.

### 72.2. Disposition

If five judges tentatively believe that the case should be filed and set for submission, the motion for leave will be granted and the case will then be handled and disposed of in accordance with Rule 52.7. If the motion for leave is denied, no motions for rehearing or reconsideration will be entertained. But the Court may, on its own initiative, reconsider a denial of a motion for leave.

### Notes and Comments

Comment to 1997 change: This is former Rule 211. The rule is amended to include all the Court's jurisdiction of extraordinary matters. Internal procedures of the Court are deleted. Other nonsubstantive changes are made.

THE TEXAS CONSTITUTION

ARTICLE 1. BILL OF RIGHTS

That the general, great and essential principles of liberty and free government may be recognized and established, we declare:

Sec. 1.  FREEDOM AND SOVEREIGNTY OF STATE.  Texas is a free and independent State, subject only to the Constitution of the United States, and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government, unimpaired to all the States.

Sec. 2.  INHERENT POLITICAL POWER; REPUBLICAN FORM OF GOVERNMENT.  All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit.  The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.

Sec. 3.  EQUAL RIGHTS.  All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

Sec. 3a.  EQUALITY UNDER THE LAW.  Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin.  This amendment is self-operative.

(Added Nov. 7, 1972.)

Sec. 4.  RELIGIOUS TESTS.  No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on

account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.

Sec. 5. WITNESSES NOT DISQUALIFIED BY RELIGIOUS BELIEFS; OATHS AND AFFIRMATIONS. No person shall be disqualified to give evidence in any of the Courts of this State on account of his religious opinions, or for the want of any religious belief, but all oaths or affirmations shall be administered in the mode most binding upon the conscience, and shall be taken subject to the pains and penalties of perjury.

Sec. 6. FREEDOM OF WORSHIP. All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

Sec. 7. APPROPRIATIONS FOR SECTARIAN PURPOSES. No money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes.

Sec. 8. FREEDOM OF SPEECH AND PRESS; LIBEL. Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public

information, the truth thereof may be given in evidence.  And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

THE TEXAS CONSTITUTION

ARTICLE 5. JUDICIAL DEPARTMENT

Sec. 5.  JURISDICTION OF COURT OF CRIMINAL APPEALS; TERMS OF COURT; CLERK.  (a) The Court of Criminal Appeals shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases of whatever grade, with such exceptions and under such regulations as may be provided in this Constitution or as prescribed by law.

(b)  The appeal of all cases in which the death penalty has been assessed shall be to the Court of Criminal Appeals.  The appeal of all other criminal cases shall be to the Courts of Appeal as prescribed by law.  In addition, the Court of Criminal Appeals may, on its own motion, review a decision of a Court of Appeals in a criminal case as provided by law.  Discretionary review by the Court of Criminal Appeals is not a matter of right, but of sound judicial discretion.

(c)  Subject to such regulations as may be prescribed by law, the Court of Criminal Appeals and the Judges thereof shall have the power to issue the writ of habeas corpus, and, in criminal law matters, the writs of mandamus, procedendo, prohibition, and certiorari.  The Court and the Judges thereof shall have the power to issue such other writs as may be necessary to protect its jurisdiction or enforce its judgments.  The court shall have the power upon affidavit or otherwise to ascertain such matters of fact as may be necessary to the exercise of its jurisdiction.  (Amended Aug. 11, 1891, Nov. 8, 1966, Nov. 8, 1977, Nov. 4, 1980, and Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 5: See Appendix, Note 3.)

UNITED STATES CONSTITUTION


FIRST AMENDMENT


Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.